## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EXPLOROLOGIST LIMITED, | ) | Civil Action No. 2:07-cv-01848-LP |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | The Honorable |
| | ) | Louis H. Pollak |
| BRIAN SAPIENT aka BRIAN J. CUTLER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### APPENDIX OF FOREIGN AUTHORITIES

Defendant attaches hereto the following authorities cited in his Motion to Dismiss Plaintiff's Complaint, electronically filed on June 11, 2007:

1. Copinger and Skone James on Copyright I §§ 7-24, 7-27(b), 7-114 -7:115, 22:116 (Kevin Garnett et al. eds., 15th ed. 2005)

2. Copyright, Designs and Patents Act 1988, s.20(2)

3. *Designer's Guild Ltd v Russel Williams (Textiles) Ltd* [2001] 1 W.L.R. 2416

4.  *Ladbroke (Football) Ltd v William Hill (Football) Ltd* [1964] 1 W.L.R. 273

Respectfully submitted,

Samuel W. Silver (Pa. I.D. No. 56596)
Chad Cooper (Pa. I.D. No. 90067)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA  19103-7286
(215) 751-2309; (215) 751-2269

*Attorneys for Defendant,*
*Brian Sapient*

Dated:  June 11, 2007

# APPENDIX OF FOREIGN AUTHORITIES ITEM 1

# COPINGER AND SKONE JAMES

## on

## COPYRIGHT

## VOLUME ONE

# COPINGER AND SKONE JAMES

on

## COPYRIGHT

FIFTEENTH EDITION

BY

**KEVIN GARNETT, M.A.**
*One of Her Majesty's Counsel*

**GILLIAN DAVIES, D.L., Ph.D.**
*Barrister*

**GWILYM HARBOTTLE, B.A. (Oxon)**
*Barrister*

LONDON
SWEET & MAXWELL
2005

---

**AUSTRALIA**
Law Book Co.—Sydney

**CANADA** and **USA**
Carswell—Toronto

**HONG KONG**
Sweet & Maxwell Asia

**NEW ZEALAND**
Brookers—Wellington

**SINGAPORE** and **MALAYSIA**
Sweet & Maxwell Asia
Singapore and Kuala Lumpur

ISBN 0-421-87650-6

9 780421 876507

SENIOR EDITORS

Kevin Garnett, M.A.,
One of Her Majesty's Counsel
Bencher of Lincoln's Inn

Gillian Davies, D.L., Ph.D.
of Lincoln's Inn, Barrister
Honorary Professor, University of Wales, Aberystwyth
Chairman of a Technical Board of Appeal and
Member of the Enlarged Board, European Patent Office

Gwilym Harbottle, B.A. (Oxon)
of Lincoln's Inn, Barrister

SPECIALIST EDITORS

INDUSTRIAL DESIGNS
Nicholas Caddick, M.A.,
B.C.L.
of the Middle Temple, Barrister

TAXATION
Aparna Nathan, LL.B. Hons,
LLM
of the Middle Temple, Barrister

THE PUBLISHING INDUSTRY
Bernard Nyman, B.A.
Sole Principal, BM Nyman & Co,
London

THE NEWSPAPER INDUSTRY
Peter Wienand, B.A.
Partner, Farrer & Co, London

THE MUSIC INDUSTRY
Antony Bebawi, Euro LL.B
Partner, Harbottle & Lewis LLP,
London

THE FILM INDUSTRY
Adrian Barr-Smith, M.A.
Partner, Denton Wilde Sapte,
London

THE BROADCASTING
INDUSTRY
Stephen Edwards, M.A.
Partner, Richards Butler,
London

THE THEATRE, THE OPERA
AND THE BALLET
D. Michael Rose, LL.B
Consultant and Former Partner,
Tarlo Lyons, London

THE ADVERTISING
INDUSTRY
Charles Swan, M.A.
Partner, The Simkins Partnership,
London

THE COMPUTER SOFTWARE
INDUSTRY
Vanessa Marsland
Partner, Clifford Chance LLP,
London

First edition by W.A. Copinger .................... 1870
Second edition by W.A. Copinger .................. 1881
Third edition by W.A. Copinger ................... 1893
Fourth edition by J.M. Easton .................... 1904
Fifth edition by J.M. Easton ..................... 1915
Sixth edition by F.E. Skone James ................ 1927
Seventh edition by F.E. Skone James .............. 1936
Eighth edition by F.E. Skone James ............... 1948
Ninth edition by F.E. & E.P. Skone James ......... 1958
Tenth edition by E.P. Skone James ................ 1965
Eleventh edition by E.P. Skone James ............. 1971
Second imprint by E.P. Skone James ............... 1977
Twelfth edition by E.P. Skone James; John F. Mummery
  and J.E. Rayner James .......................... 1980
Thirteenth edition by E.P. Skone James, John F. Mummery,
  J.E. Rayner James and K.M. Garnett ............. 1991
Fourteenth edition by K.M. Garnett, J.E. Rayner James
  and G. Davies ................................. 1999
Fifteenth edition by K.M. Garnett, G. Davies and G. Harbottle .... 2005

Published in 2005 by Sweet & Maxwell Limited
of 100 Avenue Road, London, NW3 3PF
(www.sweetandmaxwell.co.uk)
Typeset by Sweet & Maxwell's electronic publishing system
Printed and bound in Great Britain by Bath Press, UK

No natural forests were destroyed to make this product,
only farmed timber was used and replanted

A CIP catalogue record for this book is available from the British Library

ISBN 0421 876 506

All rights reserved. Crown copyright material is reproduced with the
permission of the Controller of HMSO and the Queen's Printer for Scotland.

No part of this publication may be reproduced or transmitted in any form or
by any means, or stored in any retrieval system of any nature without prior
written permission, except for permitted fair dealing under the Copyright,
Designs and Patents Act 1988, or in accordance with the terms of a licence
issued by the Copyright Licensing Agency in respect of photocopying and/or
reprographic reproduction. Application for permission for other use of
copyright material including permission to reproduce extracts in other
published works shall be made to the publishers. Full acknowledgment of
author, publisher and source must be given.

© Sweet & Maxwell Limited
2005

# CHAPTER SEVEN

# THE RIGHTS OF A COPYRIGHT OWNER: PRIMARY INFRINGEMENT

*Contents*                                                                  *Para.*
1. Introduction                                                        7-01
2. The reproduction right                                             7-09
   A.  Introduction                                                   7-09
   B.  Substantial part                                               7-23
   C.  Literary, dramatic, musical and artistic works                7-31
   D.  Sound recordings                                               7-67
   E.  Films                                                          7-70
   F.  Broadcasts                                                     7-72
   G.  Typographical arrangements                                    7-74
3. The issue of copies to the public: the distribution right          7-76
4. The rental and lending rights                                      7-81
5. Performance, showing or playing of a work in public: the pub-
   lic performance right                                              7-91
6. The communication to the public right                             7-98
7. The adaptation right                                              7-121
8. Authorisation                                                     7-130

## 1. INTRODUCTION

Copyright is a statutory property right, the rights of property granted being the **7-01**
exclusive right to do various "restricted acts" in relation to the copyright work.
Being a property right, the rights of a copyright owner can be sold or licensed. In
a commercial context, therefore, it is common to ask what are the *rights* of a
copyright owner which are available or need to be obtained. As to enforcement of
those rights, the remedy for invasion of a copyright owner's exclusive rights by a
third party is, by statutory definition, an action for infringement. In the context of
litigation, therefore, it is common to ask what are the acts that amount to an
*infringement*. These two viewpoints merely represent a different side of the same
coin. Infringement only occurs if one of the exclusive rights of the copyright
owner has been invaded.

**Primary and secondary infringement.** This chapter is concerned with the **7-02**
exclusive rights which are conferred on a copyright owner and what amounts to
an infringement of those rights. In addition, however, the 1988 Act provides ad-
ditional remedies to copyright owners in respect of various dealings in relation to
copyright works and infringing copies. The common and necessary ingredients
of these remedies are that (a) they only arise when some other infringing act has
occurred or is assumed to have occurred ("the primary infringement") and (b) the
liability of a defendant is dependent on establishing some degree of "guilty"
knowledge on his part. The acts in respect of which these remedies are available
are also classified as infringements and although they are not strictly invasions of
any of the exclusive property rights which are expressly conferred on the copy-

an infringing copy as including any copy or colourable imitation of a work[47] (in addition to defining "copyright" as the sole right to produce or reproduce the work or any substantial part of it[48]) but was no longer included as part of the definition of infringement in the 1956 or 1988 Acts.[49] Although the expression is sometimes still used,[50] it is suggested that since the ordinary meaning of colourable is that the change is designed to disguise the fact that use has been made of the claimant's work,[51] it does not add to the discussion of what amounts to impermissible copying. The defendant's state of mind, in particular whether the changes were made deliberately in an attempt to throw off the suspicion of copying, is irrelevant. The only relevant question is whether there has been a copying of a substantial part of the claimant's work. In order to answer this question, it is necessary to identify, first, what elements or features of the copyright work have been taken and then, secondly, to ask whether those elements amount to a substantial part of the copyright work, applying the tests set out below.[52] The approach is therefore no different in principle to that applied in relation to the first category of cases, although more difficult to apply because of the requirement to identify, as a first step, the elements or features which have been taken. It may be tempting, particularly in cases of artistic or musical works where it is often difficult to describe in words what has been taken, to ask whether the offending work looks or sounds like the copyright work or, conversely, to reach a conclusion that since it does not look or sound like the copyright work, no substantial part has been taken. This approach is incorrect, however, and may lead to the wrong conclusion.[53]

(c) In the third class of case, it is again necessary to identify what part or parts of the copyright work have been copied and then ask whether they amount to a substantial part of the whole work.

Although, therefore, types of copying can be differently categorised, the test remains the same.

7-24  **Substantial part and permitted uses.**  The question of what amounts to a substantial part is not answered simply by balancing the interests of the author or copyright owner against the general public interest in being able to reproduce parts of a work for certain purposes, since this latter interest can to a large extent be assumed to be safeguarded by the various permitted acts to which today the

ing the whole or part with colourable alterations; (4) reproduction under an abridged form and; (5) translation. See Copinger (4th ed., 1904), pp.156 et seq.
47 s.35(1).
48 s.1(2).
49 Although the expression is still used in the separate context of what constitutes publication of a work for the purposes of satisfying the qualification provisions of the Act. Thus CDPA 1988, s.175 states that references to publication "do not include publication which is merely colourable and not intended to satisfy the reasonable requirements of the public"
50 See, e.g. Designers Guild Ltd v Russell Williams (Textiles) Ltd [2001] 1 W.L.R. 2416, per Lord Millett, at 2425 ("The reproduction may be exact or it may introduce deliberate variations involving altered copying or colourable imitation as it is sometimes called."); Sillitoe v McGraw-Hill Book Co Ltd [1983] F.S.R. 545 at 550, where passages of the claimant's work had been rendered into oratio obliqua, described as "copying" for copyright purposes, enhanced a colourable imitation"; and also Norowzian v Arks Ltd [1998] F.S.R. 394 (a colourable imitation is "to all intents and purposes is a copy of the original work, albeit that there might be certain relatively minor changes to it").
51 See, e.g. Canio Components Ltd v Hill & Smith Ltd [1982] R.P.C. 183 and Rodi and Weinenberger A.G. v Henry Showell Ltd [1969] R.P.C. 367 at 467, both patent cases, and also Emerson v Davies (1845) 3 Story (Amer.) 768 at 793.
52 Designers Guild Ltd v Russell Williams (Textiles) Ltd [2001] 1 W.L.R. 2416.
53 As happened in the Court of Appeal in Designers Guild Ltd v Russell Williams (Textiles) Ltd, reported at [2000] F.S.R. 121.

---

rights of the copyright owner are subject. Indeed, these two issues have been kept separate since the passing of the 1911 Act. Thus copyright is only infringed if a substantial part of the claimant's work has been taken. If this issue is decided against a defendant, the question may then arise as to whether his actions fall with any of the permitted acts. The extent of such acts is today the subject of a defined code.[54]

7-25  **Substantial part: the test.**  The essential test is whether the defendant's work has been produced by the substantial use of those features of the claimant's work which, by reason of the knowledge, skill and labour employed in their production, constitute it an original copyright work. The test has been put in a number of similar ways. Has the infringer incorporated a substantial part of the independent skill, labour, etc. contributed by the original author in creating the copyright work?[55] Has the defendant made a substantial use of those features of the claimant's work in which copyright subsists?[56] Has there been a substantial appropriation of the independent labours of the author?[57] Has there been an appropriation of a part of the work on which a substantial part of the author's skill and labour was expended?[58] Has there been an over-borrowing of the skill, labour and judgment which went into the making of the claimant's work?[59] It is therefore often important to ask what are the features of the claimant's work which made it an original work and thus which give rise to its protection under the law of copyright. For example, with a literary work it may be the skill or effort in expressing thoughts or information in words, or the collecting together and presentation of other material; with a dramatic work, the working out of details of character and plot; with a musical work, the composition of a melody or its orchestration; with an artistic work, the arrangement and representation of subject matter; and so on. If substantial use has been made of these features, then infringement will have occurred.

7-26  **Old law.**  As already noted, although it has always been the law that a defendant could not escape infringement by using less than the whole of the claimant's work, it was only with the passing of the 1911 Act that the "substantial part" test was expressly included as part of the statutory definition of infringement.[60] Although this was intended to give effect to previous decisions, which are therefore sometimes still good authority,[61] caution must be used in referring to pre-1911 Act cases since the issue of what might properly be taken of a claimant's work was often bound up with questions which would now fall within the description of "fair dealing" or permitted acts, again a topic which was not then part of any statutory code. Thus the question often asked, before the 1911 Act, was whether any "unfair use" had been made of the claimant's work.[62]

54 See CDPA 1988, ss.28-40 and Ch.9.
55 Designers Guild Ltd v Russell Williams (Textiles) Ltd [2001] 1 W.L.R. 2416, per Lord Scott at 2431.
56 Kenrick S.A. v Briarfine Ltd [1977] F.S.R. 557, at 562.
57 Ladbroke (Football) Ltd v William Hill (Football) Ltd [1964] 1 W.L.R. 273 at 288.
58 Cantor Fitzgerald v Tradition (UK) Ltd [2000] R.P.C. 95.
59 Ibcos Computers Ltd v Barclays Finance Ltd [1994] F.S.R. 275. Although in Cantor Fitzgerald v Tradition (UK) Ltd, ibid., it was thought not helpful to rephrase the test by asking whether there had been an "over-borrowing", since this does not aid any further analysis.
60 Copyright Act 1911, s.1(2). Under the Literary Copyright Act of 1842, which granted the exclusive right to print or otherwise multiply copies of "books", a book was defined to include every "volume, part or division of a volume". See s.2.
61 Chappell & Co v D.C. Thompson & Co [1928-35] Mac.C.C. 467.
62 See, e.g. Weatherby & Sons v International Horse Agency and exchange Ltd [1910] 2 Ch. 297.

**Substantial part:** is a question of mixed fact and law. The issue of substantial part is a mixture of law and fact in the sense that it requires the court to apply a legal standard to the facts as found.[63] It is a matter of degree in each case[64] and has to be considered having regard to all the circumstances. In the end it is often a matter of impression,[65] in the sense that it generally involves taking into account a number of factors of varying degrees of importance and deciding whether they are sufficient to bring the whole within the legal description of "substantial part", as to which it may be difficult to give precise reasons for arriving at a conclusion one way or the other.[66] There are always borderline cases over which reasonable minds may differ.[67] For these reasons, and since the question involves the application of a not altogether precise legal standard to a combination of features of varying importance, an appeal will not lie against the decision unless the judge misdirected himself[68] or there was no evidence to support it.[69] It can be a matter which is suitable for determination on an application for summary judgment if this is the only live issue and no further evidence will be available at trial.[70]

Although it is perhaps the most common and difficult of all questions which arise in copyright cases, limited assistance is obtained from the authorities. This is because after the application of the general principles discussed below, the matter, as already noted, often becomes one of impression. A court will therefore frequently move from a citation of one or more of the general principles and an enunciation of the relevant factors to a conclusion on the particular facts of the case without further analysis. Generally, therefore, it is not useful to refer to particular decisions as to the quantity taken.[71] As to the general principles, the application of the substantial part test varies with the type of work, whether literary, dramatic, musical, artistic and so on. These categories will be considered separately, but some general propositions can be stated:

(a) As already stated, the overriding question is whether, in creating the defendant's work, substantial use has been made of the skill and labour

---

[63] *Designers Guild Ltd v Russell Williams (Textiles) Ltd* [2001] 1 W.L.R. 2416, *per* Lord Hoffmann at 2423, although in *King Features Syndicate Inc v O. & M. Kleeman* [1941] A.C. 417, HL, *per* Viscount Maugham at 424, it was described as a question of fact. In the past, it has been described as a jury question (*Beere v Ellis* (1889) 5 T.L.R. 330, applying *Planche v Braham* 4 Bing. N.C. 19), although no doubt the jury has to be directed as to the law.
[64] *Ladbroke (Football) Ltd v William Hill (Football) Ltd* [1964] 1 W.L.R. 273 at 283; *Leco Instruments (U.K.) Ltd v Land Pyrometers Ltd* [1982] R.P.C. 140.
[65] *Merchandising Corporation of America v Harpbond* [1983] F.S.R. 32.
[66] *Designers Guild Ltd v Russell Williams (Textiles) Ltd* [2001] 1 W.L.R. 2416, at 2420, 2426.
[67] *Designers Guild Ltd v Russell Williams (Textiles) Ltd* [2001] 1 W.L.R. 2416.
[68] *Ibid*, at 2418, 2423, applying *Pro Sieben Media A.G. v Carlton U.K. Television Ltd* [1999] 1 W.L.R. 605, 612–613, and *Norowzian v Arks Ltd (No. 2)* [2000] F.S.R. 363, 370. See also *Biogen v Medeva Plc* [1997] R.P.C. 1 at 45, where the actual decision may have been surprising on its facts but the Court of Appeal, having come to the conclusion that the trial judge had correctly approached the issue as one of fact, was not prepared to interfere with his finding. Note also that where the decision on substantial part is based partly on assessment given by expert witnesses, the trial judge may be in a better position than the Court of Appeal to assess the importance of evidence, because he is placed to assess the credibility of witnesses he has seen. This may be an additional reason for the Court of Appeal not to interfere with the trial judge's decision. See *Designers Guild Ltd v Russell Williams (Textiles) Ltd, ibid.*, at para.28, *per* Lord Hoffmann.
[69] *Bauman v Fussell* [1978] R.P.C. 485, at 489.
[70] Sometimes the application is by the alleged infringer who seeks a declaration of non-infringement. In a copyright case, where liability was conceded, the issue of damages or financial relief which is alleged to have been taken still does not amount to a substantial part. Usually the judge bearing such an application will be in as good a position as the trial judge to reach a decision on the point, assuming that the copyright owner is not able to persuade the court that, for example, disclosure or oral evidence might assist the determination of the issue. See *Sweeney v Macmillan Publishers Ltd* [2002] R.P.C. 651, para.22–200, below.
[71] See, *e.g. Bramwell v Halcomb* (1836) 3 My. & Cr. 737 at 738: "It is useless to refer to any particular cases as to quantity.".

---

which went into the creation of the claimant's work and thus those features which made it an original work.

(b) The quality or importance[72] of what has been taken is much more important than the quantity.[73] The issue thus depends therefore not just on the physical amount taken but on its substantial significance[74] or importance to the copyright work,[75] so that the quality, or importance, of the part is frequently more significant than the proportion which the borrowed part bears to the whole. In this context, expressions such as "quality" or "importance" need to be properly understood. A literary work may convey a very important idea but, as already discussed, the law of copyright is concerned with the protection of the expression of such ideas, not the idea itself. In the same way, a drawing may contain important information, but it is the draftsman's work which the law protects, not the information as such.[76] Quality and importance must therefore be understood in terms of the features of the work which made it an original work in the first place. It follows that the quality relevant for the purposes of substantiality in the case of a literary work refers to the literary originality of that which has been copied. In the case of an artistic work, it is the artistic originality of that which has been copied.[77]

(c) Depending on the circumstances, the question may depend on whether what has been taken is novel or striking, or is merely a commonplace arrangement of words or well known material.[78] In this respect it may be a helpful shortcut to ask whether the part taken could itself be the subject of copyright,[79] although this should not be used as a substitute for the proper and full test of substantial part.[80] In any event it is in reality merely a restatement of the basic question, which is whether use has been made of those features of the claimant's work which, by reason of the skill and labour employed in their production, constitute it an original copyright work.

(d) As a corollary of the last point, the more simple or lacking in substantial originality the copyright work, the greater the degree of taking will be needed before the substantial part test is satisfied. In the case of works of little originality, almost exact copying will normally be required to amount to infringement.[81]

(e) The more abstract and simple a copied idea, the less likely it is to constitute a substantial part. Originality, in the sense of the contribution of the

---

[72] *Cantic Components Ltd v Hill & Smith Ltd* [1982] R.P.C. 183 at 223.
[73] There are statements in many authorities to this effect. See, *e.g. Ladbroke (Football) Ltd v William Hill (Football) Ltd* [1964] 1 W.L.R. 273 at 276; *Designers Guild Ltd v Russell Williams (Textiles)* [2001] 1 W.L.R. 2416, at 2422, 2425, 2431. See also *Bramwell v Halcomb* (1836) 3 My. & Cr. 737 (all the "vital part of another's book, though it might be but a small proportion of the book in quantity").
[74] *Ladbroke (Football) Ltd v William Hill (Football) Ltd* [1964] 1 W.L.R. 273, at 283.
[75] *Designers Guild Ltd v Russell Williams (Textiles) Ltd* [2001] 1 W.L.R. 2416, *per* Lord Millett, at 2426.
[76] The difficult subject of what is protected by an artistic work is considered more fully later in this chapter.
[77] *Designers Guild Ltd v Russell Williams (Textiles) Ltd* [2001] 1 W.L.R. 2416, and see the comment on this point of the case in *Newspaper Licensing Agency Ltd v Marks & Spencer Plc* [2001] 3 W.L.R. 290.
[78] *Ladbroke (Football) Ltd v William Hill (Football) Ltd* [1964] 1 W.L.R. 273 at 276.
[79] So, in *A v B* [2001] E.M.L.R. 1006, copies of two pages from a personal daily diary were held to give entry, would have been the subject of copyright) protected by copyright. (though a substantial part of the whole diary since the first entry in the diary, and each successive entry, would have been the subject of copyright) protected by copyright.
[80] *Ladbroke (Football) Ltd v William Hill (Football) Ltd* [1964] 1 W.L.R. 273 at 277.
[81] *Gagau v Land Transport Safety Authority of New Zealand* [1999] 1 N.Z.L.R. 257 (CA of NZ).

making of the original broadcast.[3] It was always the case that rebroadcasting a work fell within the restricted act of broadcasting. An important exception exists, however, in the case of cable re-transmission of wireless broadcasts by cable.[4]

### (f) Making the work available on demand

7-114 **The on-demand right.** The second category of communication to the public right (the so-called on-demand right) is the act of making available a work to the public by electronic transmission in such a way that members of the public may access it from a place and at a time individually chosen by them.[5] The wording of this provision follows closely that of Articles 3.2 and 3.3 of the Information Society Directive, which are themselves based on Article 8 of the 1996 WIPO Copyright Treaty and Articles 10 and 14 of the 1996 WIPO Performances and Phonograms Treaty. The Directive states expressly that the transmission may be by wire or wireless means, so that the right encompasses both wireless transmissions and transmissions by cable, but this is implicit in section 20 from the fact that the communication must be by electronic transmission. The essential difference between this right and the "broadcasting" right is of course that in the case of the broadcasting right the work is transmitted at a time determined by the broadcaster with a view to its simultaneous reception by the public at large, whereas in relation to the on-demand right the transmission is to a single recipient, who initiates the transmission and chooses when and where to receive it.

7-115 **What constitutes the act of making a work available and who is liable?** Neither the Act nor the Directive says anything further about this. The important point to emphasise is that it is *the act of making a work available to the public by electronic transmission, and in such a way that the public can access it,* which matters. Thus, where A makes a work available to B, an internet service provider, so that B can make it available to the public in this way, it is suggested that it is the act of B in making it available by electronic transmission such that the public can access it which is the restricted act. Although A has made the work available, he has not made the work available to the public by electronic transmission, etc. He may of course be liable for having authorised that act or as a joint tortfeasor. In each case, it will be necessary to examine the facts to see who has committed the restricted act.[6]

7-116 **When does the act of making available occur?** Unlike the restricted act of broadcasting, there appears to be no requirement that any transmission actually takes place before the restricted act takes place: the restricted act is the making available of the work so that members of the public "may" access it. For example, therefore, it is suggested that as soon as a work becomes available on an internet service provider's servers, the restricted act is committed, and will continue to be committed until the work is no longer available.[7]

7-117 **Where does the act of making available take place?** This will often be a vital point where the transmission in question has occurred across national boundaries:

---

[3] CDPA 1988, s.6(5A). This provision was introduced to make clear that such a broadcast also qualifies for copyright protection.
[4] i.e. under CDPA 1988, s.73. See para. 9-205, below.
[5] CDPA 1988, s.20(2)(b).
[6] It is important to note, however, that a person who makes a work available within the meaning of this provision may not be available to the public, particularly if "hosting", "caching" or "mere conduit" under the E-Commerce Regulations (see paras 22-48 et seq, below).
[7] In the same way, an infringement can continuously take place by the exposure of an infringing copy for sale under CDPA 1988, s.24(1).

In principle it resurrects the arguments which existed as to the place where a broadcast should be regarded as occurring. Again, however, since the restricted act is defined by reference to the "making available" of the work, and not its actual transmission or reception, it is suggested that the place where the apparatus is situated and from where access to the work can be obtained is the place where the restricted act occurs.[8]

7-118 **Members of the public.** Although the Act refers to the work being made available to "the public", in the usual way this does not mean that the restricted act is only committed when the public at large can obtain access to it. Where the work is only available to subscribers to an internet service, the subscribers will qualify as "the public" for this purpose.

### (g) Other forms of communication to the public by electronic means

7-119 The acts of broadcasting a work and making it available on-demand are merely two specified kinds of the more general restricted act of communication of a work to the public by electronic means. As to what acts might fall outside two specified kinds but within the more general restricted act, it is easier to say what acts do not fall within the general restricted act at all. For example, the reference to a communication to the public means that point-to-point electronic communications initiated by the sender, such as emails, will not fall within the scope of the restricted act.

### (h) The old law: transitional provisions

7-120 As already explained, in relation to acts taking place on or after October 31, 2003, the new law, as set out above, must be applied.[9] In relation to acts taking place before this date, whether or not they amounted to an infringement of copyright will depend on whether they infringed the Act as it stood before amendment.[10] Readers are referred to the previous edition of this work in relation to such acts.[11]

## 7. THE ADAPTATION RIGHT

7-121 One of the acts restricted by the copyright in any literary, dramatic or musical work is the right to make an adaptation of the work.[12] Further consideration is given below as to the meaning of "adaptation" in this context, but there is an unclear dividing line between what amounts to a reproduction of a work and what amounts to an adaptation of a work. Thus, for example, although the making of a translation of a literary or dramatic work is expressly included within the definition of making an adaptation, it can clearly be argued that a translation is also a reproduction of the original work, assuming that a substantial use was

---

[8] The Government declined to make express provision in relation to this question, taking the view that it was neither necessary or appropriate given that Directive 93/98 was silent on the point. See the Government Conclusions on the Patent Office's Consultation Paper of August 7, 2002, para 3.5.
[9] This is confirmed by the transitional provisions in reg.31(2) of the Copyright and Related Rights Regulations (SI 2003/2498), which provide that acts done before October 31, 2003 shall be regarded as infringements only if they were a new or extended right arising by virtue of the Regulations.
[10] Interpretation Act 1978, s.16(1).
[11] See Copinger (14th ed.), paras 7-132 to 7-137.
[12] CDPA 1988, ss.16(1)(e), 21(1).

# CHAPTER TWENTY TWO

## CIVIL REMEDIES

*Contents*

|  |  |  | Para. |
|---|---|---|---|
| 1. | Overview | | 22–01 |
| 2. | Who may sue? | | 22–15 |
| | A. | Legal owner or person with rights | 22–17 |
| | B. | Equitable owner | 22–20 |
| | C. | Exclusive licensee | 22–23 |
| | D. | Non-exclusive licensees and agents | 22–29 |
| | E. | Joint owners | 22–31 |
| 3. | Relevant date of title | | 22–32 |
| 4. | Who may be sued? | | 22–32 |
| | A. | Copyright and design right: primary infringers | 22–32 |
| | B. | Copyright and design right: secondary infringers | 22–33 |
| | C. | Other rights: direct infringers | 22–34 |
| | D. | Joint tortfeasors | 22–35 |
| | E. | Conspiracy | 22–40 |
| | F. | Directors and controlling shareholders of companies | 22–41 |
| | G. | Vicarious liability | 22–43 |
| | H. | Persons in possession of infringing copies, infringing articles or illicit recordings | 22–44 |
| | I. | Service providers | 22–45 |
| 5. | Right of seizure without court order | | 22–46 |
| 6. | Defences | | 22–50 |
| | A. | Licences and permitted acts | 22–51 |
| | B. | Ignorance not necessarily a defence | 22–60 |
| | C. | Defences to damages claims | 22–63 |
| | D. | When absence of damage is a defence | 22–76 |
| | E. | Undertaking to take licence of right | 22–77 |
| | F. | Innocently acquired illicit recordings and infringing articles | 22–81 |
| | G. | Public interest | 22–82 |
| | H. | Use in electronic networks: mere conduit, caching and hosting | 22–88 |
| | | (i)   Introduction | 22–88 |
| | | (ii)  The defence of mere conduit | 22–93 |
| | | (iii) The defence of caching | 22–96 |
| | | (iv)  Hosting | 22–104 |
| | | (v)   Injunctions and other provisions | 22–107 |
| 7. | Remedies and procedure | | 22–113 |
| | A. | Jurisdiction | 22–113 |
| | B. | Interim relief | 22–120 |
| | | (i)   Injunction | 22–120 |
| | | (ii)  Search (formerly Anton Piller) orders | 22–141 |
| | | (iii) Identity of infringers | 22–142 |

1006

# CIVIL REMEDIES

Contents

| | | Para. |
|---|---|---|
| | (iv) Freezing (formerly Mareva) injunctions | 22–148 |
| C. | Final relief | |
| | (i) Declaratory judgment | 22–149 |
| | (ii) Permanent injunction | 22–150 |
| | (iii) Election between damages and account of profits | 22–161 |
| | (iv) Damages | 22–162 |
| | (v) Additional damages | 22–168 |
| | (vi) Account of profits | 22–175 |
| | (vii) Forfeiture | 22–179 |
| | (viii) Delivery up | 22–182 |
| | (ix) Points as to costs | 22–183 |
| | (x) The position of exclusive licensees | 22–190 |
| 8. | Procedural and related matters | 22–191 |
| A. | Infringement of each right a separate tort | 22–191 |
| B. | Pre-action conduct | 22–192 |
| C. | Commencement of proceedings | 22–200 |
| D. | Form of defence | 22–208 |
| E. | Summary judgment | 22–209 |
| F. | Presumptions | 22–210 |
| G. | Proof of copying | 22–221 |
| H. | Expert evidence | 22–223 |
| I. | Disclosure and inspection | 22–226 |
| J. | Production of original work | 22–227 |
| K. | Period of limitation | 22–228 |

## 1. OVERVIEW

**22–01 Scope of this Chapter.** This Chapter covers the non-criminal remedies and procedure in respect of infringements of all the rights covered in this work with the following exceptions and qualifications. First, remedies for breach of confidence fall into a separate category and are dealt with elsewhere.[1] This Chapter does, however, deal with some of the procedural questions which arise in confidential information cases. Second, this work only deals in outline with registered designs and Community registered designs. Accordingly, remedies and procedure for infringement of those rights do not feature in this Chapter. Finally, it should be emphasised that this Chapter is not intended to be anything like a comprehensive treatise on the subject of civil procedure. Rather it is intended to highlight and discuss those aspects of civil procedure which are specifically relevant to the enforcement of the rights covered in this work.

**22–02 Other remedies.** Where the infringement also constitutes a criminal offence, a potential claimant should always consider whether or not the expense of civil litigation might be avoided by reporting the infringement to the appropriate authority or even by commencing a private prosecution.[2] For criminal remedies, reference should be made to Chapters 15 and 16, above and Chapter 23, below. Consideration should also be given, where relevant, to reporting the matter to the Commissioners of Customs and Excise.

---

1 See paras 20–26 et seq., above.
2 For a discussion of the advantages and disadvantages of criminal proceedings, see paras 23–44 and 23–45, below.

1007

# OVERVIEW

**22–03 The Enforcement Directive.** On April 29, 2004, the European Parliament and the Council adopted a Directive on the enforcement of intellectual property rights.[3] Member States are obliged to implement the Directive by April 28, 2006.[4] The declared object of the Directive is to reduce or eliminate the prejudice caused to the functioning of the single market and the weakening of the substantive intellectual property law which is believed to be caused by the disparities between national procedural regimes.[5] This is to be achieved by the approximation of national enforcement systems so as to ensure a "high, equivalent and homogeneous level of protection in the Internal Market".[6] The Directive applies to all intellectual property rights.[7] Although the Directive contains numerous provisions, it is not thought that many of them will involve a change in English law. The main changes which are likely to result appear to be as follows. First, an extension of the categories of persons entitled to sue for infringement to non-exclusive licensees, collective rights management bodies and professional defence bodies.[8] Secondly, provision for the publication of judicial decisions at the infringer's expense.[9] Thirdly, the requirement that Member States encourage the development by trade or professional associations of codes of conduct at Community level aimed at the enforcement of intellectual property rights.[10] At the time of writing, the Government was preparing a consultation in relation to the implementation of the Directive.

**22–04 Scope of this section.** The remainder of this section of this Chapter gives a general outline of the statutory provisions as to civil remedies in relation to each individual right covered in this work. There are no statutory provisions relevant to passing off, which is actionable as a tort.

**22–05 Copyright and publication right.** An infringement of copyright is actionable by the copyright owner.[11] An infringement occurring after the grant of an exclusive licence is also actionable by the exclusive licensee.[12] Certain infringements are also actionable by a non-exclusive licensee.[13] In an action for infringement all such relief, by way of damages, injunctions, accounts or otherwise, is available to the claimant as is available in respect of the infringement of any other property right.[14] However, that general rule is subject to a number of statutory qualifications. Two relate to damages. First, there is a defence to a damages claim in the very limited number of cases where the defendant did not know and had no reason to believe that copyright subsisted in the work in question.[15] Secondly, the court may award a species of damages called "additional damages" which is peculiar to this field.[16] Two further qualifications concern injunctions. First, there is a reference to claims for an injunction and for an order for delivery up where the defendant undertakes to take a licence of right which is available under section

---

3 [2004] O.J. L 157/45. For background, see the Green Paper on combating counterfeiting and piracy in the single market, COM (98) 569 final; the follow-up to the Green Paper, COM (2000) 789 final; and the proposal for the Directive, COM(2003) 46 final.
4 Art.20(1).
5 Recitals 7–9. For criticism, see Cornish et al. [2003] EIPR 447.
6 Recital 10.
7 Art.1.
8 Art.4(1). Note that some non-exclusive licensees may already sue: see paras 22–23 et seq., below.
9 Art.15.
10 Art.17.
11 CDPA 1988, s.96(1).
12 s.101.
13 s.101A.
14 s.96(2).
15 s.97(1).
16 s.97(2).

CIVIL REMEDIES

**22-114**  **Extent of the 1988 Act may be increased.** Parts I and III of the Act may be extended to any of the Channel Islands, the Isle of Man or any colony.[5] Similarly, the provisions in respect of fraudulent reception of transmissions may be extended to the Isle of Man and any of the Channel Islands.[6] These provisions have scarcely been used.[7] Otherwise, there is no provision for extending the provisions in respect of the other rights covered in this Chapter.

**22-115**  **Acts committed outside the United Kingdom.** In addition to the provisions mentioned in paragraph 22-113, above, various provisions of the 1988 Act make it clear that acts committed outside the United Kingdom cannot be infringements of copyright under the 1988 Act. For example, copyright is defined in territorial terms, as the exclusive right to do the restricted acts "in the United Kingdom".[9] The distribution right, which is expressed (in section 18(2) of the 1988 Act) in terms of the act of putting copies into circulation in the EEA, might appear to constitute an exception to this rule. However, it is thought that this does not give any rights in respect of activities outside the United Kingdom, authorises the commission of a restricted act in the United Kingdom will infringe.[11] It is thought that similar principles apply to the other rights covered in this work.[14]

**22-116**  **Jurisdiction over foreign rights and infringements thereof: general.** A claim that acts done outside the United Kingdom constitute an infringement of the copyright law of a foreign country was not, until relatively recently, considered to be justiciable in the English courts.[12] However, the position is now changed with regard to actions claiming infringement of intellectual property rights to which either the Judgments Regulation, the Brussels Convention or the Lugano Convention applies.[13] Moreover, doubt has been cast on the main authority which states that such issues are not justiciable in proceedings which are not subject to the Regulation or the Conventions.[14]

**22-117**  **Position under the Judgments Regulation and the Brussels and Lugano Conventions.** If the action is properly constituted in the English courts under the terms of the Regulation or the relevant Convention[15] and the court has jurisdiction over the defendant (usually because of his domicile), the court must entertain the action on its merits, thereby giving full effect to the intellectual property laws

6 CDPA 1988, ss.157(2), and 255(2).
7 s.304(4) and (5).
8 An order has been made extending the provisions of the 1988 Act with modifications to Bermuda: the Copyright (Bermuda) Order 2003 (SI 2003/1517).
9 CDPA 1988, s.16(1), *Def Lepp Music v Stuart-Brown* [1986] R.P.C. 273; *Jonathan Cape Ltd v Consolidated Press Ltd* [1954] 1 W.L.R. 1313; *Pearce v Ove Arup Ltd* [2000] Ch. 403 at 438 (obiter).
10 See above, para. 7-80, above. The same applies to the distribution right in respect of performers' rights: see s.182B(2).
11 *ABKCO Music & Records Inc v Music Collection International Ltd* [1995] R.P.C. 657.
12 *Tyburn Productions Ltd v Conan Doyle* [1991] Ch. 75.
13 Council Regulation (EC) No.44/2001 on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters [2000] O.J. L.12/1 (which, so far as relevant, governs actions against defendants domiciled in EU Member States other than Denmark), the Brussels Convention on Jurisdiction and Enforcement of Judgments in Civil and Commercial Matters (which, so far as relevant, governs actions against defendants domiciled in Denmark) and the Lugano Convention on Jurisdiction and Enforcement of Judgments in Civil Matters (which, so far as relevant, governs actions against defendants domiciled in EFTA states). The position as between different parts of the United Kingdom is governed by the Civil Jurisdiction and Judgments Act 1982 (c.27), Sch.4.
14 See para. 22-118, below.
15 For example, there is no *lis pendens* (Judgments Regulation, Art.27; Brussels Convention, Art.21; Lugano Convention, Art.23).

REMEDIES AND PROCEDURE

of other states.[16] Where the Judgments Regulation applies, this principle will apply to rights equivalent to those covered in this work unless Article 22(4) of the Regulation applies. Article 22(4) provides that in proceedings concerned with the registration or validity of patents, trade marks, designs, or other similar rights required to be deposited or registered, the courts of the contracting state in which the deposit or registration has been applied for, has taken place or is under the terms of a Community instrument or international convention deemed to have taken place have exclusive jurisdiction, regardless of domicile. Similar provision is made by Article 16(4) of the Brussels Convention and Article 16(4) of the Lugano Convention.

**Position in other cases.** In actions which are not subject to the Judgments Regulation or the Conventions, the position is less clear. There is no doubt that (subject to questions of personal jurisdiction[17] and *forum non conveniens*[18] and the provision of evidence as to foreign law[19]) the English courts will grant relief in respect of acts in those countries which would amount to passing off if committed in England.[20] As to copyright, in *Tyburn Productions Ltd v Conan Doyle*[21] Vinelott J held that the question whether a defendant had any copyright in the United States so as to be able to prevent the distribution of the claimant's film was not justiciable in England. His decision was based in part on a finding that the *Moçambique* rule applies to copyright.[22] This rule provides that the English court has no jurisdiction to entertain proceedings for the determination of the right to or the right to the possession of immovable property situated outside England.[23] However, this part of the reasoning in the *Tyburn* case has been doubted.[24] Nevertheless, the *Tyburn* decision has been approved by the Court of Appeal on the basis that the judge was right to regard the relief sought as "an exercise in futility" because there was no evidence that the English court's decision would be treated as binding in the United States.[25] At least in the Court of Appeal, therefore, there is certainly scope for argument that an English court may rule on questions of title to foreign rights equivalent to copyright, provided it can be shown that such an order would have some practical effect. Furthermore, the *Tyburn* deci-

16 *Gareth Pearce v Ove Arup Partnership Limited* [2000] Ch. 403; *Coin Controls Ltd v Suzo International (UK) Ltd* [1997] 3 All E.R. 45; [1997] F.S.R. 660; *Fort Dodge Animal Health Ltd & Others v Akzo Nobel NV & Another* [1998] F.S.R. 222, CA.
17 Which is governed by the common law rule that a defendant who is liable to be served with a claim form subject to the jurisdiction which is clearly more appropriate: Dicey & Morris, *The Conflict of Laws* (13th ed.) Rule 24. As to service out of the jurisdiction, see CPR Part 6 and the relevant Practice Direction.
18 That is, the court's power to stay English proceedings on the ground that there is another forum in another jurisdiction which is clearly more appropriate: Dicey & Morris, *The Conflict of Laws* (13th ed.) Rule 31.
19 Where necessary under the Private International Law (Miscellaneous Provisions) Act 1995 (c.42), s.11.
20 See e.g. *Alfred Dunhill Ltd v Sunoptic SA* [1979] F.S.R. 337. Note that the so-called "double actionability" rule has been abolished by the Private International Law (Miscellaneous Provisions) Act 1995 (c.42), s.10; accordingly, there is no longer any requirement that acts complained of should be actionable in England. See *Clerk & Lindsell on Torts* (18th ed.), para.6-89.
21 [1991] Ch. 75.
22 See *Pearce v Ove Arup Ltd* [2000] Ch. 403 at 439-40 and *R. Griggs Group Ltd v Evans* [2004] EWHC 1088, Ch D (Peter Prescott Q.C.) at paras 135-139.
23 In doing so, he followed the Australian case of *Potter v Broken Hill Pty Co Ltd* (1906) 3 C.L.R. 479 in which it had been held that the *Moçambique* rule applied to a case where the validity of a foreign patent was in issue. It was conceded that if his rule applied to patents, it also applied to copyright (see the *Tyburn* case at [1991] Ch. 75).
24 Dicey & Morris, *The Conflict of Laws* (13th ed.) Rule 114(3). For some exceptions to this, see the next paragraph.
25 See *Pearce v Ove Arup Ltd* [2000] Ch. 403 at 439-40. See also *R. Griggs Group Ltd v Evans* [2004] EWHC 1088, Ch D (Peter Prescott Q.C.) at para.139.

# APPENDIX OF FOREIGN AUTHORITIES ITEM 2

30 of 423 DOCUMENTS

Butterworths UK Statutes
Copyright 2007, Butterworths Tolley UK
a division of Reed Elsevier, Inc.
All rights reserved.

*** THIS DOCUMENT IS CURRENT THROUGH 26 MARCH, 2007 ***

**COPYRIGHT, DESIGNS AND PATENTS ACT 1988**
**1988 CHAPTER 48**

**CHAPTER II RIGHTS OF COPYRIGHT OWNER**
**The acts restricted by copyright**
Royal Assent [15 November 1988]

*Copyright, Designs and Patents Act 1988, Ch. 48, s. 20 (Eng.)*

**[20 Infringement by communication to the public]**

[(1) The communication to the public of the work is an act restricted by the copyright in--

(a) a literary, dramatic, musical or artistic work,

(b) a sound recording or film, or

(c) a broadcast.

(2) References in this Part to communication to the public are to communication to the public by electronic transmission, and in relation to a work include--

(a) the broadcasting of the work;

(b) the making available to the public of the work by electronic transmission in such a way that members of the public may access it from a place and at a time individually chosen by them.]

**NOTES:**

**Amendment**

Substituted by SI 2003/2498, regs 3, 6(1).

Date in force: 31 October 2003: see SI 2003/2498, reg 1; for savings and transitional provisions see regs 30-40 thereof.

**See Further**

See further, the Electronic Commerce (EC Directive) (Extension) (No 2) Regulations 2003, SI 2003/2500, reg 2, Schedule, Pt 1 which provides that the Electronic Commerce (EC Directive) Regulations 2002, SI 2002/2013 shall

1988 CHAPTER 48

apply to this Act, notwithstanding reg 3(2) of those regulations.

# APPENDIX OF FOREIGN AUTHORITIES ITEM 3

Designers Guild Ltd v Russell Williams (Textiles) Ltd

HOUSE OF LORDS

*[2001] 1 All ER 700, [2000] 1 WLR 2416*

**HEARING-DATES:** 23, 24 OCTOBER, 23 NOVEMBER 2000

23 NOVEMBER 2000

**CATCHWORDS:**

Copyright - Infringement - Artistic work - Fabric design - Claimant alleging that defendant's fabric design infringing copyright in its own design - Judge finding that defendant had copied claimant's design and that copying had been in relation to substantial part - Defendant not challenging judge's finding on copying but Court of Appeal reversing judge's conclusion on substantiality - Whether Court of Appeal entitled to interfere with judge's conclusion.

**HEADNOTE:**

The claimant, DGL, brought proceedings against the defendant, RWT, alleging that a fabric design produced by the latter infringed the copyright in one of its own designs. At trial, the judge, relying primarily on the similarities between the two designs, concluded that RWT had copied DGL's design. He further concluded that the copying had been in relation to a substantial part of the copyright work and accordingly upheld DGL's claim. On its appeal, RWT did not challenge the judge's finding of copying but instead attacked his conclusion on substantiality. The Court of Appeal analysed the components parts of RWT's design, pointed to certain differences between it and DGL's design and concluded that the parts that had been copied did not amount to a substantial part. Accordingly, the appeal was allowed, and DGL appealed to the House of Lords.

Held - It was not for a Court of Appeal to embark on the issue of substantiality afresh in the manner of a first instance court by making original findings of fact. Rather, as an appellate court it should review findings already made. Unless, therefore, the judge had misdirected himself there was no ground for interfering with his conclusion. In the instant case, there was no ground for interfering with the judge's conclusion. Moreover, the Court of Appeal had erred by analysing the individual features of the two designs and highlighting certain dissimilarities, and it had not given effect to the judge's unchallenged conclusion that the similarities between the two designs were so marked as to warrant a finding that one had been copied from the other. While the finding of copying did not in theory conclude the issue of substantiality, it was almost bound to do so on the facts. Accordingly, the appeal would be allowed. (see p 701 f, p 702 d to f, p 705 a g, p 707 d to g, p 708 c d, p 709 j, p 717 g h and p 718 a e, post).

**NOTES:**

Notes

For infringing act in relation to substantial part of work, see 9(2) Halsbury's Laws (4th edn reissue) para 320.

**CASES-REF-TO:**

Cases referred to in opinions

Biogen Inc v Medeva plc (1996) 38 BMLR 149, HL.

[2001] 1 All ER 700, [2000] 1 WLR 2416

Francis Day & Hunter Ltd v Bron (t/a Delmar Publishing Co) [1963] 2 All ER 16, [1963] Ch 587, [1963] 2 WLR 868, CA.

Kenrick & Co v Lawrence & Co (1890) 25 QBD 99.

Kleeneze Ltd v DRG (UK) Ltd [1984] FSR 399.

Ladbroke (Football) Ltd v William Hill (Football) UK Ltd [1964] 1 All ER 465, [1964] 1 WLR 273, HL.

LB (Plastics) Ltd v Swish Products Ltd [1979] RPC 551, HL.

Norowzian v Arks Ltd (No 2) [1999] IP & T 223, CA.

Pro Sieben Media AG v Carlton UK Television Ltd [1999] 1 WLR 605, CA.

Warwick Film Productions Ltd v Eisinger [1967] 3 All ER 367, [1969] Ch 508, [1967] 3 WLR 1599.

## INTRODUCTION:

Appeal

The plaintiff, Designers Guild Ltd (DGL), appealed with permission of the Appeal Committee of the House of Lords given on 7 December 1999 from the decision of the Court of Appeal (Morritt, Auld and Clarke LJJ) on 26 March 1999 ([2000] FSR 121) allowing an appeal by the defendant, Russell Williams Textiles Ltd (trading as Washington DC) (RWT), from the decision of Lawrence Collins QC, sitting as a deputy judge of the Chancery Division, on 14 January 1998 ([1998] FSR 803) upholding DGL's claim for copyright infringement against RWT. The facts are set out in the opinion of Lord Scott of Foscote.

## COUNSEL:

Alastair Wilson QC and Jonathan D C Turner (instructed by Taylors, Blackburn) for DGL.; Michael Fysh QC and Iain Purvis (instructed by Philip Conn & Co, Manchester) for RWT.

Their Lordships took time for consideration.

23 November 2000. The following opinions were delivered.

23 November 2000

**PANEL:** LORD BINGHAM OF CORNHILL, LORD HOFFMANN, LORD HOPE OF CRAIGHEAD, LORD MILLETT AND LORD SCOTT OF FOSCOTE

**JUDGMENTBY-1:** LORD BINGHAM OF CORNHILL.

**JUDGMENT-1:**

LORD BINGHAM OF CORNHILL.

My Lords, in common with all of your Lordships I agree that this appeal should be allowed and the judge's order restored, and I would order that the appellants, Designers Guild Ltd (DGL), have their costs before the House and in the Court of Appeal. But since there are some differences of approach among my noble and learned friends most expert in this field I venture to summarise, very shortly and simply, my own reasons for reaching the conclusion I do. For that purpose I gratefully adopt the account given by my noble and learned friend Lord Scott of Foscote of the facts and

[2001] 1 All ER 700, [2000] 1 WLR 2416

background of the case and of the judgments delivered by the judge and the Court of Appeal.

The law of copyright rests on a very clear principle: that anyone who by his or her own skill and labour creates an original work of whatever character shall, for a limited period, enjoy an exclusive right to copy that work. No one else may for a season reap what the copyright owner has sown.

It is not now disputed that DGL's Ixia design was an original product of DGL's skill and labour. That is not to say that DGL drew no inspiration from elsewhere: 'there is no new thing under the sun'. But the design was sufficiently original to earn copyright protection.

DGL complained that Russell Williams (Textiles) Ltd (RWT), in its Marguerite design, had copied the Ixia design and so infringed its copyright. RWT strongly contested that accusation at trial, seeking to show that it had not and could not have copied the Ixia design. That, as I infer, was the central issue at the trial. But the judge rejected RWT's evidence. Relying in the main on similarities, which he listed, between the Marguerite and Ixia designs, he concluded in round terms that the one had been copied from the other.

That finding did not conclude the case in favour of DGL. For, realistically recognising that no real injury is done to the copyright owner if no more than an insignificant part of the copyright work is copied, s 16(3) of the Copyright, Designs and Patents Act 1988 provides that, to infringe, an act must be done 'in relation to the work as a whole or any substantial part of it'. So the judge had to consider whether RWT had copied DGL's work as a whole or any substantial part of it. Since the judge had based his finding of copying largely on the similarity between the two designs it would have been very surprising if he had found that RWT had not copied a substantial part of DGL's Ixia design, but it was necessary for the judge to consider that question, and he did. He found that there had been copying of a substantial part.

While not accepting the judge's finding of copying, RWT recognised the virtual impossibility of dislodging it in the Court of Appeal and did not challenge it. RWT's challenge was accordingly directed to the judge's finding that a substantial part of the Ixia design had been copied. The Court of Appeal upheld this challenge. But in doing so, as it seems to me, it fell into error. First, by analysing individual features of the two designs and highlighting certain dissimilarities the court failed to give effect to the judge's conclusion, not challenged before it, that the similarities between the two designs were so marked as to warrant a finding that the one had been copied from the other. While the finding of copying did not in theory conclude the issue of substantiality, on the facts here it was almost bound to do so. Secondly, the Court of Appeal approached the issue of substantiality more in the manner of a first instance court making original findings of fact than as an appellate court reviewing findings already made and in very important respects not challenged. It was not for the Court of Appeal to embark on the issue of substantiality afresh, unless the judge had misdirected himself, which in my opinion he had not.

There was, I conclude, no ground for interfering with the judge's conclusion.

**JUDGMENTBY-2:** LORD HOFFMANN.

**JUDGMENT-2:**

LORD HOFFMANN.

My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend Lord Bingham of Cornhill. I agree with it, but in view of the fact that we are differing from the Court of Appeal, I shall give my reasons in rather greater detail.

1. THE ISSUES

There is no dispute that the plaintiff was entitled to copyright in the artwork for the fabric design Ixia. The infringement of which the plaintiff complained was that for the purpose of creating its own design Marguerite the

[2001] 1 All ER 700, [2000] 1 WLR 2416

defendant had copied a substantial part of Ixia. There were accordingly two main issues at the trial. First, what, if anything had the designers of Marguerite copied from Ixia. Secondly, did what had been copied amount to 'the whole or a substantial part' of Ixia?

## 2. THE FINDINGS OF THE JUDGE

On the first issue, the position taken by the defendant at the trial was that its designers had copied nothing. Mrs Aileen Williams, the director in charge of design, and Miss Ibbotson, who produced the art work under her direction, each said in evidence that they was not aware of Ixia at the relevant time. The judge ([1998] FSR 803) did not believe them. He found them unsatisfactory witnesses and decided that they must have copied. In coming to this conclusion, he relied first upon similarities in the design which went 'far beyond the similarities which would be expected simply from both being based on an impressionistic style or from both being based on a combination of stripes and scattered flowers and leaves'. He listed these similarities as follows (at 813):

'1. Each fabric consists of vertical stripes, with spaces between the stripes equal to the width of the stripe, and in each fabric flowers and leaves are scattered over and between the stripes, so as to give the same general effect. 2. Each is painted in a similar neo-Impressionistic style. Each uses a brush-stroke technique, i.e. the use of one brush to create a stripe, showing the brush marks against the texture. 3. In each fabric the stripes are formed by vertical brush strokes, and have rough edges which merge into the background. 4. In each fabric the petals are formed with dryish brushstrokes and are executed in a similar way (somewhat in the form of a comma). 5. In each fabric parts of the colour of the stripes show through some of the petals. [Technically called the "resist effect".] 6. In each case the centres of the flower heads are represented by a strong blob, rather than by a realistic representation. 7. In each fabric the leaves are painted in two distinct shades of green, with similar brush strokes, and are scattered over the design.'

Secondly, the judge relied upon the inferences to be drawn from the fact that the defendant's designers had given a false explanation of the provenance of their design. Thirdly, he relied as similar fact evidence upon the fact that they had, as he found, copied the design of another competitor and falsely denied doing so.

On the second issue, the judge summarised the submissions of counsel for the defendant. This took the traditional form of dissecting the Ixia design into its component elements, assigning reasons why each element (such as 'stripes', 'flowers' etc) lacked originality or had in some respects not been copied and concluding that those elements which had been copied were not a substantial part. The judge rejected the submission. He said (at 828) that the whole work should be considered:

'It is the combination of the flowers and the stripes, the way in which they related to each other, the way in which they were painted, and the way in which there was a "resist" effect which makes the overall combination the copying of a substantial part.'

## 3. THE COURT OF APPEAL

In the Court of Appeal ([2000] FSR 121) Mr Fysh QC, for the defendant, conceded that he could not challenge the judge's findings on copying. Only the issue of substantiality therefore remained alive. The Court of Appeal said that substantiality was a question of judgment on which they were in as good a position to form a view as the judge. They disagreed with him for three reasons.

### (a) Visual comparison

Morritt LJ said (at 133 (para 30)) that when he compared the two designs, it appeared to him that the one did not involve the copying of a substantial part of the other: '... they just do not look sufficiently similar.' Clarke LJ agreed.

### (b) Dissection

[2001] 1 All ER 700, [2000] 1 WLR 2416

Morritt LJ (with whom Auld and Clarke LJJ agreed) analysed the component parts of the design. Although both had stripes and flowers, the layout of the flowers in Marguerite was different and the flowers themselves were not copies. That left only the idea of stripes and flowers, which was not original. The brushwork and resist effect involved the use of 'comparable techniques' but the visual results were in certain respects different. The effects which were the same did not add up to a substantial part.

(c) Ideas rather than expression

Morritt LJ (at 135 (para 37)) said that the plaintiff was not entitled to a monopoly in ideas. The defendant copied 'the idea of Ixia', they 'adopted the same techniques' but did not copy a substantial part of the expression of the idea.

My Lords, I must examine each of these three reasons.

4. VISUAL COMPARISON

Mr Fysh was the author of the suggestion that the question of substantiality could be resolved by a visual comparison between the two fabrics. He said that the question of substantiality was one of impression. That, in a sense, is true. When judges say that a question is one of impression, they generally mean that it involves taking into account a number of factors of varying degrees of importance and deciding whether they are sufficient to bring the whole within some legal description. It is often difficult to give precise reasons for arriving at a conclusion one way or the other (apart from an enumeration of the relevant factors) and there are borderline cases over which reasonable minds may differ. But the first step in trying to answer any question (whether of impression or otherwise) is to be clear about what the question is. In the present case, it is whether the features which the judge found to have been copied from Ixia formed a substantial part of Ixia as an artistic work. That is certainly a question of judgment or impression. But why, in answering that question, should it be relevant to consider whether Ixia did or did not look like Marguerite?

The similarities between Ixia and Marguerite were of course highly relevant to the question of whether there had been copying and, if so, what features had been copied. They were the foundation upon which the judge constructed his conclusion that the features I have enumerated had been copied. But once those features have been identified, the question of whether they formed a substantial part of the plaintiff's design cannot be decided by revisiting the question of whether it looks like the defendant's. The more I listened to Mr Fysh's submissions as to why it was relevant to compare Ixia with Marguerite, the more it seemed to me that he was skilfully trying to undermine his concession that he could not challenge the judge's finding that certain features of the design had been copied. Mr Alastair Wilson QC met this submission on its own ground by producing two artistically draped samples of the two designs in similar colourways. I am bound to say that, at some distance, they looked remarkably similar to me. But, in a case in which there is no longer an issue over what has been copied, I do not regard this as a relevant exercise. In my respectful opinion the Court of Appeal erred in principle by allowing itself to be distracted from the statutory question, which was whether the elements found as a fact to have been copied formed a substantial part of Ixia.

5. DISSECTION

The exercise in dissection also, as it seems to me, involved two errors. First, it ignored substantial parts of the judge's findings on what had been copied and, secondly, it dealt with the copied features piecemeal instead of considering, as the judge had done, their cumulative effect. Thus the judge's findings on copying were by no means confined to the notion of stripes and flowers. There are many ways of depicting both stripes and flowers and the judge was obviously impressed by the fact that the defendant had been unable to find any other stripe and flower pattern which resembled Ixia or Marguerite in anything like the degree to which they resembled each other. With the assistance of the expert evidence of Mr Victor Herbert, a design consultant, the judge identified the additional visual similarities as arising from such matters as the brushwork, the resist effect and the loose arrangement of freely drawn leaves and flowers. These features, he found, had been copied and cumulatively constituted a substantial part of the work.

My Lords, here again it seems to me that Mr Fysh's invitation to the Court of Appeal to reduce the copied elements

[2001] 1 All ER 700, [2000] 1 WLR 2416

to the mere notion of stripes and flowers amounted to an attempt to withdraw his concession that he could not challenge the judge's findings on copying. The Court of Appeal dismissed some of the elements which the judge found to have been copied as 'technique'. That is true. The creation of artistic work involves having ideas and using technique to express them. But that cannot detract from the fact that the results of the use of the techniques were visual effects forming part of the artistic work. They were what produced the distinctive impression of looseness and boldness combined with lightness and fragility which the designer wished to achieve.

The Court of Appeal also dismissed the significance of these copied elements on the ground that the visual effects they produced as applied to the two designs were in certain respects different. For example, the underlying stripe colour showing through the petals in Ixia made them look translucent whereas in Marguerite they looked perforated. But this seems to me the same fallacy as that involved in visual comparison. When one is considering the question of substantiality, it is no longer relevant to examine in what respects the two designs are different. The difference between translucency and perforation may have led to the conclusion that the defendant did not copy its resist effect from the plaintiff. But once it is concluded that it did, the only question is whether the resist effect as such, together with all the other copied elements, added up to a substantial part of the plaintiff's work.

If there had been no finding that anything had been copied except the notion of flowers and stripes, the conclusion of the Court of Appeal would have been unexceptionable. But this involved ignoring the findings of fact, both in their detail and their cumulative effect.

## 6. IDEAS AND EXPRESSION

It is often said, as Morritt LJ said in this case, that copyright subsists not in ideas but in the form in which the ideas are expressed. The distinction between expression and ideas finds a place in the Agreement on Trade-Related Aspects of Intellectual Property Rights (TRIPs) (Marakesh, 15 April 1994; TS 10 (1996); Cm 3046) (OJ 1994 L336 p 214), to which the United Kingdom is a party (see art 9.2: 'Copyright protection shall extend to expressions and not to ideas ...'). Nevertheless, it needs to be handled with care. What does it mean? As Lord Hailsham of St Marylebone said in LB (Plastics) Ltd v Swish Products Ltd [1979] RPC 551 at 629, 'it all depends on what you mean by "ideas"'.

Plainly there can be no copyright in an idea which is merely in the head, which has not been expressed in copyrightable form, as a literary, dramatic, musical or artistic work. But the distinction between ideas and expression cannot mean anything so trivial as that. On the other hand, every element in the expression of an artistic work (unless it got there by accident or compulsion) is the expression of an idea on the part of the author. It represents her choice to paint stripes rather than polka dots, flowers rather than tadpoles, use one colour and brush technique rather than another, and so on. The expression of these ideas is protected, both as a cumulative whole and also to the extent to which they form a 'substantial part' of the work. Although the term 'substantial part' might suggest a quantitative test, or at least the ability to identify some discrete part which, on quantitative or qualitative grounds, can be regarded as substantial, it is clear upon the authorities that neither is the correct test. Ladbroke (Football) Ltd v William Hill (Football) UK Ltd [1964] 1 All ER 465, [1964] 1 WLR 273 establishes that substantiality depends upon quality rather than quantity ([1964] 1 All ER 465 at 469, 473, 477, 481, [1964] 1 WLR 273 at 276, 283, 288, 293 per Lord Reid, Lord Evershed, Lord Hodson and Lord Pearce respectively). And there are numerous authorities which show that the 'part' which is regarded as substantial can be a feature or combination of features of the work, abstracted from it rather than forming a discrete part. That is what the judge found to have been copied in this case. Or to take another example, the original elements in the plot of a play or novel may be a substantial part, so that copyright may be infringed by a work which does not reproduce a single sentence of the original. If one asks what is being protected in such a case, it is difficult to give any answer except that it is an idea expressed in the copyright work.

My Lords, if one examines the cases in which the distinction between ideas and the expression of ideas has been given effect, I think it will be found that they support two quite distinct propositions. The first is that a copyright work may express certain ideas which are not protected because they have no connection with the literary, dramatic, musical or artistic nature of the work. It is on this ground that, for example, a literary work which describes a system or

[2001] 1 All ER 700, [2000] 1 WLR 2416

invention does not entitle the author to claim protection for his system or invention as such. The same is true of an inventive concept expressed in an artistic work. However striking or original it may be, others are (in the absence of patent protection) free to express it in works of their own (see Kleeneze Ltd v DRG (UK) Ltd [1984] FSR 399). The other proposition is that certain ideas expressed by a copyright work may not be protected because, although they are ideas of a literary, dramatic or artistic nature, they are not original, or so commonplace as not to form a substantial part of the work. Kenrick & Co v Lawrence & Co (1890) 25 QBD 99 is a well-known example. It is on this ground that the mere notion of combining stripes and flowers would not have amounted to a substantial part of the plaintiff's work. At that level of abstraction, the idea, though expressed in the design, would not have represented sufficient of the author's skill and labour as to attract copyright protection.

Generally speaking, in cases of artistic copyright, the more abstract and simple the copied idea, the less likely it is to constitute a substantial part. Originality, in the sense of the contribution of the author's skill and labour, tends to lie in the detail with which the basic idea is presented. Copyright law protects foxes better than hedgehogs. In this case, however, the elements which the judge found to have been copied went well beyond the banal and I think that the judge was amply justified in deciding that they formed a substantial part of the originality of the work.

7. THE APPELLATE FUNCTION

The question of substantiality is one of mixed law and fact in the sense that it requires the judge to apply a legal standard to the facts as found. It is, as I said, one of impression in that it requires the overall evaluation of the significance of what may be a number of copied features in the plaintiff's design. I think, with respect, that the Court of Appeal oversimplified the matter when they said that they were in as good a position to decide the question as the judge. I say this for two reasons.

First, although the question did not depend upon an assessment of the credibility of witnesses, there seems to me no doubt that a judge may obtain assistance from expert evidence in identifying those features of an artistic work which enable it to produce a particular visual effect. The plaintiff's expert Mr Herbert described his expertise as 'the art of visual literacy'. This seems to me to be right. So I think that the judge, having heard Mr Herbert, was well placed to assess the importance of the plaintiff's designer's brush strokes, resist effect and so forth in the overall artistic work. The Court of Appeal, on the other hand, adopted a reductionist approach which ignored these elements.

Secondly, because the decision involves the application of a not altogether precise legal standard to a combination of features of varying importance, I think that this falls within the class of case in which an appellate court should not reverse a judge's decision unless he has erred in principle (see Pro Sieben Media AG v Carlton UK Television Ltd [1999] 1 WLR 605 at 612-613). I agree with Buxton LJ in Norowzian v Arks Ltd (No 2) [1999] IP & T 223 at 230-231 when he said:

'... [W]here it is not suggested that the judge has made any error of principle a party should not come to the Court of Appeal simply in the hope that the impression formed by the judges in this court, or at least by two of them, will be different from that of the trial judge.'

In my opinion the judge made no error of principle. His decision that the copied features formed a substantial part of the work should therefore not have been reversed. I would allow the appeal.

**JUDGMENTBY-3:** LORD HOPE OF CRAIGHEAD.

**JUDGMENT-3:**

LORD HOPE OF CRAIGHEAD.

My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend Lord Bingham of Cornhill. I agree with it, and for the reasons which he has given I too would allow the appeal.

[2001] 1 All ER 700, [2000] 1 WLR 2416

**JUDGMENTBY-4:** LORD MILLETT. M

**JUDGMENT-4:**

LORD MILLETT. M

Lords, both parties design and sell fabrics and wallpapers. The plaintiffs brought proceedings against the defendants for infringement of the copyright in one of their designs. The trial judge (Mr Lawrence Collins QC) found that the defendants had prior access to the copyright work and that their design reproduced many of its features. He rejected the defendants' evidence of independent origin, and found that their design was copied from and reproduced a substantial part of the copyright work. He accordingly gave judgment for the plaintiffs (see [1998] FSR 803).

The defendants appealed to the Court of Appeal, but they did so on a very narrow ground. They abandoned most of the grounds in their notice of appeal, and did not challenge the judge's findings of fact, in particular that the defendants' design was copied from and reproduced features of the copyright work. They contented themselves with challenging his conclusion that what they had taken was a substantial part of the copyright work.

The Court of Appeal began by making a visual comparison of the two designs. Their initial reaction was that it did not look as if the defendants' design involved the copying of a substantial part of the copyright work. As Morritt LJ put it ([2000] FSR 121 at 133 (para 30)): 'On the broadest level they just do not look sufficiently similar.'

Recognising that it would not be right to reach a concluded view 'on so subjective and unanalytical approach alone', they proceeded to conduct a detailed analysis of the judge's findings of fact and recorded the many differences of detail in those features of the defendants' design which the judge had found to have been copied from the copyright work. This only served to confirm their initial impression. They concluded that, while the defendants had copied the idea of the copyright work and adopted the same techniques, they had not copied a substantial part of the expression of the idea. They accordingly allowed the defendants' appeal.

It is difficult to avoid the impression that the Court of Appeal were not persuaded that the defendants had copied the copyright work at all. Unable to reverse the judge's unchallenged findings that they had, they thought that if the defendants had copied any features of the copyright work they could not have copied very much. By adopting this approach they not only went behind the judge's unchallenged findings of fact, which they were not entitled to do, but rejected his finding of substantiality which, being essentially a matter of impression, an appellate court should always be very slow to do.

If this were all, I doubt that I would have wished to add anything to what my noble and learned friends have said. But I think that the Court of Appeal erred in principle in the approach which they adopted. In particular, I think that they misunderstood the function of a visual comparison of the two works in a case concerned with artistic copyright and the stage at which such a comparison should be undertaken.

It must be borne in mind that this is an action for infringement of copyright. It is not an action for passing off. The gist of an action for passing off is deceptive resemblance. The defendant is charged with deceiving the public into taking his goods as and for the goods of the plaintiff. A visual comparison of the competing articles is often all that is required. If the overall impression is that 'they just do not look sufficiently similar' then the action will fail.

An action for infringement of artistic copyright, however, is very different. It is not concerned with the appearance of the defendant's work but with its derivation. The copyright owner does not complain that the defendant's work resembles his. His complaint is that the defendant has copied all or a substantial part of the copyright work. The reproduction may be exact or it may introduce deliberate variations-involving altered copying or colourable imitation as it is sometimes called. Even where the copying is exact the defendant may incorporate the copied features into a larger work much and perhaps most of which is original or derived from other sources. But while the copied features must be a substantial part of the copyright work, they need not form a substantial part of the defendant's work (see Warwick Film

[2001] 1 All ER 700, [2000] 1 WLR 2416

Productions Ltd v Eisinger [1967] 3 All ER 367, [1969] Ch 508). Thus the overall appearance of the defendant's work may be very different from the copyright work. But it does not follow that the defendant's work does not infringe the plaintiff's copyright.

The first step in an action for infringement of artistic copyright is to identify those features of the defendant's design which the plaintiff alleges have been copied from the copyright work. The court undertakes a visual comparison of the two designs, noting the similarities and the differences. The purpose of the examination is not to see whether the overall appearance of the two designs is similar, but to judge whether the particular similarities relied on are sufficiently close, numerous or extensive to be more likely to be the result of copying than of coincidence. It is at this stage that similarities may be disregarded because they are commonplace, unoriginal, or consist of general ideas. If the plaintiff demonstrates sufficient similarity, not in the works as a whole but in the features which he alleges have been copied, and establishes that the defendant had prior access to the copyright work, the burden passes to the defendant to satisfy the judge that, despite the similarities, they did not result from copying.

Even at this stage, therefore, the inquiry is directed to the similarities rather than the differences. This is not to say that the differences are unimportant. They may indicate an independent source and so rebut any inference of copying. But differences in the overall appearance of the two works due to the presence of features of the defendant's work about which no complaint is made are not material. In the present case the disposition of the flowers and (except in one instance) the colourways of the defendants' design are very different from those of the plaintiffs' design. They were not taken from the copyright work, and the plaintiffs make no complaint in respect of them. They make a significant difference to the overall appearance of the design. But this is not material where the complaint is of infringement of copyright and not passing off.

Once the judge has found that the defendants' design incorporates features taken from the copyright work, the question is whether what has been taken constitutes all or a substantial part of the copyright work. This is a matter of impression, for whether the part taken is substantial must be determined by its quality rather than its quantity. It depends upon its importance to the copyright work. It does not depend upon its importance to the defendants' work, as I have already pointed out. The pirated part is considered on its own (see Ladbroke (Football) Ltd v William Hill (Football) UK Ltd [1964] 1 All ER 465 at 481, [1964] 1 WLR 273 at 293 per Lord Pearce) and its importance to the copyright work assessed. There is no need to look at the infringing work for this purpose.

The Court of Appeal were concerned only with this second stage. They were not entitled to reverse the judge's finding that the defendants' design reproduced features of the copyright work, nor his identification of the features in question. The only issue was whether those features represented a substantial part of the copyright work. A visual comparison of the two designs was not only unnecessary but likely to mislead.

My noble and learned friend Lord Scott of Foscote has drawn attention to the differences between the copying of a discrete part of the copyright work and the altered copying of the whole, or the copying with or without modifications of some but not all the features of the copyright work. The distinction is not material in the present case. Whether or not it is alleged that a discrete part of the copyright work has been taken, the issues of copying and substantiality are treated as separate questions. Where, however, it is alleged that some but not all the features of the copyright work have been taken, the answer to the first question will almost inevitably answer both, for if the similarities are sufficiently numerous or extensive to justify an inference of copying they are likely to be sufficiently substantial to satisfy this requirement also.

For these reasons, as well as those given by my noble and learned friends Lord Hoffmann and Lord Bingham of Cornhill, I would allow the appeal.

**JUDGMENTBY-5:** LORD SCOTT OF FOSCOTE.

**JUDGMENT-5:**

[2001] 1 All ER 700, [2000] 1 WLR 2416

LORD SCOTT OF FOSCOTE.

My Lords, both the appellant, Designers Guild Ltd (DGL) and the respondent, Russell Williams (Textiles) Ltd (RWT), design and sell fabrics. The issue in this litigation is whether RWT's Marguerite design is an infringing copy of DGL's Ixia design. The trial judge, Mr Lawrence Collins QC, sitting as a deputy judge of the Chancery Division, held that it was ([1998] FSR 803). The Court of Appeal ([2000] FSR 121) held that it was not.

The Ixia design

Of the two designs Ixia came first. It was produced in 1994, in art form, by Helen Burke, a designer employed by DGL. From Helen Burke's design the Ixia fabric was produced. The design, in its artwork form, consisted of vertical stripes of alternating pink and pale yellow and with flowers scattered haphazardly across the stripes. The flowers consisted of four, and sometimes three, white petals with a centre stamen in a bold deep red and with green leaves in the vicinity of, but not actually connected to, each set of white petals. The stripes were painted with rough edges and rough brushwork. The flower petals and the leaves were painted in an impressionistic style with the colour of the stripes showing through the petals. Indeed the design as a whole was impressionistic in character. When the artwork design was transposed on to textile there were some differences. Three distinct versions of stripes were produced. One version alternated pink with pale yellow as the artwork had done. The other two alternated deep blue stripes with very pale blue stripes and turquoise stripes with very pale blue stripes. The pale yellow and the pale blue stripes on the fabric do not, unlike the artwork pale yellow stripes, show the brushwork. But there were no other significant differences between the stripes on the fabric and the stripes on the artwork. The fabric stripes, whichever of the three colourways, pink, blue or turquoise, one looks at, give the impression as do the artwork stripes of rough, impressionistic brushwork, with the underlying colour of the fabric showing through and with rough edges to the stripes. The flower petals, the stamen and the leaves on the fabric have no significant differences from their artwork counterparts, save that on the blue colourway design the stamen is turquoise instead of red. It is accepted, that the Ixia design is, for copyright purposes, an original artistic work and that the copyright is owned by DGL.

Fabric with the Ixia designs was included by DGL in its 1995 Orientalis collection. DGL distributed pattern books of its collection, some 1,500 or thereabouts, to its wholesale and retail customers and the Ixia fabrics went on sale at DGL's shop in the King's Road, London, on 1 September 1995. The fabrics were shown at a trade fair in London on 1 October 1995. The trade fair was attended by Mrs Williams, a director of RWT. Mrs Williams works with RWT's designers on the design of their textile patterns. The evidence of the marketing of the Ixia fabrics led the judge to conclude that, by October or November 1995 when RWT's Marguerite design was created, RWT had had the opportunity to copy.

The litigation

In September 1996 DGL was alerted to the presence at a trade fair in Utrecht of fabrics with the Marguerite design. An examination of these fabrics led DGL to believe that the Marguerite design was a copy of the Ixia design. Letters passed between the parties' respective solicitors and litigation then followed.

The deputy judge, in a conspicuously careful judgment, came to the conclusion that the Marguerite design had been copied from the Ixia design. His conclusion of copying was not challenged in the Court of Appeal and is not challenged before your Lordships. The point taken in the Court of Appeal, successfully as it turned out, was a substantiality point. Section 16(3) of the Copyright, Designs and Patents Act 1988 provides that:

'References in this Part to the doing of an act restricted by the copyright in a work are to the doing of it-(a) in relation to the work as a whole or any substantial part of it, and (b) either directly or indirectly ...'

The Court of Appeal was persuaded that although there had been copying-as I have said, the deputy judge's finding of fact to that effect was not challenged-the copying did not extend to the copying of a substantial part of Ixia. Morritt LJ, who gave the leading judgment in the Court of Appeal, succinctly stated RWT's case thus ([2000] FSR 121 at 127

[2001] 1 All ER 700, [2000] 1 WLR 2416

(para 12)):

'[RWT's] case on this appeal is quite simply that notwithstanding such copying and notwithstanding such similarities the claim that RWT infringed the copyright of DGL in the painting of Ixia fails because there was no copying of the whole of the painting of Ixia and such copying as there was of part of the painting of Ixia did not extend to a substantial part.'

In assessing the manner in which this issue of substantiality should be approached and whether the Court of Appeal's answer on the issue was right, it is necessary, in my opinion, to start with the judge's finding that copying was established. What was it that he found to have been copied? Clarity as to the answer to that question must precede the question as to whether what was copied was the whole or a substantial part of the copyright work.

The finding of copying

The judge came to the conclusion of copying via a consideration of the similarities between the two designs, a recognition of the opportunity to copy that RWT had had, and a consideration of RWT's evidence as to the independent provenance of the Marguerite design.

The Marguerite design, like the Ixia design, is based on vertical stripes in alternating colours and with flowers and associated stalks and leaves scattered across the stripes. The flower petals, like those on the Ixia design, are white. The stalks and leaves are two-tone green. As with the Ixia design, the Marguerite design was reproduced on fabric in different versions with different colourways. Each version has pale yellow stripes. The stripes that alternate with the pale yellow stripes are either pink, blue, green or orange. A difference between the Ixia fabric and the Marguerite fabric is that on Marguerite the pale yellow stripes, as well as the alternate stripes, show brushwork lines. On the Ixia fabric it is only the alternate colour stripes that show the brushwork lines. The Marguerite flower petals and stalks and leaves show, when compared with those on Ixia, both similarities and differences.

On Marguerite the white petals are painted more boldly, or less delicately, than those on Ixia but, still, like those on Ixia, the underlying stripe colour shows through the petals. The Marguerite stamen on the pink colourway design are of a somewhat deeper shade of red than those on the Ixia pink colourway design. On the Ixia fabric with a blue colourway the stamen are turquoise; on the fabric with a turquoise colourway, the stamen are the same shade of red as on the pink colourway fabric. On each of the Marguerite fabrics, other than that with a pink colourway, the stamen are biscuit coloured. The leaves on the Ixia fabric are two-tone green. The stalks and leaves on the Marguerite fabric, too, are two-tone green of much the same shades. But the latter are more firmly and less impressionistically drawn than the former.

The judge came to the following conclusion on similarity:

'In my judgment, [DGL] has clearly shown relevant similarity. The similarities are apparent. They go far beyond the similarities which would be expected simply from both being based on an impressionistic style or from both being based on a combination of stripes and scattered flowers and leaves.' (See [1998] FSR 803 at 815.)

He identified seven similarities which led him to that conclusion. He described them as follows (at 813):

'1. Each fabric consists of vertical stripes, with spaces between the stripes equal to the width of the stripe, and in each fabric flowers and leaves are scattered over and between the stripes, so as to give the same general effect. 2. Each is painted in a similar neo-Impressionistic style. Each uses a brush-stroke technique, i.e. the use of one brush to create a stripe, showing the brush marks against the texture. 3. In each fabric the stripes are formed by vertical brush strokes, and have rough edges which merge into the background. 4. In each fabric the petals are formed with dryish brushstrokes and are executed in a similar way (somewhat in the form of a comma). 5. In each fabric parts of the colour of the stripes show through some of the petals. 6. In each case the centres of the flower heads are represented by a strong blob, rather than by a realistic representation. 7. In each fabric the leaves are painted in two distinct shades of green, with similar

[2001] 1 All ER 700, [2000] 1 WLR 2416

brush strokes, and are scattered over the design.'

He referred also to the differences between the two designs:

'The overall impression is very similar, but there are differences. The Ixia design is smaller and more delicate and the detail is different. In Marguerite the effect of the stripes showing through the petals is not as marked as it is in Ixia. The leaves in Marguerite are distinctly less impressionistic than those in Ixia. The impression of similarity is more marked on a comparison of the pink colourways.'

Having expressed his conclusion on the rival fabrics' similarities and having found that RWT personnel had had an opportunity to copy Ixia, the judge turned his attention to RWT's evidence as to the independent provenance of their Marguerite design. This evidence was given by Miss Ibbotson, the designer of the Marguerite design, and Mrs Williams, a director of RWT who had worked with Miss Ibbotson in producing the Marguerite design. Their evidence was that the Marguerite flowers had been derived from an artwork design, referred to as 'Open Cherry Blossom', created by Miss Ibbotson in October 1995. Variations had been incorporated into the Open Cherry Blossom flower design which had led to the Marguerite flower design. This flower design had then been added to a number of colourways of which Mrs Williams had chosen the four to which I have already referred. Both Miss Ibbotson and Mrs Williams said that at the time the Marguerite design was being developed they were not aware of the Ixia design. The judge summed up the position as follows (at 818):

'The essence therefore of the defence is that (a) neither Mrs Williams nor Miss Ibbotson knew of the Ixia design when the Marguerite design was produced and executed; (b) any similarities between Ixia and Marguerite are coincidental; and (c) the Marguerite design evolved from the floral part of the Open Cherry Blossom design being copied onto the acetate for use on muslin, or to show how Open Cherry Blossom would work with white flowers.'

But the judge rejected the evidence of Miss Ibbotson and Mrs Williams. He described Miss Ibbotson (at 819) as 'a very unsatisfactory witness' and said: '... she and Mrs Williams, far from being helpful and frank, were content to deny the obvious.' They had given evidence that the origin of Marguerite was an acetate floral design that, in October 1995, had been copied from Open Cherry Blossom in order to enable the floral motif on Open Cherry Blossom to be used for printing white flowers on to muslin.

The judge had been troubled about this evidence, both because of differences between the flowers on the acetate design and the Open Cherry Blossom flowers and also because the flowers on the acetate had certain characteristics which appeared on the Ixia flowers but not on the Open Cherry Blossom flowers. He expressed the conclusion (at 820) that: '... the explanation was designed to provide a false provenance for the floral part of the Marguerite design, and to distance it from the creation of the striped artwork.'

The judge rejected, therefore, the evidence that Miss Ibbotson and Mrs Williams had given of the provenance of the Marguerite design. He rejected also Mrs Williams' evidence that she had been unaware of the Ixia design. He said:

'In my judgment the effect of the (1) many and obvious similarities; (2) the opportunity to copy; (3) the complementary nature of the acetate and the striped artwork; and (4) the false provenance given to the acetate, is that [DGL] has convincingly discharged the burden of proving that [RWT] copied Ixia.'

The judge's finding of copying, accepted before the Court of Appeal and before your Lordships, and the manner in which that finding was arrived at, are, in my opinion, of fundamental importance in reviewing the reversal by the Court of Appeal of his decision. The finding of copying cannot be accurately described as a finding of the copying of a part of Ixia. In the passage cited above the judge said that DGL had proved that RWT 'copied Ixia'. He did not find that the Ixia stripes had been copied, or that the Ixia flowers or leaves had been copied or that the colours of the ingredients of the design had been copied, or that any specific feature of Ixia had been copied. He simply found that the Ixia design had been copied. The Ixia design had incorporated features that, by themselves, were not original. There was nothing original about vertical stripes. Helen Burke had based her vertical stripes on fabrics appearing in various pictures

[2001] 1 All ER 700, [2000] 1 WLR 2416

painted by Matisse. But she had brought flowers, leaves and vertical stripes together in a design that was accepted to be an original artistic work. The judge, rejecting the evidence of Miss Ibbotson and Mrs Williams, found that the acetate, with the flowers, stalks and leaves, and the vertical stripe work of the Marguerite design had been created together for the purpose of producing the Marguerite design as a copy of the Ixia design. So, in a case of this sort what part does the concept of substantiality have to play?

Substantiality

Section 16(3) of the 1988 Act says that copying a copyright work is a copyright infringement if the copying is of 'the work as a whole or any substantial part of it'. Section 16(3) may come into play in two quite different types of case. One type of case is, obviously, where an identifiable part of the whole, but not the whole, has been copied. For example, only a section of a picture may have been copied, or only a sentence or two, or even only a phrase, from a poem or a book, or only a bar or two of a piece of music, may have been copied (see the examples given at pp 88-89 (para 2-102) of Laddie, Prescott and Vitoria The Modern Law of Copyright and Designs (2nd edn, 1995) (which, for convenience, I will refer to as 'Laddie'). In cases of that sort, the question whether the copying of the part constitutes an infringement depends on the qualitative importance of the part that has been copied, assessed in relation to the copyright work as a whole. In Ladbroke (Football) Ltd v William Hill (Football) UK Ltd [1964] 1 All ER 465 at 469, [1964] 1 WLR 273 at 276 Lord Reid said: '... the question whether he has copied a substantial part depends much more on the quality than on the quantity of what he has taken.'

The present case is not a case of that type. The judge did not identify any particular part of Ixia and hold that that part had been copied. His finding of copying related to Ixia as a whole.

The other type of case in which a question of substantiality may become relevant is where the copying has not been an exact copying of the copyright work but a copying with modifications. This type of copying is referred to in Laddie as 'altered copying'. A paradigm of this type of case would be a translation of a literary work into some other language, or the dramatisation of a novel. The translation, or the play or film, might not have a single word in common with the original. But, assuming copyright existed in the original, the 'copy' might well, and in the case of a word by word translation certainly would, constitute an infringement of copyright.

The present case is an 'altered copying' case. Helen Burke put together a number of artistic ideas derived from various sources in order to produce her Ixia design, an original artistic design as it is accepted to be. Miss Ibbotson and Mrs Williams, as the judge found, copied the Ixia design in order to produce their Marguerite design. But they did so with modifications. The Marguerite design is not an exact copy of Ixia. Nor is any specific part of the Marguerite design an exact copy of any corresponding part of the Ixia design. It is an altered copy.

The question, then, where an altered copy has been produced, is what the test should be in order to determine whether the production constitutes a copyright infringement. If the alterations are sufficiently extensive it may be that the copying does not constitute an infringement at all. The test proposed in Laddie (pp 92-93 (para 2-108)) to determine whether an altered copy constitutes an infringement is: 'Has the infringer incorporated a substantial part of the independent skill, labour etc contributed by the original author in creating the copyright work ...?'

My Lords, I think this is a useful test, based as it is on an underlying principle of copyright law, namely, that a copier is not at liberty to appropriate the benefit of another's skill and labour.

My noble and learned friend Lord Millett has made the point that once copying has been established, the question of substantiality depends on the relationship between what has been copied on the one hand and the original work on the other, similarity no longer being relevant. My Lords, I respectfully agree that that would be so in the first type of case. But in an altered copying case, particularly where the finding of copying is dependant, in the absence of direct evidence, upon the inferences to be drawn from the extent and nature of the similarities between the two works, the similarities will usually be determinative not only of the issue of copying but also of the issue of substantiality. And even where

[2001] 1 All ER 700, [2000] 1 WLR 2416

there is direct evidence of copying, as, for example, where it is admitted that the copier has produced his 'copy' with the original at his elbow, the differences between the original and the 'copy' may be so extensive as to bar a finding of infringement. It is not a breach of copyright to borrow an idea, whether of an artistic, literary or musical nature, and to translate that idea into a new work. In 'altered copying' cases, the difficulty is the drawing of the line between what is a permissible borrowing of an idea and what is an impermissible piracy of the artistic, literary or musical creation of another. In drawing this line, the extent and nature of the similarities between the altered copy and the original work must, it seems to me, play a critical and often determinative role. In particular, this must be so where there is no direct evidence of copying and the finding of copying is dependant on the inferences to be drawn from the similarities. In the 'Little Spanish Town' case, Francis Day & Hunter Ltd v Bron (t/a Delmar Publishing Co) [1963] 2 All ER 16 at 19, [1963] Ch 587 at 610, Willmer LJ said:

'... I do not think it could be doubted that there was material on which to base the inference that the composer of "Why" deliberately copied from "Spanish Town". Were that the right inference, I am satisfied that the degree of similarity would be sufficient to constitute an infringement of the plaintiffs' copyright.'

And Diplock LJ said:

'... it is well established that to constitute infringement of copyright in any literary, dramatic or musical work there must be present two elements: First, there must be sufficient objective similarity between the infringing work and the copyright work, or a substantial part thereof, for the former to be properly described, not necessarily as identical with, but as a reproduction or adaptation of the latter; secondly, the copyright work must be the source from which the infringing work is derived.' (See [1963] 2 All ER 16 at 27, [1963] Ch 587 at 623.)

The same principles apply to artistic copyright as to literary, dramatic or musical copyright. Both Willmer and Diplock LJJ treated similarity as being relevant to the substantiality issue. Laddie cites the 'Little Spanish Town' case as an example of altered copying (pp 93-94 (para 2-109)).

In the present case, the similarities between Ixia and Marguerite, as found by the judge, play, in my judgment a determinative role. If the similarities between Ixia and Marguerite were so extensive and of such a nature as to justify a finding that, in the absence of acceptable evidence of an independent provenance for Marguerite, Marguerite was copied from Ixia, it must, in my opinion, follow that the Marguerite design incorporated a substantial part of the Ixia design. It must follow also that, in designing the Marguerite design, the designers incorporated a substantial part of the skill and labour of Helen Burke. The judge's finding of copying made it, in my opinion, unnecessary for him to go on to ask whether the copying was of a substantial part. But both the judge and the Court of Appeal engaged in that inquiry.

The judge did so in order to deal with arguments that had been addressed to him by Mr Geoffrey Hobbs QC, counsel for RWT at the trial. Mr Hobbs, as I read the judge's description of his argument, was arguing that the Marguerite white flowers had not been copied from Ixia but had been derived, via the acetate, from the Open Cherry Blossom design, and that, accordingly, the white flowers should be set to one side when considering whether the Marguerite design had copied a substantial part of the Ixia design. Counsel pointed out, correctly, that the Ixia vertical stripes were not original but had been derived from Matisse and that the Marguerite vertical stripes differed geometrically and in colour from the Ixia stripes. It followed, counsel submitted, that the copying of whatever was original in the Ixia design could not be said to be a substantial part of that design.

The judge, in rejecting that argument, said ([1998] FSR 803 at 828): 'In my judgment there has been copying of a substantial part.' He went on to emphasise that it was 'the whole work' that had to be looked at 'to determine whether the alleged infringing material [had] adopted the essential features and substance of the original'. He said:

'The right approach is to look at the end result of the acetate, the striped artwork, the modifications made by Mrs Williams (especially making the stripes less harsh) and her selection of colourways, and the printed fabric. That end result is an infringement of the painting on which Ixia was based.'

[2001] 1 All ER 700, [2000] 1 WLR 2416

In my opinion, the judge's approach in comparing Ixia ('the whole work') with Marguerite ('the end result') was correct. And having made the comparison he expressed his conclusion that: 'It is the design which was copied and has been reproduced.' (My emphasis.) So, what had been copied was the design, and the design was a substantial part. In dealing in this way with the 'substantial part' argument that had been addressed to him by counsel, the judge was re-affirming his conclusion that the Ixia design had been copied.

The Court of Appeal's approach to the 'substantial part' issue

In para 12 of his judgment ([2000] FSR 121 at 127), Morritt LJ recorded that counsel for RWT had accepted that he could not challenge the judge's findings on copying and that the similarities between the two fabrics described by the judge did exist. He recorded counsel's argument that 'notwithstanding such copying and notwithstanding such similarities' DGL's claim should fail 'because there was no copying of the whole of the painting of Ixia and such copying as there was of part of the painting of Ixia did not extend to a substantial part'. This submission was not, in my view, consistent with the judge's findings of copying. Moreover, I think, with respect to counsel, that it introduced a confusion. Counsel was arguing the case as if it were one in which only a part of Ixia had been copied. But that was not what the judge had held.

This approach led the court into attempting a dissection of the rival designs in an attempt to identify the part or parts of Ixia that had been copied. It led Morritt LJ (at 132 (para 25)) to formulate as the question of fact to be determined: 'Did the production of Marguerite involve the indirect copying of a substantial part of the painting for Ixia?'

Morritt LJ (at 133 (para 29)) referred to 'those features of the painting of Ixia which the judge considered to have been copied into Marguerite'. He summarised them as:

'a) the combination of the flowers and the stripes, b) the way in which the flowers and stripes are related to each other, c) the way in which the flowers and stripes were painted, d) the resist effect.'

This was a fair and accurate summary of the respects in which the judge had found there to be similarities between the two designs. They were the similarities that, with other indicia, had led him to the conclusion that the designers of Marguerite had copied the Ixia design. But the judge had not expressed his finding of copying as being limited to those features. Morritt LJ then went on to consider in turn each of the features and to ask himself whether a copying of that feature constituted an infringement. He concluded in each case that it did not. As to the combination of the flowers and stripes, he regarded that as the copying of an idea, rather than the copying of the expression of an idea. As to the relationship between the flowers and the stripes, he said that counsel for DGL had accepted that the layout or disposition of the flowers in Marguerite was not an infringement of copyright in that it had been derived from an independent source. He said, also, that the flowers in Marguerite were not copies of those in Ixia. As to the concession, I think there may have been some misunderstanding. Certainly before your Lordships no such concession has been made. Moreover the judge had rejected RWT's evidence as to the provenance of the Marguerite flowers and had made a finding of copying that extended to the design as a whole. As to the way in which the flowers and stripes were painted, ie the brushwork, Morritt LJ agreed that comparable painting techniques had been used, but said (at 134 (para 33)) that 'the visual result is not the same'. And as to the 'resist' effect, ie the technique by which an impression is given that an undercolour is showing through, here again, Morritt LJ discerned visual differences between the rival designs. He expressed his conclusion in para 35:

'Accordingly, having sought to analyse the similarities between the two works, I find that Marguerite adopted the same idea and in three respects, the brushwork on the stripes, the formation of the petals and the resist effect used the same techniques as were used in Ixia. But though the same techniques were used in those respects their use produced different visual effects and the subject matters of their use, the stripes and the flowers, were not copied from Ixia into Marguerite. This analysis supports the outcome of my visual comparison but does not coincide with the judge's conclusion.'

[2001] 1 All ER 700, [2000] 1 WLR 2416

And, in para 37 (at 135): 'The designers of Marguerite certainly copied the idea of Ixia, they also adopted the same techniques but they did not copy a substantial part of the expression of the idea.'

Auld and Clarke LJJ agreed, and, consequently, the appeal was allowed.

Conclusion

In my opinion, there are two respects in which the Court of Appeal's approach went wrong. First, the conclusions seem to me to contradict the judge's finding of copying. More important, however, the approach whereby the constituent features of the rival designs were isolated from the whole and compared with one another was, in my judgment, in a case where copying had been found established and the finding was not under challenge, wrong in principle. The Marguerite design was an altered copy. The question whether the copying constituted an infringement did raise a question of substantiality, but a question that had to be determined by comparing Marguerite as a whole with Ixia as a whole. Did Marguerite, incorporate a substantial part of the skill and labour expended by the designer of Ixia in producing Ixia?

The judge had found that it did. He could not otherwise have made his finding of copying. There had been no direct evidence of copying and the judge's finding had been based on the extensive similarities between Ixia and Marguerite. These similarities, coupled with the opportunity to copy and in the absence of any acceptable evidence from RWT as to an independent provenance for Marguerite, had led the judge to conclude, on a balance of probabilities, that Marguerite had been copied from Ixia. If the similarities between the two works were sufficient to justify the inference that one had been copied from the other, there was, in my judgment, no further part for the concept of substantiality to play. The thrust of Morritt LJ's judgment in the present case suggests that he disagreed with the basis on which the judge had arrived at his finding of copying. If the judge's finding of copying had been challenged in the Court of Appeal on the ground that the similarities between Ixia and Marguerite were not sufficiently substantial to justify the inference that Marguerite had been copied from Ixia, the challenge would, I think, have been sympathetically received. And if asked whether the similarities on which the judge had based his finding of copying showed that Marguerite had incorporated a substantial part of Helen Burke's skill and labour in designing Ixia, I think that the Court of Appeal, in disagreement with the judge, would have said that it did not.

But the finding of copying was not challenged, and, in any event, findings on such matters are particularly the province of the trial judge. In Biogen Inc v Medeva plc (1996) 38 BMLR 149 at 166 my noble and learned friend, Lord Hoffmann, commented:

'Where the application of a legal standard such as negligence or obviousness involves no question of principle but is simply a matter of degree, an appellate court should be very cautious in differing from the judge's evaluation.'

The same caution should, in my view, be employed in relation to evaluations about similarities and substantiality. (See also the remarks of Buxton LJ in Norowzian v Arks Ltd (No 2) [1999] IP & T 223 at 230-231.)

For these reasons, and those given by my noble and learned friend, Lord Bingham of Cornhill, whose speech I have the advantage of reading in draft, I would allow the appeal.

**DISPOSITION:**

Appeal allowed.

Dilys Tausz Barrister.

# APPENDIX OF FOREIGN AUTHORITIES ITEM 4

54 of 58 DOCUMENTS

LADBROKE (FOOTBALL), LTD. v. WILLIAM HILL (FOOTBALL), LTD.

HOUSE OF LORDS

*[1964] 1 All ER 465, [1964] 1 WLR 273*

**HEARING-DATES:** 18, 20, 21, 26, 27, 28 November 1963, 21 January 1964

21 January 1964

**CATCHWORDS:**

Copyright -- Compilation -- Originality -- Approach to determining whether copyright exists -- Compilation regarded as a whole -- Skill, labour and judgment involved -- Football betting coupon -- Wagers listed in coupon selected from a very great variety of possible wagers -- Work of selecting wagers to be taken into account when assessing originality -- Work of presentation of chosen wagers to the eye of the customer by means of the coupon also involving skill, labour and judgment -- Coupon an original literary work within Copyriht Act, 1956 (4 & 5 Eliz. 2 c. 74), s. 2 (1) and s. 48 (1).

Copyright -- Infringement -- Compilation -- Approach -- Determining first whether work as a whole entitled to copyright and then whether part reproduced was a substantial part -- Football betting coupon comprising various parts -- Substantial part copied -- Copyright Act, 1956 (4 & 5 Eliz. 2 c. 74), s. 2 (5) (a) and s. 49 (1).

**HEADNOTE:**

The correct approach in deciding if there is infringement of copyright in a literary compilation is first to determine whether the work as a whole is entitled to copyright, and, second, to enquire whether the part reproduced by the defendant is a substantial part of the whole; but it is not the correct approach to dissect the work into fragments and, if the fragments are not entitled to copyright, to deduce that the whole compilation could not be so entitled (see p. 469, letters C and F, p. 475, letter H, and p. 479, letter C, post).

The respondents were well-known bookmakers who had done business for many years in fixed odds football betting sending out to their clients each week during the football season a fixed odds football coupon.  The coupon was a sheet of paper on which were printed sixteen lists of matches to be played each week; each list was headed with an appropriate name and offered a variety of wagers at stated odds and contained explanatory notes.  One of the lists contained the full list of matches to be played at the end of the week this list being determined by the Football League who owned the copyright in it.  The other lists were shorter lists of matches selected by the respondents from the full list.  Altogether the coupon offered 148 varieties of wager at widely differing odds.  A great deal of skill, judgment, experience and work had gone into devising the coupon for the respondents had to select from the very great variety of possible wagers those that would appeal to the punter while being profitable to the respondents, and had then to arrange and describe the selected wagers in an attractive way on the coupon.  The respondents had not altered their coupon since 1951, though the selection of matches in the lists was necessarily changed each week.  Some of the wagers offered by the respondents were commonly offered by other bookmakers.  The appellants, who were also well-known bookmakers, decided to enter the field of fixed odds football betting in 1959, and in devising their coupon for the 1960/1961 season

[1964] 1 All ER 465, [1964] 1 WLR 273

they copied from the respondents' coupon fifteen out of the sixteen lists arranging them in the same order as they appeared in the respondents' coupon, in many cases with the same headings and almost identical varieties of wager, and with similar explanatory notes. They did not copy the odds offered by the respondents but worked these out for themselves and since the respondents' and the appellants' coupons were published simultaneously each week there was no copying of matches selected by the respondents. The respondents claimed copyright in their coupon and alleged infringement by the appellants. By the Copyright Act, 1956, s. 2 (1) copyright subsisted in every "original" literary work, a literary work including, by virtue of s. 48 (1), a compilation. Under s. 2 (5) (a) and s. 49 (1) copyright gave the exclusive right to reproduce a substantial part of the work in any form. Though the appellants admitted copyright in the respondents' selection of matches and statement of odds (neither of which they had copied) they denied copyright in the rest of the coupon. It was not disputed that, as regards a compilation (such as the coupons), the originality requisite to render a work original for the purposes of s. 2 (1) was a matter of degree depending on the amount of skill, judgment or labour that had been involved in making the compilation.

Held: (i) for the purpose of determining whether the respondents' coupon had the originality requisite to render it original work within s. 2 (1) of the Copyright Act, 1956, it was right to take into account the considerable skill, judgment and labour expended by the respondents in the selection of types of wagers, for the production of the coupons was an object of the work so done and that work was preparatory work which could not properly be excluded (see p. 477, letter C, p. 479, letter C, and p. 480, letter I, to p. 481, letter A, post; cf. p. 470, letters A and B, post), moreover (per LORD EVERSHED) after the work of deciding the wagers had been done, there still remained the further task, requiring considerable skill, labour and judgment, of expressing and presenting the chosen wagers for the eye of the customer (see p. 472, letter H, post); accordingly there was copyright in the respondents' coupon.

Collis v. Cater, Stoffell and Fortt, Ltd. ((1898), 78 L.T. 613) and University of London Press, Ltd. v. University Tutorial Press, Ltd. ([1916] 2 Ch. 601) applied.

Purefoy Engineering Co., Ltd. v. Sykes Boxall & Co., Ltd. ((1955), 72 R.P.C. 89) and Cramp & Sons, Ltd. v. Frank Smythson, Ltd. ([1944] 2 All E.R. 92) distinguished.

(ii) on the facts the copying of the respondents' coupon by the appellants amounted to reproduction of a substantial part of the compilation, and accordingly there was infringement of the respondents' copyright by the appellants (see p. 471, letter A, p. 474, letter G, p. 477, letter I to p. 478, letter A, and p. 481, letter E, post).

Dictum of PETERSON, J., in University of London Press, Ltd. v. University Tutorial Press, Ltd. ([1916] 2 Ch. at p. 610) approved.

Appeal dismissed.

**NOTES:**

As to copyright in compilations and selections, see 8 HALSBURY'S LAWS (3rd Edn.) 374, 375, paras. 687 and 688; and for cases on the subject, see 13 DIGEST (Repl.) 58-62, 79-98. As to infringement by copying a substantial part of the work see 8 HALSBURY'S LAWS (3rd Edn.) 427, para. 777; for cases on infringement, see 13 DIGEST (Repl.) 104-110, 451-518.

For the Copyright Act, 1956, s. 2 (1), (5), s. 48 (1), s. 49 (1), see 36 HALSBURY'S STATUTES (2nd Edn.) 72, 73, 142, 145.

**CASES-REF-TO:**

Blacklock (H.) & Co., Ltd. v. Pearson (C. Arthur), Ltd., [1915] 2 Ch. 376; 84 L.J.Ch. 785; 113 L.T. 775; 13 Digest (Repl.) 58, 78.
British Broadcasting Co. v. Wireless League Gazette Publishing Co., [1926] Ch. 433; 95 L.J.Ch. 272; 135 L.T. 93; 13

[1964] 1 All ER 465, [1964] 1 WLR 273

Digest (Repl.) 61, 96.
Canterbury Park Race Course Co., Ltd. v. Hopkins, (1932), 49 N.S.W.W.N. 27; 13 Digest (Repl.) 62, * 43.
Collis v. Cater, Stoffell and Fortt, Ltd., (1898), 78 L.T. 613; 13 Digest (Repl.) 59, 81.
Cramp & Sons, Ltd. v. Frank Smythson, Ltd., [1944] 2 All E.R. 92; [1944] A.C. 329; 113 L.J.Ch. 209; 171 L.T. 102; 13 Digest (Repl.) 61, 94.
Dicks v. Yates, (1881), 18 Ch.D. 76; 50 L.J.Ch. 809; 44 L.T. 660; 13 Digest (Repl.) 72, 162.
Football League, Ltd. v. Littlewoods Pools, Ltd., [1959] 2 All E.R. 546; [1959] Ch. 637; [1959] 3 W.L.R. 42; 3rd Digest Supp.
Francis Day and Hunter, Ltd. v. Twentieth Century Fox Corpn., Ltd., [1939] 4 All E.R. 192; [1940] A.C. 112; 109 L.J.P.C. 11; 161 L.T. 396; 13 Digest (Repl.) 114, 562.
Hawkes & Son (London), Ltd. v. Paramount Film Service, Ltd., [1934] Ch. 593; 103 L.J.Ch. 281; 151 L.T. 294; 13 Digest (Repl.) 116, 574.
Hogg v. Scott, (1874), L.R. 18 Eq. 444; 43 L.J.Ch. 705; 31 L.T. 163; 13 Digest (Repl.) 130, 711.
Kelly v. Morris, (1866), L.R. 1 Eq. 697; 35 L.J.Ch. 423; 14 L.T. 222; 30 J.P. 628; 13 Digest (Repl.) 109, 511.
Lamb v. Evans, [1893] 1 Ch. 218; 62 L.J.Ch. 404; 68 L.T. 131; 13 Digest (Repl.) 60, 89.
leslie v. Young & Sons, [1894] A.c/. 335; 13 Digest (Repl.) 61, 95.
Macmillan v. Suresh Chunder Deb, (1890), I.L.R. 17 Calc. 951; 13 Digest (Repl.) 57, * 31.
Macmillan & Co. v. Cooper, (1923), L.R. 51 Ind. App. 109; 93 L.J.P.C. 113; 13 L.T. 675; 13 Digest (Repl.) 63, 106.
Masson Seeley & Co., Ltd. v. Embosotype Manufacturing Co., (1924), 41 R.P.C. 160; 13 Digest (Repl.) 59, 86.
Purefoy Engineering Co., Ltd. v. Sykes Boxall & Co., Ltd., (1955), 72 R.P.C. 89; 13 Digest (Repl.) 112, 537.
University of London Press, Ltd. v. University Tutorial Press, Ltd., [1916] 2 Ch. 601; 86 L.J.Ch. 107; 115 L.T. 301; 13 Digest (Repl.) 55, 53.

**INTRODUCTION:**

Appeal.  Appeal from an order of the Court of Appeal (LORD DENNING, M.R., and DONOVAN, L.J., DIPLOCK, L.J., dissenting), dated Dec. 19, 1962 (unreported), allowing an appeal by the respondents, William Hill (Football), Ltd., the plaintiffs in the action, from the judgment of LLOYD-JACOB, J., dated June i6, 1962 (unreported).  By his judgment LLOYD-JABOC, J., dismissed the respondents' claim to copyright in their fixed-odds football coupons, but the Court of Appeal (DIPLOCK, L.J., dissenting) held that the coupons were an original literary work, viz., a compilation, within the meaning of s. 2 and s. 48 of the Copyright Act, 1956, entitling the respondents to claim copyright in them, and that the appellants had reproduced a substantial part of the coupons thereby infringing the respondents' copyright.  The Court of Appeal granted the respondents an injunction * restraining the appellants from infringing their copyright.  From that decision the appellants appealed.  The facts relevant to this appeal are set out in the opinion of LORD REID, post.

* For the form of the injunction see footnote (25), p. 474, post.

**COUNSEL:**

Sir Frank Soskice, Q.C., P.J. S. Bevan and I. T. R. Davidson for the appellants.  Gerald Gardiner, Q.C., and D. G. A. Lowe for the respondents.

**JUDGMENT-READ:**

The House took time for consideration.  Jan. 21.  The following opinions were delivered.

**PANEL:** Lord Reid, Lord Evershed, Lord Hodson, Lord Devlin * and Lord Pearce

[1964] 1 All ER 465, [1964] 1 WLR 273

&ast; Lord Devlin retired on Jan. 10, 1964.

**JUDGMENTBY-1:** LORD REID

**JUDGMENT-1:**

LORD REID: My Lords, the respondents are well-known bookmakers. Each week during the football season they have for many years sent out to their clients -- referred to as punters -- a fixed odds football betting coupon. The appellants are also old established bookmakers. They decided to enter this field of betting in 1959 and began to send out coupons which closely resembled the respondents' coupons. The respondents claim copyright in their coupons and allege infringement by the appellants. The appellants maintain that only certain parts of their coupons are copyright and they deny infringement. The decision of LLOYD-JACOB, J., in favour of the appellants was reversed by the Court of Appeal (LORD DENNING, M.R., and DONOVAN, L.J., DIPLOCK, L.J., dissenting) and an injunction was granted. The appellants now seek to have the order of LLOYD-JACOB, J., restored.

A coupon is a sheet of paper on which are printed various lists of forthcoming matches between well-known teams. One called "Nothing Barred" is a full list of some fifty matches. The others are shorter lists of matches selected by the bookmaker from the full list. The bets offered in respect of these lists vary in character. From some the punter must pick a certain number of winners. From others he must pick so many home or away wins or draws or a combination of these. And there are other kinds of bets offered. The variety of bets offered is very great. The respondents' coupon contained sixtten lists each with an appropriate name, and we were told that no less than 148 different varieties of bet were offered if one adds up all those offered under each list. Naturally the odds offered differ widely -- from as low as 5-2 to as high as 20,001-1. And the respondents have one list of peculiar difficulty where they offer £ 100,000 for two pence. It is not disputed that a vast amount of skill, judgment, experience and work has gone into building up the respondents' coupon. There is keen competition in this field. If the bookmaker selects matches too easy to forecast, or offers too favourable odds, he may lose very large sums. If his selections of types of bet, matches and odds do not appeal to punters they will go to rival firms. It appears that the respondents have not altered the general form of their coupon since 1951. They only occasionally alter the odds offered for each type of bet. What is new each week is the selection of the matches which are to go into the lists.

When the appellants decided to enter this field they had to devise a suitable form of coupon. Their manager who was given this task was formerly employed by the respondents, but it appears that he tried to devise a form of coupon substantially different from the respondents' coupon. The coupons of some twenty other firms in the business were produced at the trial, and, while they have a general similarity, they vary very much in the nature of their lists and the variety of bets offered in respect of many of the lists. Most of them were studied by the appellants' manager, but his proposals were rejected by the appellants' managing director, who adopted a form closely similar to the respondents' coupon. The respondents had sixteen lists: the appellants' coupon contains fifteen of these lists, all of which appear in the same order as in the respondents' coupon. Moreover, the varieties of bets offered by the appellants in each of these fifteen lists are almost identical with the offers by the respondents in their corresponding list. It is true that, with I think one exception, each of these lists is to be found in one or more of the other bookmakers' coupons and some are to be found in almost all of them. But the appellants do not suggest that the close resemblance between their coupon and the respondents' coupon is fortuitous. They admit that a good deal was simply copied from the respondents, and they say that they were entitled to do that. By no means everything was copied. For some of the lists they devised new names or headings, and the learned trial judge has found that they worked out for themselves the hundred or more different odds offered in respect of the various kinds of bets. It was impossible to copy the selections of matches: the selections must be from the matches to take place in the following week, so there would not be time for one bookmaker to copy from the coupon of another matter which alters every week.

The first question to be determined is whether or to what extent copyright attaches to these coupons. The respondents say that a coupon must be regarded as a single work and that as such it is protected by copyright. The appellants seek to dissect the coupon. They would not only dissect it into the sixteen lists, but they would further

[1964] 1 All ER 465, [1964] 1 WLR 273

dissect each list into heading, selection of matches, and statement of odds offered for the various kinds of bets. They admit that there is copyright in the selection and in the statements of odds offered: they can safely do that because there they did not copy. But they deny any copyright as regards the rest of the coupon. The Copyright Act, 1956, provides, by s. 2, that copyright shall subsist in every original literary work and, by s. 48, that literary work includes any written table or compilation. I have no doubt that the coupon must be treated as a single compilation. The appellants' dissection theory is derived from some statements in infringement cases and I must, therefore, examine at this point the law regarding infringement. Copyright gives the exclusive right to do certain things including "reproducing the work in any material form", (s. 2 (5) (a)), and reproduction includes reproduction of a substantial part of the work (s. 49 (1)). Broadly, reproduction means copying, and does not include cases where an author or compiler produces a substantially similar result by independent work without copying. If he does copy, the question whether he has copied a substantial part depends much more on the quality than on the quantity of what he has taken. One test may be whether the part which he has taken is novel or striking, or is merely a commonplace arrangement of ordinary words or well-known data. So it may sometimes be a convenient short cut to ask whether the part taken could by itself be the subject of copyright. But, in my view, that is only a short cut, and the more correct approach is first to determine whether the plaintiff's work as a whole is "original" and protected by copyright, and then to inquire whether the part taken by the defendant is substantial. A wrong result can easily be reached if one begins by dissecting the plaintiff's work and asking, could section A be the subject of copyright if it stood by itself, could section B be protected if it stood by itself, and so on. To my mind, it does not follow that, becuase the fragments taken separately would not be copyright, therefore the whole cannot be. Indeed, it has often been recognised that if sufficient skill and judgment have been exercised in devising the arrangements of the whole work, that can be an important or even decisive element in deciding whether the work as a whole is protected by copyright.

The appellants relied on cases where it has been held that in general the title of a work is not copyright. Those cases are dealt with by LORD WRIGHT in the judgment of the Privy Council in Francis Day and Hunter, Ltd. v. Twentieth Century Fox Corpn., Ltd. n(1), and I think that he rightly expressed the principle when he said n(2):

n(1) [1939] 4 All E.R. 192; [1940] A.C. 112.

n(2) [1939] 4 All E.R. at p. 197; [1940] A.C. at p. 122.

"The copying which is complained of is the use of the title, and that is too unsubstantial on the facts of this case to constitute an infringement."
None of the decisions cited in argument appears to me to conflict with the view that one must first decide whether the plaintiff's work as a whole is entitled to copyright and then see whether the part taken is a substantial part. The only apparent exception would seem to be a case such as Leslie v. Young & Sons n(3) where a compilation was treated as consisting of severable parts, one of which was held to be original work and copyright while the rest was not. The appellants' main argument was based on quite a different ground. They deny that the respondents' coupon is an original compilation. There is no dispute about the meaning of the term "original":

n(3) [1894] A.C. 335.

"The word 'original' does not in this connexion mean that the work must be the expression of original or inventive thought. Copyright Acts are not concerned with the originality of ideas, but with the expression of thought, and, in the case of 'literary work', with the expression of thought in print or writing. The originality which is required relates to the expression of the thought. But the Act does not require that the expression must be in an original or novel form, but that the work must not be copied from another work -- that it should originate from the author"
per PETERSON, J., in University of London Press, Ltd. v. University Tutorial Press, Ltd. n(4). It is not disputed that, as regards compilation, originality is a matter of degree depending on the amount of skill, judgment or labour that has been involved in making the compilation.

[1964] 1 All ER 465, [1964] 1 WLR 273

n(4) [1916] 2 Ch. 601 at p. 608.

In the present case, if it is permissible to take into account all the skill, judgment and labour expended in producing the respondents' coupon, there can be no doubt that it is "original". But the appellants say that the coupon must be regarded as having been produced in two stages: first, the respondents had to decide what kind of business they would do -- what kinds of bets they would offer to their clients -- and then they had to write these out on paper. The appellants say that it is only the skill, judgment and labour involved in the latter stage that can be considered and that that part of their operation involved so little skill, judgment or labour that it cannot qualify as "original". It fact the respondents did not proceed in that way. Their business was to devise a coupon which would appeal to the betting public, and its form and arrangement were not something dictated by previous decisions about the nature of the bets to be offered. The appellants likened the coupon to a trader's catalogue of his wares, and argued that in considering whether a catalogue is entitled to copyright one must disregard the trader's skill and work in deciding what wares he will stock for sale and only consider the skill and labour involved in the actual preparation of the catalogue. ·I do not think that that is a true analogy. Even in the case of a catalogue there may be a question whether the work in deciding what to sell and the work in deciding how to sell it are not so inter-connected as to be inseparable. Copyright in a catalogue in no way prevents honest competition -- any other trader can decide to stock and sell any or all of the catalogued articles, and he can thereafter make a new catalogue of his own wares. What he must not do is simply to copy the other traders' catalogue.

The appellants rely on Purefoy Engineering Co., Ltd. v. Sykes Boxall & Co., Ltd. n(5), and, in particular, on some observations therein n(6). As two of your lordships were parties to that decision I need not say more than that I am satisfied that those observations do not assist the appellants. It is to be observed that earlier in the judgment n(7) the decision in Collis v. Cater, Stoffell and Fortt, Ltd. n(8), was expressly approved. There NORTH, J., held that a somewhat lengthy chemist's catalogue was entitled to copyright, although it contained "nothing whatever but a simple list" n(9) of drugs, etc. with names and prices which the plaintiff kept in stock or could obtain to order. The cases where copyright has been denied to a compilation are comparatively few, the most important being Cramp & Sons. Ltd. v. Frank Smythson, Ltd. n(10). There the work was a pocket diary with a number of pages containing information such as is usually found in diaries. The trial judge, UTHWATT, J., had said n(11) that he could not see that the selection of lists and tables and the arrangement of the diary were anything other than a commonplace selection of gobbets of information and a commonplace arrangement neither of which involved any real exercise of knowledge, labour, judgment or skill. VISCOUNT SIMON, L.C. n(12), having approved a passage in the judgment of LORD ATKINSON in Macmillan & Co. v. Cooper n(13) to the effect that the precise amount of knowledge, labour, judgment or literary skill or taste which the author must bestow in order to acquire copyright must in each case be very much a question of degree, went on to say n(14):

n5 (1955), 72 R.P.C. 89.

n(6) (1955), 72 R.P.C. at p. 99.

n(7) (1955), 72 R.P.C. at p. 95.

n(8) (1898), 78 L.T. 613.

n(9) (1898) 78 L.T. at p. 614.

n(10) [1944] 2 All E.R. 92; [1944] A.C. 329.

n(11) [1944] 2 All E.R. at p. 93; [1944] A.C. at p. 330.

n(12) [1944] 2 All E.R. at p. 94; [1944] A.C. at p. 335.

[1964] 1 All ER 465, [1964] 1 WLR 273

n(13) (1923), L.R. 51 Ind. App. 109.

n(14) [1944] 2 All E.R. at p. 95; [1944] A.C. at p. 336.

"There was no evidence that any of these tables was composed specially for the respondents' diary; there was no feature of them which could be pointed out as novel or specially meritorious or ingenious from the point of view of the judgment or skill of the compiler; it was not suggested that there was any element of originality or skill in the order in which the tables were arranged."

I think that the present case differs from that case in every one of these features, and I am satisfied that copyright did attach to the respondents' coupon.

As regards infringement, I have already indicated the extent to which the appellants copied from the respondents' coupon. That appears to me to amount to a very substantial part of the coupon both in quantity and quality. In this connexion, I think that there is much wisdom in the reference by PETERSON, J., to the "rough practical test that what is worth copying is prima facie worth protecting" -- in University of London Press, Ltd. v. University Tutorial Press, Ltd. n(15). I would therefore hold that there has been infringement, and that this appeal should be dismissed.

n(15) [1916] 2 Ch. at p. 610.

**JUDGMENTBY-2:** LORD EVERSHED

**JUDGMENT-2:**

LORD EVERSHED: My Lords, the vital question in the present case is whether the respondents have established that copyright subsisted in the whole of the football betting coupons issued by them for the season 1960-61, that is to say, whether each such coupon is, within the terms of s. 2, as expanded by s. 48, of the Copyright Act, 1956, an original literary compilation. LLOYD-JACOB, J., gave a negative answer to this question and the appellants' argument before your lordships was to the same effect. Alternatively, the appellants contended that if copyright could exist at all in the coupons it must be limited to that part of the document which is called its "headings". On this difficult matter there has been a difference of judicial opinion, and I have for my part not found the question one easy to answer, since the football coupon as a document has characteristics which distinguish it from other "compilations" which have been considered in the many cases cited to your lordships, and the problem is, therefore, in important respects novel. In argument the analogy was naturally drawn to cases in which anthologies or catalogues had been considered; and, although I think the example of the catalogue is useful for present purposes, it seems to me that, for reasons that later appear, there is perhaps the closest analogy in the decided cases with that of the diary including the tables of dates, weights and measures, etc., commonly found therein which came before this House in the case of Cramp & Sons, Ltd. v. Frank Smythson, Ltd. n(16).

n(16) [1944] 2 All E.R. 92; [1944] A.C. 329.

No doubt the document (that is, the coupon) is ex facie a compilation in the sense that it is made up by putting together in writing (that is, in print) a number of individual items or components. Nonetheless, the coupon is peculiar in this respect: it is the actual instrument of trade used by those concerned in the business of bookmaking. It is the thing sent out by the trader to his actual or potential customers and it is then returned by the customers with their selections of the wagers offered, that is, their choices of the numerous alternative forecasts which they are invited to make written thereon by them. In this respect the coupon might be comparable to a list or catalogue used by a trader who had in fact no premises available for visiting by customers -- the catalogue containing a list of the items offered by the trader for sale with appropriate spaces in which the customer could indicate which of the items he wanted and would then return the list or catalogue with his name and address written thereon and (perhaps) a statement of the total sum involved. In this case what correspond to the articles offered for sale by the trader are the wagers offered by the bookmaker. As my

[1964] 1 All ER 465, [1964] 1 WLR 273

noble friend, LORD REID, has pointed out, the coupon is concerned with the Association Football matches played during the football season. On every Saturday during the season there are some fifty-four matches played by the professional teams of the English divisions and the Scottish League. It is obvious that the different forecasts which such a list of matches could comprehend is in number very large indeed since not only may the punter be invited to forecast which of two teams in any match (that is the home team or the away team) will win or whether the result will be a draw, but he may be also invited to forecast what the position in any match will be at half time, and also how many goals each team in any match may score both at half time and at the end of the match. It is also abundantly clear on the evidence produced in the case that the appropriate odds which the bookmaker may safely or profitably offer in respect of any forecast or group of forecasts is something which only great skill, experience will discover; and further, that the selection and description of the wagers which will attract custom is no less a matter of skill, judgment and experience. It was further made clear that, since potential customers will inevitably tend to be attracted by the same or similar wagers, certain of them have become very commonly adopted by those concerned in the trade -- for example the so-called "Nothing barred list"; so that anyone entering this type of business would almost inevitably have to include such a list and other similar wagers commonly found presented by other bookmakers, and would be no more poaching on the preserves of a competitor by so doing than would a newcomer, for example, in the tobacconist trade by offering (and stating that he offered) certain well-known brands of cigarettes which every tobacconist would be expected by the public to offer for sale. To what has been said one other important consideration must be added, namely, that the list of matches played in each week has at all relevant dates been determined by the Football League, who own the copyright in such list.

So it is said on the part of the appellants that the coupon as a document could have no originality, since it is essentially composed merely of a selection of well-known and well-tried wagers, and is composed each week merely by applying these well-known and well-tried wagers to all, or a limited number, of the League's list of matches. It was also said on the appellants' part that the selection involved in making up the coupons was no more than putting in print what were called "ideas" involving, therefore, nothing in the way of original literary work in any sense: and your lordships' attention was directed to the well-known proposition that there is no copyright in ideas. My lords, I have reached a conclusion adverse to these contentions. When one takes one of these coupons in one's hand and looks at it, the right conclusion is, to my mind, that it falls sensibly and properly within the definition of an original literary compilation. True it is that no question of literary taste or quality is involved that would give to the coupon the award of literature as normally understood; but, having regard to the introduction of a compilation into the definition, that clearly cannot be a decisive factor, since otherwise such things as lists or catalogues could never have been held to have been properly subject to copyright. The result, in my opinion, is that the respondents' coupon is in truth a compilation in writing which is distinctive and original. True it is that a great amount of work is devoted to calculating the odds; but this is not a case in which, in my opinion, the resulting document, that is the coupon, has involved no further skill, labour or judgment -- any more than was the list of matches themselves treated as involving no distinctive or original work by UPJOHN, J., in the case of Football League, Ltd. v. Littlewoods Pools, Ltd. n(17). There can, in my judkgment, be no doubt on the evidence in the present case that when all the hard work has been done in deciding on the wagers to be offered there still remains the further distinct task, requiring considerable skill, labour and judgment (though of a different kind) of devising the way in which the chosen wagers are expressed and presented to the eye of the customer. As I have earlier stated, the case on its facts which might be thought nearest to the present is that already mentioned of Cramp & Sons, Ltd. v. Frank Smythson, Ltd. n(18): for there the document in which copyright was sought was itself the thing, that is the diary, which was handed out by the trader to the customer. In that case, however, as appears from the statement of facts, there was no evidence whatever bearing on the work which had been incident to the preparation of the plaintiff's diary and particularly to the tables contained in it. On the other hand, it was clearly proved that the various tables which were inserted in the plaintiff's diary were tables commonly so inserted in other diaries. Thus, in the course of his speech VISCOUNT SIMON, L.C., said n(19):

n(17) [1959] 2 E.R. 546; [1959] Ch. 637.

n(18) [1944] 2 All E.R. 92; [1944] A.C. 329.

[1964] 1 All ER 465, [1964] 1 WLR 273

n(19) [1944] 2 All E.R. at p. 95; [1944] A.C. at p. 336.

"There was no evidence that any of these tables was composed specially for the respondents' diary; there was no feature of them which could be pointed out as novel or specially meritorious or ingenious from the point of view of the judgment or skill of the compiler; it was not suggested that there was any element of originality or skill in the order in which the tables were arranged."
To the same effect LORD MACMILLAN said n(20):

n(20) [1944] 2 All E.R. at p. 96; [1944] A.C. at p. 338.

"The inclusion or exclusion of one or more of the tables constituting the ordinary stock material of the diary-compiler seems to me to involve the very minimum of labour and judgment."
The distinction may be fine between those cases in which a list or table is regarded as properly entitled to copyright and those cases in which a list or table is not so regarded. This, indeed, readily appears from the case of Leslie v. Young & Sons n(21) where the compilation from the official railway timetables of a local timetable relating to a particular town was not regarded as constituting an original work entitled to copyright though the compilation of certain circular tours in reference to the same town was regarded as so entitled. It must further be taken as well established, as stated by LORD ATKINSON in delivering the judgment of the Judicial Committee in Macmillan & Co. v. Cooper n(22), that the precise amount of knowledge, labour, judgment or skill which must be bestowed on a compilation in order that it should acquire copyright within the meaning of the Act cannot be defined in precise terms but must in every case depend largely on the special facts of that case and be very much a matter of degree.

n(21) [1894] A.C. 335.

n(22) (1923), 93 L.J.P.C. 113 at p. 121.

On the facts of this case, and in the light of the authorities to which I have alluded, I conclude that there was present here the requisite degree of skill, judgment and labour not only in selecting out of the vast possible total of wagers those which should be offered but also in the way in which the result of the selection was presented to the customer, including particularly the arrangement of the document and of its component headings and the way in which such headings were described and were coloured and also in the way in which, in the appropriate notes underneath the headings, the punter was informed of the possibilities open to him under each heading.

If I am so far right, then the question remains: was therehere sufficient copying to amount to infringement of the respondents' copyright in their relevant coupon? On the premise supposed, my answer to this question is clearly in the affirmative. It is not in doubt that what amounts in any case to substantial reproduction within the meaning of s. 2 (5) (a) and s. 49 of the Copyright Act, 1956, again cannot be defined in precise terms but must be a matter of fact and degree. It will, therefore, depend not merely on the physical amount of the reproduction but on the substantial significance of that which is taken. Counsel for the respondents prepared for your lordships a table showing the striking similarities in fact between the respondents' relevant coupon and the coupon of the appellants, and I confess that I have found this table not less impressive after having seen counsel for the appellants' similar table showing (as undoubtedly is the fact) that a high proportion of the wagers in fact offered by the respondents may also be found offered by coupons produced by other rival bookmakers. It seems, however, clear on the evidence that Mr. C. Stein n(23) on a vital occasion chose to reject the suggested form of coupon which had been prepared for his consideration in favour of adopting a coupon which was a remarkably close parallel to that of the respondents (and thereby of relying on the skill and experience of the respondents in their past trading) not only in that the appellants' coupon contained fifteen out of sixteen of the headings to be found in the respondents' coupon, and substantially in the same order, but also in that the lay-out and presentation of these wagers, including the appendant notes, follow substantially the precedent found in the respondents' coupon. I do not of course forget -- and this should be said in fairness to the appellants -- that in this case beyond question a great deal of trouble had been taken, a great deal of work had been done by the appellants and their

[1964] 1 All ER 465, [1964] 1 WLR 273

officers in working out the effect of the various wagers which they might offer and in reaching a conclusion on what wagers they could offer having regard particularly to the limits of their subscribed capital. In other words, this not a case in which the appellants have been shown merely to have copied the respondents' coupon without having done any work or any substantial work whatever in regard to the conduct of the business in which they were about to engage. Nevertheless, for reasons which I have already endeavoured to state, there is in my judgment here a real distinction between the work done in arriving at conclusions on what wagers could properly and safely be offered and the work done in designing the nature and appearance and general lay-out of the coupon as a literary compilation: and in my judgment, for reasons which I have also edeavoured to state, I have felt compelled to the conclusion that there was here a sufficient substantial copying by the appellants to amount to an infringement of the respondents' copyright. I add only a reference to that part of the judgment of LLOYD-JACOB, J., in which he himself came to the conclusion that there were "a number of features of correspondence which are to my mind too indicative of copying to be overlooked". The learned judge gave certain instances; but it was not of course necessary for him, having regard to the view which he had taken on the existence of copyright in the coupon, to arrive at any precise conclusion as to the amount and extent of the copying in fact done by the appellants.

    n(23) The appellants' managing director.

    Having stated my conclusion I wish to add only my regret to find myself differing from DIPLOCK, L.J., in this matter With all respect, however, I have been unable to agree with him that (to use his words):

    "Although the whole document attracts literary copyright, because it is a 'compilation' of matches selected... the part of it which has been copied is not the part which is a compilation but is mere words descriptive of the type of wager offered at the stated odds..."
As it seems to me, and for the reasons which I have already given, the respondents' coupon is, as a whole, a compilation, an original literary work within the meaning of the Act of 1956 and the reproduction of it by the appellants seems to me to be of sufficient significance to amount to a substantial reproduction. I also venture to think that the learned lord justice was not entitled to conclude, as he did, that the case of Purefoy Engineering Co., Ltd. v. Sykes Boxall & Co., Ltd. n(24) is authority for the view that a tradesman desiring to compete with another tradesman is entitled not only to sell identical kinds of goods but also for the purpose to copy the rival's list of goods which he had previously published. I confess that I was at an early stage of the argument somewhat troubled by the possible effect of the form of the injunction n(25) granted by the Court of Appeal. Assuming that the respondents had established their right under the Copyright Act, 1956, and had also proved reproduction by the appellants, then no doubt the form of the injunction is one appropriate and common in the circumstances. Nonetheless, I confess that I was somewhat disturbed less the equitable remedy of the injunction might, having regard to the circumstances of the present case and particularly the correspondence in the types of wagers offered by all bookmakers engaging in this kind of business, work inequitably on the appellants by placing them in such difficulties as almost to prevent their continuing to carry on their business. I am glad, however, to say that on this matter I have been since relieved. Counsel for the respondents was able to show that the appellants have in fact been able to conduct their business during the present football season by the use of coupons to which counsel freely admitted there could be no objection on the part of the respondents. It is also to be borne in mind that if the respondents should attempt to make an unjust and unfair use of the injunction it would be open to the appellants on producing a form of coupon which they could show did not involve any infringement of the respondents' copyright to apply, on giving appropriate undertakings (e.g., to adhere to the coupon which they so produced) to have the injunction discharged.

    n(24) (1955), 72 R.P.C. 89.

    n(25) The form of injunction was, "an injunction restraining [the appellants] by their servants or agents or otherwise from infringing [the respondents'] copyright by reproducing, or making any adaptation of any substantial part of [the respondents'] fixed odds football coupon or coupons or by publishing and distributing for

[1964] 1 All ER 465, [1964] 1 WLR 273

purposes of trade any advertisement, circular, leaflet or other document, containing any such reproduction or adaptation."

For the reasons which I have attempted to state I therefore agree that this appeal should be dismissed.

**JUDGMENTBY-3:** LORD HODSON

**JUDGMENT-3:**

LORD HODSON: My Lords, the first question is whether copyright subsists in the respondents' fixed odds football coupons. The second is whether the appellants have, if the answer to the first question is in the affirmative, infringed the respondents' copyright by appropriating a substantial part of their labours by the publication of similar coupons. The respondents failed in their action at first instance, because LLOYD-JACOB, J., answered the first question in the negative, holding that they were not entitled to copyright protection in respect of their coupons. On appeal the Master of the Rolls and DONOVAN, L.J., held that the respondents were entitled to protection, that their copyright had been infringed and granted an injunction. DIPLOCK, L.J., dissented and was of the same opinion as LLOYD-JACOB, J.

The coupons are protected, if at all, as compilations which are by definition treated as literary work, see s. 48 (1) of the Copyright Act, 1956. The words "literary work" cover work which is expressed in print or writing irrespective of the question whether the quality or style is high, as was pointed out by PETERSON, J., in University of London Press, Ltd. v. University Tutorial Press, Ltd. n(26). The coupons are compilations, being derived from various sources, unless they are not original, for copyright subsists only in original literary work; see s. 2 (1) of the Act of 1956. Thus, commonplace matter put together or arranged without the exercise of more than negligible work, labour and skill in making the selection will not be entitled to copyright. "Whether enough work, labour and skill is involved, and what its value is, must always be a question of degree". Cramp & Sons, Ltd. v. Frank Smythson, Ltd, n(27), per LORD PORTER.

> n(26) [1916] 2 Ch. at p. 608.
>
> n(27) [1944] 2 All E.R. at p. 97; [1944] A.C. at p. 340.

The appellants have sought to argue that the coupons can be dissected and that on analysis no copyright attaches to any of their component parts and accordingly no protection is available. In my opinion this approach is wrong and the coupons must be looked at as a whole. Copyright is a statutory right which by the terms of s. 2 of the Act of 1956 would appear to subsist, if at all, in the literary or other work as one entity. True it is that the list of matches, fifty-three in number, to be played on a Saturday is not the subject of the respondents' copyright nor did the appellants copy it. Similarly, the restricted lists of matches which the appellants used was not copied from that the respondents; the lists came out simultaneously. Again, the odds quoted in the lists, involving mathematical calculation, were worked out independently and not copied, as the learned judge found. A significant feature of the respondents', or indeed of any other, coupon is the method of arrangement which has been described colloquially as the lay-out. I prefer to use the word arrangement which is relevant in considering labour involved in making a compilation. In Lamb v. Evans n(28) a trades directory consisted of advertisements classified under headings denoting the different trades, composed by the plaintiff or persons found by him to compose them. The Court of Appeal, affirming CHITTY, J., held that the headings were the subject of copyright. BOWEN, L.J., said n(29):

> n(28) [1893] 1 Ch. 218.
>
> n(29) [1893] 1 Ch. at p. 227.

"They are the result of literary labour, both as regards the composition of the headings themselves and their

[1964] 1 All ER 465, [1964] 1 WLR 273

collocation or concatenation in the book"
I would not therefore accept the submission of the appellants, which appears to have been accepted by the learned Master of the Rolls, that except where artistic merit is concerned no question of "lay-out" or, as I prefer to call it, method of arrangement is relevant. Moreover, in the case of the respondents' coupon the selection of headings showing the choice of bets offered by the respondents is itself shown to have ben the result of skill and labour expended on them.

It was submitted by the appellants that these headings were the equivalent of titles of a book or play and that titles could not be protected. They relied on two cases, Dicks v. Yates n(30) and Francis Day and Hunter, Ltd. v. Twentieth century Fox Corpn., Ltd. n(31) neither of which support the proposition that, as a matter of law, copyright cannot subsist in titles. No doubt they will not as a rule be protected, since alone they would not be regarded as a sufficiently substantial part of the book or other copyright document to justify the preventing of copying by others. In any event, there is good authority for the protection of headings in a proper case in Lamb v. Evans n(28) where the headings in question were elaborate and given in each case in English, French, German and Spanish.

n(28) [1893] 1 Ch. 218.

n(30) (1881), 18 ch.D. 76.

n(31) [1939] 4 All E.R. 192; [1940] A.C. 112.

Even if the appellants had been able by their method of approach to destroy piecemeal the respondents' claim to copyright in the way in which they have sought to do, this would not effect their object, for it is clearly established that a claim to copyright may subsist by virtue of selection alone. In the judgment of the Privy Council delivered by LORD ATKINSON in Macmillan & Co. v. Cooper n(32) the following extract from the judgment of SIR ARTHUR WILSON, J., appears (this relates to PALGRAVE'S GOLDEN TREASURY, the subject of the action Macmillan v. Suresh Chunder Deb n(33) tried by SIR ARTHUR WILSON in Calcutta):

n(32) (1923), 93 J.J.P.C. at p. 119.

n(33) (1890), I.L.R. 17 Calc. 951.

"In the case of works not original in the proper sense of the term, but composed of, or compiled or prepared from materials which are open to all, the fact that one man has produced such a work does not take away from anyone else the right to produce another work of the same kind, and in doing so to use all the materials open to him. But, as the law is concisely stated by HALL, V.-C., in Hogg v. Scott n(34) 'The true principle in all these cases is, that the defendant is not at liberty to use or avail himself of the labour which the plaintiff has been at foir the purpose of producing his work -- that is, in fact, merely to take away the result of another man's labour, or, in other words, his property.'"

n(34) (1874), L.R. 18 Eq. 444 at p. 458.
The decision in Palgrave's case n(35) depends in no way on the fact that the copyright in the works of the original authors had lapsed, and its correctness cannot I think be doubted. The copyright of the author of the anthology resided in the aggregate of the work.

n(35) Viz., Macmillan v. Suresh Chunder Deb, (1890), I.L.R. 17 Calc. 951.

If the respondents have employed more than negligible skill and labour in their selection of sixteen lists containing varieties of bets which they offer to their customers, they are entitled to be protected in respect of their coupons as being original compilations. The evidence shows that this selection was a highly skilled matter involving, as the learned

[1964] 1 All ER 465, [1964] 1 WLR 273

Master of te Rolls said, selections from an infinity of choice and much expenditure of time, money and effort. I agree, therefore, with the majority of the Court of Appeal that the respondents' coupons are entitled to protection as compilations, for the amount of skill and labour employed is not to be regarded as negligible.

I have not overlooked the argument which appealed to DIPLOCK, L.J., based on the undoubted truth that copyright is concerned not with the originality of ideas but with the expression of thought, in the case of literary work, with the expression of thought in print or writing. The argument is supported by reference to the case of Purefoy Engineering Co., Ltd. v. Sykes Boxall & Co., Ltd. n(36). The actual decision in that case does not assist the argument, but there is there drawn a distinction between skill and labour devoted to the selection of a range of goods in which the plaintiffs were intending to trade and that employed for the purpose of bringing into existence the literary work, namely, a catalogue. It may well be that there are cases in which expenditure of time and money has been laid out which cannot propery be taken into account as skill and labour involved in bringing into existence the literary work, be it catalogue or other compilation. This, however, is not, in my opinion, such a case, and I cannot accept that preparatory work must be excluded in this case so as to draw a line between the effort involved in developing ideas and that minimal effort required in setting those ideas down on paper. The catalogue cases, such as Collis v. Cater, Stoffell and Fortt, Ltd. n(37) show that preparatory work can be relevant matter for consideration. That case concerned a catalogue which was nothing more than a simple list of certain articles described by their common names. Compare also Canterbury Park Race Co., Ltd. v. Hopkins n(38) where preparatory work is referred to in connexion with a race card. The respondents' work is in my opinion such that copyright subsists in it.

n(36) (1955), 72 R.P.C. 89.

n(37) (1898), 78 L.T. 613.

n(38) (1932), 49 N.S.W.W.N. 27 at p. 28.

There remains the question whether there has been a substantial appropriation by the appellants of the independent labour of the respondents. Substantiality depends on quality not quantity, as is illustrated by the case of Hawkes & Son (London), Ltd. v. Paramount Film Service, Ltd. n(39), where the refrain only of "Colonel Bogey" was appropriated. True that the bulk of the coupon documents consists of lists of matches and of odds offered in which (as calculations) no copyright is claimed but the essential feature of the coupons, indeed of all the football coupons in evidence, is the selection of a limited number of matches from the whole number and the selection of a number of bets. These bets require nice calculation and great skill in order to ensure that the bookmaker will win vis-a-vis the punters as a whole, while at the time the odds offered will not be so unattractive to the individual punter that he will not fill in the coupon in the hope of winning.

n(39) [1934] Ch. 593.

An analysis of the bets offered in which the respondents' and appellants' lists are checked with those of other bookmakers demonstrates that, as LLOYD-JACOB, J., put it, there are a number of features of correspondence which are too indicative of copying to be overlooked. The selection of and the arrangements of these lists of bets with their footnotes are, to my mind, the essential feature of the respondents' coupon and Mr. William Hill n(40) scarcely put it too high when he claimed im his evidence that the appellants had in 1960, the first year in which they entered the fixed odds business, taken the respondents' coupon, put their name on it, and put a point on here and a point on there. The appellants are not, in my opinion, able to escape by saying that all that they have done is to give banal commonplace descriptions to matter which is common to all engaged in the business and that even if they have copied they have copied nothing of any significance. I think that it is not inappropriate in this connexion to quote the words of PETERSON, J., in the case from which I have cited n(41) when he said "there remains the rough practical test that what is worth copying is prima facie worth protecting". I have no doubt that the appellants have taken a substantial part of the respondents' copyright.

[1964] 1 All ER 465, [1964] 1 WLR 273

n(40) Chairman of the respondent company.

n(41) Viz., University of London Press, Ltd. v. University Tutorial Press, Ltd., [1916] 2 ch. at p. 610.

**JUDGMENTBY-4:** LORD DEVLIN

**JUDGMENT-4:**

LORD DEVLIN: My Lords, I think that this appeal can be determined on quite a short point. It is an important point and one that has led to a difference of judicial opinion. The respondents are bookmakers who devoted a great deal of time, skill and experience to the preparation of a fixed odds betting coupon for football matches. There is an infinity of ways of betting on the results of the fifty-four League matches that are played every Saturday during the season. The simplest and obvious way is for the bookmaker to offer odds against the punter picking winners out of the whole list; the more winners that he wagers that he will pick the greater the odds. Then you can have "restricted" lists of selected matches in which there can be all sorts of variations; the punter can be invited to pick home wins, away wins and draws in various combinations. Then you can invite him to forecast scores full-time and half-time. The respondents' coupon contains sixteen different lists of matches, each list permitting of a number of different wagers which the punter can make against odds fixed according to tables given in the coupon. It is common ground that the preparation of a coupon with bets of this sort requires a great deal of industry and skill. Among other things, skill is required in the selection of types of wagers that will appeal to punters while offering a good profit to the bookmaker, in arranging them on the coupon and giving them attractive headings.

That a document prepared in this way can be the subject of copyright is not disputed. Nor is it disputed that the appellants copied it. They were newcomers in a field in which the respondents had been successful pioneers. They thought rightly that the types of wagers selected by the respondents would be those shown by experience to be both attractive and profitable, and that they would do better to rely on the respondents' selection than to make their own. They also adopted to a large extent the arrangement and the headings. If the argument did not go beyond this point, it would, I think, be plain that there was a breach of copyright. There is copyright in every original literary work, which by definition includes compilation, so that there can be copyright in such productions as timetables and directories, provided always they are "original". The requirement of originality means that the product must originate from the author in the sense that it is the result of a substantial degree of skill, industry or experience employed by him. The appellants argue that the skill, industry and experience admittedly employed by the respondents was not employed in the production of the coupon. It was employed, they say, in the selection of types of wager. These wagers were, so to speak, the articles which the respondents offered for sale to the public. Like other salesmen, the respondents had as a matter of business to decide what sort of wares they were going to offer. The making of that choice is a matter of business which, it is argued, is irrelevant for the purposes of copyright. So the skill and labour devoted to the work of selection must be exorcised. What is left, that is, the skill and labour required to express in writing a business decision, is negligible; and so there is no originality. This is the short point taken by the appellants which found favour with LLOYD-JACOB, J., at the trial and with DIPLOCK, L.J., dissenting in the Court of Appeal.

My lords, both on principle and on authority, it appears to me to be an unsound point. Any selection, for an example an anthology, requires a process of decision between alternatives, and I cannot see that it matters whether the decision is made on literary or on business grounds. An anthology of saleable poems is as much entitled to protection as an anthology of beautiful poems. It is pointed out, quite rightly, that an anthology is different from a list that is descriptive of articles for sale, since the anthology is itself the thing that is to be offered for sale. But if this distinction was a good one, there could never be a copyright in a catalogue of goods. Such a proposition would be contrary to Collis v. Cater, Stoffell and Fortt, Ltd. n(42). This case was applied by the Court of Appeal in Purefoy Engineering Co., Ltd. v. Sykes Boxall & Co., Ltd. n(43), where it was described as a decision that had never been doubted. I do not think that your lordships should now overrule it, or that it can be distinguished on the grounds adopted by DIPLOCK, L.J., in the Court of Appeal. Masson Seeley & Co., Ltd. v. Embosotype Manufacturing Co. n(44) is another case in which TOMLIN, J., held that there was copyright in a trade catalogue.

[1964] 1 All ER 465, [1964] 1 WLR 273

n(42) (1898), 78 L.T. 613.

n(43) (1955), 72 R.P.C. at p. 95.

n(44) (1924), 41 R.P.C. 160.

I do not think that it is necessary in this type of case that the work done should have as its sole, or even as its main, object the preparation of a document such as a list or catalogue or race card. It is sufficient that the preparation of the document is an object of the work done. If that be so, the work cannot be split up and parts allotted to the several objects. The value of the work as a whole must be assessed when the claim to originality is being considered. If, when the work of selection is being done, there is no intention of listing results, the matter might well be different. A line could then be drawn between the work of selecting and the work of recording a selection independently made. No such line can be drawn in the present case which is, to my mind, much stronger than the ordinry case in which goods are being catalogued. The whole object of the work done was the production of the coupon. It was argued on behalf of the appellants, still on the analogy of the sale of goods, that a decision against them would amount to grave interference with freedom of trade. There is no copyright in business methods. If a wine merchant, it was argued, selected a dozen different wines as having in combination a special appeal, and arranged the bottles together in a shop window, there was nothing to prevent a rival trader copying the arrangement. Ought it to make any difference if, instead of a shop window arrangement, the merchant makes a list? My lords, I think with respect that this argument is based on a fundamental misapprehension of the law of copyright. The law does not impinge on freedom of trade; it protects property. It is no more an interference with trade than is the law against larceny. Free trade does not require that one man should be allowed to appropriate without payment the fruits of another's labour, whether they are tangible or intangible. The law has not found it possible to give full protection to the intangible. But it can protect the intangible in certain states, and one of them is when it is expressed in words and print. The fact that that protection is of necessity limited is no argument for diminishing it further; and it is nothing to the point to say that either side of the protective limits a man can obtain gratis whatever his ideas of honesty permit him to pick up.

I would therefore dismiss the appeal.

**JUDGMENTBY-5:** LORD PEARCE

**JUDGMENT-5:**

LORD PEARCE: My Lords, the question whether the plaintiffs are entitled to copyright in their coupon depends on whether it is an original literary work. The words "literary work" include a compilation. They are used to describe work which is expressed in print or writing irrespective of whether it has any excellence of quality or style of writing (per PETERSON, J., in University of London Press, Ltd. v. University Tutorial Press, Ltd. n(45)). The word "original" does not demand original or inventive thought, but only that the work should not be copied and should originate from the author (ibid.). In deciding therefore whether a work in the nature of a compilation is original, it is wrong to start by considering individual parts of it apart from the whole, as the appellants in their argument sought to do. For many compilations have nothing original in their parts, yet the sum total of the compilation may be original. (See, for instance, the case of PALGRAVE'S GOLDEN TREASURY n(46) referred to by the Privy Council in Macmillan & Co. v. Cooper n(47)). In such cases the courts have looked to see whether the compilation of the unoriginal material called for work or skill or expense. If it did, it is entitled to be considered original and to be protected against those who wish to steal the fruits of the work or skill or expense by copying it without taking the trouble to compile it themselves. So the protection given by such copyright is in no sense a monopoly, for it is open to a rival to produce the same result if he chooses to evolve it by his own labours. (See Kelly v. Morris n(48).)

n(45) [1916] 2 Ch. at p. 608.

n(46) Viz., Macmillan v. Suresh Chunder Deb., (1890), I.L.R. 17 Calc. 951.

[1964] 1 All ER 465, [1964] 1 WLR 273

n(47) (1923), 93 L.J.P.C. 113.

n(48) (1866), L.R. 1 Eq. 697 at p. 701.

In Lamb v. Evans n(49) LINDLEY, L.J., said with regard to a trades directory,

n(49) [1893] 1 Ch. at p. 224.

"It appears to me that the plaintiff has an exclusive right to the publication of those headings with the translations -- not that he can restrain other people from publishing the same sort of thing if they go about it in the right way, but he has a right to restrain other people from copying his book. There is so much common to his book and to other books of the same sort that they very likely will contain the same information. It is just like the case of a man who publishes a map of a particular country; another may publish a map of the same country exactly like it, if he makes his map from original materials; but the first can restrain the other from copying his map, which is a totally different thing."
Thus, directories, catalogues, and the like have been held to be original and to acquire copyright if the work that goes to their making has been sufficient (Collis v. Cater, Stoffell and Fortt, Ltd. n(50); Blacklock (H.) & Co., Td. v. Pearson (C. Arthur), Ltd. n(51). Where, however, the work of compilation was not "substantial" but was "negligible" it was held to have no copyright (Cramp & Sons, Ltd. v. Frank Smythson, Ltd. n(52)). The arrangement of the material is one of the factors to be considered. VISCOUNT SIMON, L.C., in that case said n(53):

n(50) (1898), 78 L.T. 613.

n(51) [1915] 2 Ch. 376.

n(52) [1944] 2 All E.R. 92; [1944] A.C. 329.

n(53) [1944] 2 All E.R. at p. 95; [1944] A.C. at p. 336.

"There was no evidence that any of these tables was composed specially for the respondents' diary; there was no feature of them which could be pointed out as novel or specially meritorious or ingenious from the point of view of the judgment or skill of the compiler; it was not suggested that there was any element of originality or skill in the order in which the tables were arranged."
So in each case it is a question of degree whether the labour or skill or ingenuity or expense involved in the compilation is sufficient to warrant a claim to originality in a compilation.

Applying those principles to the present case I feel little doubt that the respondents' coupon is entitled to copyright. The respondents have been pioneers in this field and have invented various bets and nomenclatures, some of which have been adopted by their rivals. A study of the coupons of twenty-three principal firms engaged in the fixed odds betting business shows that a large proportion of the bets in the respondents' coupon are also offered by their rivals, and much similarity of language, arrangement and substance will be found in their coupons. It emerges clearly that the arrangement and contents of the coupon are the central point of the business -- what one witness called the heart of the business. The coupon must contain an assorted selection of bets that will attract a customer and induce him to fill up the coupon in preference to rival coupons. To this end, the respondents have devoted much work and money and ingenuity. Out of the vast number of bets that can be offered, they select and devise those which, while being profitable to them, will fill the coupon with the greatest allure.

The appellants seek to say that this work is preliminary and has been directed to decisions as to what types of bets the respondents shall pursue in the business; that such decisions are merely ideas and as such not the subject of copyright; and that the work of actually writing down those ideas in the coupon is too easy and negligible to justify any claim to originality. An argument on those lines was unsuccessful in the case of the British Broadcasting Co. v.

[1964] 1 All ER 465, [1964] 1 WLR 273

Wireless League Gazette Publishing Oc. n(54), and Football League, Ltd. v. Littlewoods Pools, Ltd. n(55). There may be cases where such a dichotomy might be justified between some preliminary work and the actual transcription of a compilation, if the work was done with no ultimate intention of a compilation. But on the facts of the present case such an argument cannot succeed. The whole of the respondents' efforts from the beginning were devoted to arranging a coupon that would attract punters and be the basis of the respondents' business. Types of bets were not considered in vacuo but only in relation to the part which they would play in the coupon. In my opinion the majority of the Court of Appeal rightly held that the respondents had established copyright in the coupon.

     n(54) [1926] Ch. 433.

     n(55) [1959] 2 All E.R. 546; [1959] Ch. 637.

    Did the appellants reproduce a substantial part of it? Whether a part is substantial must be decided by its quality rather its quantity. The reproduction of a part which by itself has no originality will not normally be a substantial part of the copyright and therefore will not be protected. For that which would not attract copyright except by reason of its collocation will, when robbed of that collocation, not be a substantial part of the copyright and therefore the courts will not hold its reproduc tion to be an infringement. It is this, I think, which is meant by one or two judicial observations that "there is no copyright" in some unoriginal part of a whole that is copyright. They afford no justification, in my view, for holding that one starts the inquiry as to whether copyright exists by dissecting the compilation into component parts instead of starting it by regarding the compilation as a whole and seeing whether the whole has copyright. It is when one is debating whether the part reproduced is substantial that one considers the pirated portion on its own.

    In the present case the learned judge found that there was deliberate copying, but he did not decide whether the part copied was substantial. The majority of the Court of Appeal though that it was. I agree with them. There are many things which are common to many coupons. But the respondents' coupon had an individuality. The appellants clearly modelled their coupon on the respondents' coupon and copied many of the things that give it this individuality. I cannot regard these things taken together as other than substantial. There is force in the words of PETERSON, J., in the case of the University of London Press, Ltd. n(56) that "what is worth copying is... worth protecting".

     n(56) [1916] 2 Ch. at. p. 610.

    I would therefore dismiss the appeal.

**DISPOSITION:**

    Appeal dismissed.

**SOLICITORS:**

    Joynson-Hicks & Co. (for the appellants); Hardcastle Sanders & Armitage (for the respondents).