# UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EXPLOROLOGIST LIMITED | ) | |
| 1 Lumley Street London | ) | |
| United Kingdom W1K 6TT | ) | |
|         Plaintiff | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **No. 07-1848** |
| BRIAN SAPIENT | ) | |
| aka BRIAN J. CUTLER | ) | |
| 303 Warren Road | ) | |
| Hatsboro, PA. 19140 | ) | |
|         Defendant | ) | |

## *APPENDIX OF FOREIGN AUTHORITIES*

Plaintiff attaches hereto the following authorities cited in his Brief and Opposition to Motion to Dismiss, electronically filed on June 28, 2007:

1. Copyright, Designs and Patents Act 1988.
2. *Spelling Goldberg Productions v B.P.C. Publishing Ltd.* [1981] R.P.C. 283

Respectfully submitted,
EXPLOROLOGIST LIMITED
By and Through Counsel,
     /s/

_____
Richard Winelander, Esquire
1005 North Calvert Street
Baltimore, MD 21202
rw@rightverdict.com
410.576.7980
Fax:   410.385.2023
and
     /s/

_____
Alan L. Frank Law Associates, P.C.
8380 Old York Road, Suite 410
Elkins Park, PA 19027
afrank@alflaw.net
215.935.1000
Fax:   215.935.1110
Attorneys for Plaintiff

# Exhibit 1

# Excerpts from the Copyright, Designs and Patents Act 1988

**Section 16: The acts restricted by copyright in a work.**

**16.-(1)** The owner of the copyright in a work has, in accordance with the following provisions of this Chapter, the exclusive right to do the following acts in the United Kingdom-

(a) to copy the work (see section 17);

(b) to issue copies of the work to the public (see section 18);

(ba) to rent or lend the work to the public (see section 18A);

(c) to perform, show or play the work in public (see section 19);

(d) to communicate the work to the public (see section 20);

(e) to make an adaptation of the work or do any of the above in relation to an adaptation (see section 21);

and those acts are referred to in this Part as the "acts restricted by the copyright".

**(2)** Copyright in a work is infringed by a person who without the licence of the copyright owner does, or authorises another to do, any of the acts restricted by the copyright.

**(3)** References in this Part to the doing of an act restricted by the copyright in a work are to the doing of it-

(a) in relation to the work as a whole or any substantial part of it, and

(b) either directly or indirectly;

and it is immaterial whether any intervening acts themselves infringe copyright.

**(4)** This Chapter has effect subject to-

(a) the provisions of Chapter III (acts permitted in relation to copyright works), and

(b) the provisions of Chapter VII (provisions with respect to copyright licensing).

**Section 17: Infringement of copyright by copying.**

**17.-(1)** The copying of the work is an act restricted by the copyright in every description of copyright work; and references in this Part to copying and copies shall be construed as follows.

*Richard Winelander Esq.*
1005 North Calvert Street
Baltimore, MD  21202
410-576-7980

**(2)** Copying in relation to a literary, dramatic, musical or artistic work means reproducing the work in any material form.

This includes storing the work in any medium by electronic means.

**(3)** In relation to an artistic work copying includes the making of a copy in three dimensions of a two-dimensional work and the making of a copy in two dimensions of a three-dimensional work.

**(4)** Copying in relation to a film or broadcast includes making a photograph of the whole or any substantial part of any image forming part of the film or broadcast.

**(5)** Copying in relation to the typographical arrangement of a published edition means making a facsimile copy of the arrangement.

**(6)** Copying in relation to any description of work includes the making of copies which are transient or are incidental to some other use of the work.

**Section 18: Infringement by issue of copies to the public.**

**18.-(1)** The issue to the public of copies of the work is an act restricted by the copyright in every description of copyright work.

**(2)** References in this Part to the issue to the public of copies of a work are to--

   (a) the act of putting into circulation in the EEA copies not previously put into circulation in the EEA by or with the consent of the copyright owner, or

   (b) the act of putting into circulation outside the EEA copies not previously put into circulation in the EEA or elsewhere.

**(3)** References in this Part to the issue to the public of copies of a work do not include-

   (a) any subsequent distribution, sale, hiring or loan of copies previously put into circulation (but see section 18A: infringement by rental or lending), or

   (b) any subsequent importation of such copies into the United Kingdom or another EEA state,

except so far as paragraph (a) of subsection (2) applies to putting into circulation in the EEA copies previously put into circulation outside the EEA.

**(4)** References in this Part to the issue of copies of a work include the issue of the original.

**Section 18A: Infringement by rental or lending of work to the public**

**18A.-(1)** The rental or lending of copies of the work to the public is an act restricted by the copyright in--

   (a) a literary, dramatic or musical work,

   (b) an artistic work, other than--

*Richard Winelander Esq.*
1005 North Calvert Street
Baltimore, MD  21202
410-576-7980

(i) a work of architecture in the form of a building or a model for a building, or

(ii) a work of applied art, or

(c) a film or a sound recording.

**(2)** In this Part, subject to the following provisions of this section--

(a) "rental" means making a copy of the work available for use, on terms that it will or may be returned, for direct or indirect economic or commercial advantage, and

(b) "lending" means making a copy of the work available for use, on terms that it will or may be returned, otherwise than for direct or indirect economic or commercial advantage, through an establishment which is accessible to the public.

**(3)** The expressions "rental" and "lending" do not include--

(a) making available for the purpose of public performance, playing or showing in public or communication to the public;

(b) making available for the purpose of exhibition in public; or

(c) making available for on-the-spot reference use.

**(4)** The expression "lending" does not include making available between establishments which are accessible to the public.

**(5)** Where lending by an establishment accessible to the public gives rise to a payment the amount of which does not go beyond what is necessary to cover the operating costs of the establishment, there is no direct or indirect economic or commercial advantage for the purposes of this section.

**(6)** References in this Part to the rental or lending of copies of a work include the rental or lending of the original.

**Section 19: Infringement by performance, showing or playing of work in public.**

**19.-(1)** The performance of the work in public is an act restricted by the copyright in a literary, dramatic or musical work.

**(2)** In this Part "performance", in relation to a work-

(a) includes delivery in the case of lectures, addresses, speeches and sermons, and

(b) in general, includes any mode of visual or acoustic presentation, including presentation by means of a sound recording, film or broadcast of the work.

**(3)** The playing or showing of the work in public is an act restricted by the copyright in a sound recording, film or broadcast.

*Richard Winelander Esq.*
1005 North Calvert Street
Baltimore, MD 21202
410-576-7980

**(4)** Where copyright in a work is infringed by its being performed, played or shown in public by means of apparatus for receiving visual images or sounds conveyed by electronic means, the person by whom the visual images or sounds are sent, and in the case of a performance the performers, shall not be regarded as responsible for the infringement.

### Section 20: Infringement by communication to the public.

**20.-(1)** The communication to the public of the work is an act restricted by the copyright in -

    (a) a literary, dramatic, musical or artistic work,

    (b) a sound recording or film, or

    (c) a broadcast.

**(2)** References in this Part to communication to the public are to communication to the public by electronic transmission, and in relation to a work include -

    (a) the broadcasting of the work;

    (b) the making available to the public of the work by electronic transmission in such a way that members of the public may access it from a place and at a time individually chosen by them.

### Section 30: Criticism, review and news reporting.

**30.-(1)** Fair dealing with a work for the purpose of criticism or review, of that or another work or of a performance of a work, does not infringe any copyright in the work provided that it is accompanied by a sufficient acknowledgement and provided that the work has been made available to the public.

**(1A)** For the purposes of subsection (1) a work has been made available to the public if it has been made available by any means, including -

    (a) the issue of copies to the public;

    (b) making the work available by means of an electronic retrieval system;

    (c) the rental or lending of copies of the work to the public;

    (d) the performance, exhibition, playing or showing of the work in public;

    (e) the communication to the public of the work,

but in determining generally for the purposes of that subsection whether a work has been made available to the public no account shall be taken of any unauthorised act.

*Richard Winelander Esq.*
1005 North Calvert Street
Baltimore, MD  21202
410-576-7980

**(2)** Fair dealing with a work (other than a photograph) for the purpose of reporting current events does not infringe any copyright in the work provided that (subject to subsection (3)) it is accompanied by a sufficient acknowledgement.

**(3)** No acknowledgement is required in connection with the reporting of current events by means of a sound recording, film or broadcast where this would be impossible for reasons of practicality or otherwise.

# Exhibit 2

*Spelling Goldberg Productions v B.P.C. Publishing Ltd.* [1981] R.P.C. 283

*Richard Winelander Esq.*
1005 North Calvert Street
Baltimore, MD  21202
410-576-7980

*[handwritten:] [1974] 1 W.L.R. 452 / [1981] 2 W.L.R. p. 276*

IN THE COURT OF APPEAL

*Before:* LORD JUSTICE BRIDGE
LORD JUSTICE CUMMING-BRUCE
LORD JUSTICE BRIGHTMAN

11th February 1980

SPELLING GOLDBERG PRODUCTIONS INC. v. B.P.C. PUBLISHING LTD.

(Application for Intervention)

*Practice — Intervention in appeal — Interveners affected by decision on construction of Copyright Act 1956 — Whether "question or issue" between interveners and parties — Intervention refused.*

R.S.C. Order 15, rule 6(2).

*The trial judge in this case had held that it did not constitute an infringement of the copyright in a cinematograph film to reproduce individual frames in the defendants' magazines and posters. The applicants for intervention, who were film companies, desired to intervene in the appeal in support of the plaintiffs. They contended that there was jurisdiction to allow them to intervene under R.S.C. Order 15, rule 6(2)(b)(ii), because a question or issue might arise between them and the defendants if the defendants were to copy frames from the interveners' films in the same way as they had from the plaintiffs'.*

*Held, dismissing the application to intervene:*

*(1) There was no jurisdiction to allow the film companies to intervene, since R.S.C. Order 15, rule 6(2) required there to be a present "question or issue" between the parties to the appeal and the interveners. The mere possibility that the defendants might in future copy frames from the interveners' films if they were successful on the appeal did not give rise to such a question or issue.*

*(2) per* Cumming-Bruce L.J. *Even if there were jurisdiction to accede to the application, as a matter of discretion it should be refused.*

Tetra Molectric Ltd. v. Japan Imports Ltd. (Win Lighter Corpn. intervening) [1976] R.P.C. 541 was cited in argument by the interveners. The other parties were not called upon.

*Peter Prescott,* instructed by Joynson-Hicks & Co., appeared for the interveners. *Jeremy Davies,* instructed by Lee Lane-Smith of Manchester, appeared for the

plaintiffs. *John Mummery,* instructed by Denton Hall & Burgin, appeared for the defendants.

**Bridge L.J.**—This is an application by four parties naming themselves in the notice of motion as interveners for an order that they be made parties to an appeal which is pending in this court against a judgment of His Honour Judge Mervyn Davies Q.C., sitting as a Deputy Judge of the Chancery Division.

As I understand it, in those proceedings Judge Davies held that certain matters published by the defendants did not constitute an infringement of copyright of the plaintiffs who are film makers. What the interveners say is that they also are film makers and that they are interested in the question of what material taken from their films can be published with impunity and without risk of infringing their copyright in the same manner as has happened as between the defendants, who are the respondents to the appeal, and the plaintiffs, who are the appellants. Mr. Prescott acknowledges that there is no question or issue arising between his clients, the interveners, and either of the parties to the pending appeal in this court. Nevertheless, he says that he can bring himself within the language of R.S.C. Order 15, rule 6(2) on the footing that in the future there might arise such an issue.

The fact of the matter is that the interest of the interveners is solely an interest in the outcome of the appeal in so far as it determines a question of law which may affect the interveners' business in future. There is no present threat by the respondent defendants to publish any such material as they have published taken from films made by the plaintiff appellants, taking their material from films made by the interveners. In those circumstances one has to consider whether this case falls within the ambit of R.S.C. Order 15, rule 6(2). The relevant language reads as follows:

"At any stage of the proceedings in any cause or matter the court may on such terms as it thinks just and either of its own motion or on an application—

(b) order any of the following persons to be added as a party, namely—

(ii) . . . any person between whom and any party to the cause or matter there may exist a question or issue arising out of or relating to or connected with any relief or remedy claimed in the cause or matter which in the opinion of the Court it would be just and convenient to determine as between him and that party as well as between the parties to the cause or matter."

In my judgment the construction of that provision gives me no difficulty at all and what is clearly contemplated is a situation in which there already exists a question or issue arising from a decision upon which the rights of the party seeking to intervene in the proceedings may depend. Mr. Prescott has urged upon us that the use of the word "may" in the phrase "may exist a question or issue" contemplates the possibility of a future question or issue which might possibly arise between the parties seeking to join in litigation and one or other of the parties already involved in the litigation, but I can see no reason to give that phrase that somewhat, as it seems to me, extravagant construction. Clearly what is contemplated is that, at the time when an order for joinder is made under this provision, the question or issue which already arises between the party seeking to be joined and one or other of

282

**Cumming-Bruce L.J.**    **Spelling Goldberg Productions v.**    [1981] R.P.C.
**Brightman L.J.**    **B.P.C. Publishing Ltd.**

the existing parties to the litigation. It being conceded that no such question or issue arises here, it seems to me that there is no jurisdiction in the court to accede to the application that these interveners should be joined in the pending appeal. Accordingly I would dismiss this application.

**Cumming-Bruce L.J.**—I agree. The terms of R.S.C. Order 15, rule 6(2)(b)(ii) impose upon the court the responsibility for determining two questions. First, whether on the facts there may exist a question or issue arising out of, or relating to, or connected with any relief or remedy claimed in the cause or matter which him and that party as well as between the parties in the matter. That, for the reasons stated by Bridge L.J., requires the court to examine the facts and to decide whether, if the facts alleged are proved, there then is a question or issue of the kind described.

The submission made in this court on behalf of the interveners is that that is too narrow a construction of the words "may exist" and that it is sufficient that at some future time, if certain contingencies not presently in existence come into existence, the contemplation of those future contingencies gives rise to a situation in which the court should grant leave for such intervention. The consequences of such construction of the rule are certainly very surprising, because it appears to me to be implicit that any person who may be affected by the determination of the court on a point of law can claim that, under this rule, the court has jurisdiction to consider whether to let him intervene. On the facts of this case and from the affidavit of Mr. Louis Stevenson, whose initiative one cannot but admire, paragraph 8 suggests that it is most possible that if the judgment is allowed to stand the defendants will wish to publish posters and poster magazines. But in paragraph 9 it appears that the eagerness of the proposed interveners to intervene is based just as much upon a quite different consideration which has got absolutely nothing at all to do with the activities, intended activities, or possible activities of the defendants. What worries them just as much as anything in paragraph 8 is the effect on their business relations with a great many other people, other than the defendants, if the law is determined in a way that they wish to prevent. I have no doubt that the construction of the words "may exist a question or issue" contended for is much too wide.

The second question, which only arises if the court decided the matter of jurisdiction, would be whether, in the opinion of the court, it would be just and convenient to determine the question or issue by granting intervention. If I was wrong on the question of construction, I would unhesitatingly hold that the case raised by Mr. Stevenson's affidavit does not give rise to facts which, as a matter of discretion, it would be just and convenient to determine between the proposed interveners as well as the parties to the litigation. I agree that the motion should be refused.

**Brightman L.J.**—I also agree that the application should be refused for the reasons given by my Lords.

*Interveners to pay both parties' costs.*
*Leave to appeal refused.*

Printed in Scotland by Her Majesty's Stationery Office at HMSO Press, Edinburgh
Dd 825256 C19 7/81 (1797)

IN THE COURT OF APPEAL.

*Before:* LORD JUSTICE BUCKLEY
LORD JUSTICE TEMPLEMAN
LORD JUSTICE DONALDSON

18th and 19th February 1980

IN THE HIGH COURT OF JUSTICE—CHANCERY DIVISION

*Before:* JUDGE MERVYN DAVIES Q.C.
(Sitting as a deputy Judge of the High Court)

5th, 6th, 7th and 8th February 1979

SPELLING GOLDBERG PRODUCTIONS INC. v. B.P.C. PUBLISHING LTD.

*Copyright — Cinematograph film — Infringement — "Starsky and Hutch" — Reproduction in magazine of individual frames from film — Knowledge of defendant — Infringement established — Appeal allowed.*

*Copyright Act 1956, sections 13, 18 and 49(1).*

*Copyright (International Conventions) Order 1972*

*The defendants had published a magazine and a wall poster which embodied photographs which were reproductions of individual frames from the plaintiffs' "Starsky and Hutch" cinematograph films.*

*The plaintiffs contended that reproducing a single frame infringes the copyright in a film under section 13(5)(a) by constituting "making a copy of the film"; "copy" being defined in section 13(10) as "any print, negative or other article on which the film or part of it is recorded".*

*The trial judge dismissed the plaintiffs' claim\* on the grounds that (1) to be a copy of a film or part of it within section 13(10), the copy has itself to have the characteristics of a cinematograph film, i.e. it has to be a sequence of images, recorded on material, and capable of being shown as a moving picture; and (2) "part of it" in section 13(10) means "substantial part" because section 13(5) must be read subject to section 49(1).*

---

\* Reported [1979] F.S.R. 494.

Merwyn Davies Q.C.     Spelling Goldberg Productions Inc. v.     [1981] R.P.C.
B.P.C. Publishing Ltd.

*Held, allowing the appeal:*

(1) *Making a copy of a frame of a film is an infringement of the copyright in the film because a single frame is a part of a film within section 13(10) even though it does not itself possess the characteristics of a film.*

(2) *If section 49(1) applies to section 13 at all, it applies not so as to impose a requirement that a copy of a part of a film has to be a copy of a substantial part of the film, but so as to render it an infringement of copyright to reproduce a substantial part of a part of a film, i.e. a substantial part of a frame from a film.*

*Obiter observations on section 18(2) of the Copyright Act 1956.*

No cases were cited in the judgments of the Court of Appeal or below.

The following cases were cited in argument:

*Barker v. Hulton* (1912) 28 T.L.R. 496.
*E. M. Gomme Ltd. v. Relaxateze Ltd.* [1976] R.P.C. 377.
*Stock v. Frank Jones* [1978] 1 W.L.R. 231.

*Jeremy Davies*, instructed by *Lee Lane-Smith* appeared for the plaintiffs. *John Mummery*, instructed by *Denton, Hall & Burgin* appeared for the defendants.

**Judge Merwyn Davies Q.C.**—This is a copyright action. The plaintiffs are Aaron Spelling Productions Inc. and Leonard Goldberg Productions Inc. Both are incorporated under the laws of the State of California. They trade as a limited partnership under California law, using the name Spelling Goldberg Productions. The defendant company is an English limited company trading as Phoebus Publishing Co. The dispute between the parties concerns some photographs published by the defendant company in what has been called a magazine and a poster. The photographs show some of the characters in a well-known B.B.C. television programme entitled "Starsky and Hutch".

The relief claimed in the statement of claim includes (1) a claim for an injunction to restrain the defendants from reproducing or publishing certain films and photographs, being films and photographs the copyright in which is owned by the plaintiffs; (2) an enquiry as to damages for infringement of copyright and for conversion; (3) damages for passing off; (4) alternatively an account of profits; and (5) delivery up of infringing material. The plaintiffs decided not to proceed with their claim of passing off and notified the defendants of that fact on 16 January 1979. Accordingly, the action came before me as an action for infringement of copyright in films and photographs. However, the action then proceeded as an action for infringement of film copyright only, that is, not for infringement of copyright in photographs.

This came about in this way: paragraphs 3 and 6 of the statement of claim, dated 23 March 1977, indicate a claim for infringement of copyright in both cinematograph films and photographs. The particulars of paragraphs 3 and 6 were voluntarily supplied on 14 July 1977. Paragraph 3 of these particulars indicated that the photographs complained of were copies of parts of films. The said paragraph 3 went on to say that the schedules specifying the films would be served separately. No such schedule is with the particulars; but reading also paragraph 4 of those particulars

one might say that the claim made was still in respect of both films and photographs, that is, photographs taken otherwise than on cinematograph film. On 8 November 1977, a request was made for further particulars under the same paragraphs 3 and 6 of the statement of claim. The reply to that request calls for no comment.

Then on 4 January 1978 the plaintiffs voluntarily supplied the defendants with the schedule of films mentioned in the document dated 14 July 1977. This schedule included the words: "Therefore, the photographs referred to in paragraphs 3 and 4 of the particulars as served on 14 July 1977 are all taken from one or more of the plaintiffs' television film called 'Starsky and Hutch'." The pleadings and particulars preceding this document did not particularise the photographs or the cinematograph films in respect of which the plaintiffs were claiming copyright. I must say that Mr. Davies, who appeared before me, was not responsible for the statement of claim or for those particulars. With the delivery of the schedule dated 4 January 1978, the defendants knew with certainty that the claim against them was in respect of copyright in films and not in respect of copyright in photographs.

That was not the end of the matter. On 26 January 1979, shortly before the trial date, the plaintiffs served a new schedule of films. On the first day of the trial the plaintiffs amended the schedule in red. This schedule, as amended, is Schedule X. Schedule X indicated that the plaintiffs wished to claim for infringement not only in respect of "Starsky and Hutch" films, but also in respect of three photographs produced by ordinary photography, that is, not derived from any film. These three photographs had not before been identified to the defendants and all the schedule said was that the original negatives might be inspected on reasonable notice. Not surprisingly, Mr. Mummery for the defendants contended that it was too late for the plaintiffs to bring in a new claim in respect of what I may call photograph copyright, when he had come to contest a claim in respect of film copyright only. I agreed with Mr. Mummery and so it was that the trial has proceeded as a trial for infringement of film copyright only.

There is now another pleading point to be mentioned. Mr. Davies accepted before me that paragraph 6 of the statement of claim was not apt for the claims he was making. Paragraph 6 alleged in effect infringement of film copyright by the publishing of photographs. Mr. Davies sought to bring paragraph 6 into line with section 13(5)(b) of the Copyright Act 1956 by substituting for the original paragraph 6 a new paragraph 6 in these terms:

"By making and printing or authorising others to make and print copies of the said magazine and poster, the defendants have made or authorised the making of copies (in the form of prints) of frames from the cinematograph films of the plaintiffs. Each such frame is a part of one of the plaintiffs' cinematograph films. In the premises the said prints are copies of the plaintiffs' cinematograph films within the meaning of section 13(10) of the Copyright Act 1956."

The statement of claim was accordingly amended in this way, Mr. Mummery not objecting.

I turn to the facts of the case. There is little dispute here. The plaintiffs are the producers of a series of television films called "Starsky and Hutch". United Kingdom copyrights exist in this film: Copyright Act 1956, section 13(1) to (5)(b) and the Copyright (International Conventions) Order 1972 made under section 32 of the

1956 Act. The plaintiffs are the owners of the United Kingdom copyright in the film: Copyright Act 1956, section 13(4).

The defendants are well-known publishers. They conduct a very large business and publish multi-volume reference works on a weekly basis and are the sole publishers of such works as A. Liddell Hart's *History of the Second World War*, and Taylor's *History of the Twentieth Century*. As well, they publish hard-back books of illustrated matter and also magazines, and what were called one-off titles. As may be supposed, they make great use of photographic agencies. I was told that they are in daily communication with one agency or another.

In the course of this business the defendants, at the end of 1976, put out two publications; the first is a Starsky and Hutch pin-up poster priced at 35p: and the second is a magazine-type publication of 30 pages priced at 45p. The front cover has photographs of Starsky and Hutch below the words "Starsky and Hutch, packed with facts and colour pictures". The plaintiffs' complaint is that eight of these colour pictures were printed in breach of their copyright. Seven of the pictures show Starsky and Hutch and the others show two other characters in the series. The particular pictures complained of are these: as to the poster, the picture was in the first fold of the poster, showing the heroes in a telephone box; as to the magazine, the yellow-edged picture across pp. 1 and 2, the picture across pp. 6 and 7, the picture on p. 21, the picture across pp. 1 and 2, the picture across pp. 24 and 25, the picture on p. 26 (that is, Captain Dobie), the picture across pp. 28 and 29. This last picture is the same telephone box picture as appears in the poster.

Mr. Mummery for the defendants conceded that each of the eight photographs I have specified was a reproduction of a particular frame from the plaintiffs' cinematograph films. The defendants were able to publish these photographs because they had obtained from the B.B.C. and from some photographic agencies some publicity material relating to the "Starsky and Hutch" series that had been issued by, or with the consent of, the plaintiffs. The publicity material included photographs derived from individual frames of the cinematograph film used in the series, photographs from frames of film taken in the course of making the film but not used in the series—that is, discarded film—and some posed pictures taken otherwise on non-cinematograph film. It was not established at the trial that the defendants, in making use of the publicity material in the way that they did, did so with the licence of the plaintiffs. On the other hand, the defendants say that, if any infringement is established against them, then they are not liable for conversion damages, because they are entitled to the protection of section 18(2)(b) of the Copyright Act 1956.

The plaintiffs' claim on the facts summarised above is that the defendants have infringed their copyright in the "Starsky and Hutch" films. The infringement alleged is, as to each of the defendants' photographs, that the defendants in printing a photograph have made "a copy of the film," as that phrase is used in section 13(5)(a) of the Copyright Act 1956. Section 13(5) provides that:

"The acts restricted by the copyright in a cinematograph film are (a) making a copy of the film; (b) causing the film, in so far as it consists of visual images, to be seen in public, or, in so far as it consists of sounds, to be heard in public;

(c) broadcasting the film; (d) causing the film to be transmitted to subscribers to a diffusion service."

Subsections (b), (c) and (d) are not material for present purposes, so the question is whether or not, in the terms of the Copyright Act 1956, a magazine photograph may be a copy of a film.

The first step to take is to apply section 49(1) of the Act. That subsection reads:

"Except in so far as the context otherwise requires, any reference in this Act to the doing of an act in relation to a work or other subject-matter shall be taken to include a reference to the doing of that act in relation to a substantial part thereof, and any reference to a reproduction, adaptation or copy of a work, or a record embodying a sound recording, shall be taken to include a reference to a reproduction, adaptation or copy of a substantial part of the work, or a record embodying a substantial part of the sound recording, as the case may be."

I disregard a proviso to the subsection, which is not material. The effect of that subsection, with its reference to "the doing of an act in relation to a work or other subject-matter"—that is, a cinematograph film—is that copyright in a cinematograph film is infringed by making a copy of a substantial part of the film. Accordingly, if one copies one frame from the film, does one copy a substantial part? On commonsense grounds, one might suppose that a frame taken from a film and used extensively for publicity purposes might well be a substantial part of the film, but I do not think that the wording of section 13 allows for that conclusion. A copy of a single frame is not a copy of a substantial part of a film, in the light of the definitions of cinematograph film and copy in section 13(10).

Section 13(10) defines the term "cinematograph film" as meaning "any sequence of visual images recorded on material of any description (whether translucent or not) so as to be capable, by the use of that material, (a) of being shown as moving picture, or (b) of being recorded on other material (whether translucent or not), by the use of which it can be so shown." Thus a cinematograph film has three characteristics. It has a sequence of images, it is recorded on material, and it is capable of being shown as a moving picture. One then looks at the definition of "copy" in section 13(10). That definition reads, "copy, in relation to a cinematograph film, means any print, negative, tape or other article on which the film or part of it is recorded." The word "copy" in section 13(5)(a) therefore means an article on which the cinematograph film or part of it is recorded.

The definitions that I have mentioned convey to me the notion that a copy of part of the film is an article which itself has the three characteristics set out above. It follows that one does not make a copy of a substantial part of a cinematograph film by making a copy of a single frame from the film, because to make a copy of a part of the film one has to make an article which itself has the three characteristics. Of course, a magazine photograph has not these characteristics. It follows, in my judgment, that a magazine photograph cannot be a copy of a film or part of a film, at any rate within section 13. It comes, I think to this: that a copy of the film within section 13(5)(a) means a copy that is itself a film. Just as a film has a sequence of images capable of being shown as a moving picture, so a copy of the film must have a sequence of images capable of being so shown. My conclusion is, I think, in line

288

Meryvn Davies Q.C.    Spelling Goldberg Productions Inc. v.    [1981] R.P.C.
B.P.C. Publishing Ltd.

with section 13(9) of the Act and with the definition of "publication" in section 13(10).

Section 13(9) shows that a copy of a film is something with which a sound-track may be associated. If to make a photograph of a single frame is to make a copy of the film, then the definition of "publication" that I have mentioned would mean that the sale of a photograph of a single frame would constitute a publication of a film. I do not think that that can have been an intention of the Act. There is the further point that paragraphs (b), (c) and (d) of section 13(5) specify acts which can be done only in relation to a film as a sequence of images and not in relation to one frame from a film.

Mr. Davies ably submitted that to make a photograph of a frame is to make a copy of a film. He concentrated on the definition of "copy" in section 13(10). In relation to that word he said, as I understand it, that section 49(1) has no application. He pointed first to the opening words of section 49(1), which are "Except in so far as the context otherwise requires"; and, secondly, to the end words in section 49(1), which are "and any reference to a reproduction, adaptation or copy of a work, or a record embodying a sound recording, shall be taken to include a reference to a reproduction, adaptation or copy of a substantial part of the work, or a record embodying a substantial part of the sound recording, as the case may be".

A cinematograph film is not a work within the Copyright Act, nor is it a record. A film is the subject-matter of copyright by virtue of Part II of the Act. Accordingly it is argued that the part mentioned in the definition of "copy" in section 13(10) can be a part less than a substantial part and so may be a single frame. It follows that a reading of section 13(5)(a) need not be confined to the act of making a copy of the film or a substantial part. It extends to the making of any part. I do not see any difficulty in accepting the argument thus far, but in my view it does not get the plaintiffs home. I say that because section 13(5)(a) requires the plaintiffs to show that a part of the film has been made and what the defendants have made here is a photograph, not a part of a cinematograph film, a cinematograph film being an article having the three characteristics that I have referred to earlier.

Mr. Davies also submitted that a single frame from a film is a photograph and, as such, is an artistic work in which copyright subsists. This point seems not open on the pleadings. However that may be, the point does not seem to me to be good. No doubt a frame, cut from its reel, may in colloquial terms be spoken of as a "photograph," but in section 48(1) the word "photograph" is defined. The definition reads, " 'photograph' means any product of photography or of any process akin to photography, other than a part of a cinematograph film." It was argued that, despite the words "other than a part of a cinematograph film," a frame is a photograph. The reasoning was, as I understand, that if I should hold that the word "part" in the definition of copy in section 13(10) meant, by reference to section 49(1), a substantial part then consistently with that holding, the word "part" in that definition of photograph should be read as a substantial part. Thus, so the argument goes, it is open to regard an insubstantial part of a film, such as one frame, as being a photograph. I do not accept this argument. One reads the word "part," in reference to the word "part" in section 49(1). One does not read the word "part" into the doing of an act, see section 49(1). One reads the word "substantial" into the section 48 definition of "photograph," because that definition contains no

reference to the doing of an act. That is to say, one does not read section 49(1) with the section 48 definition of "photograph".

I appreciate that there is no reference to the doing of an act in section 13(10), but the word "part" there must, I think, be construed consistently with this meaning in section 13(5)(a). It follows that the plaintiffs' claim fails. It may be unsatisfactory that section 13 of the Copyright Act 1956 confers no copyright protection on a single frame from a cinematograph film, but that is how I construe the Act.

I have mentioned that the defendants relied upon section 18(2) of the Act to protect them from being liable for conversion damages. It is desirable that I say a few words on this subject. The relevant part of section 18(2) reads as follows:

"A plaintiff shall not be entitled by virtue of this section to any damages or to any other pecuniary remedy (except costs) if it is proved or admitted that, at the time of the conversion or detention in question . . . (b) where the articles converted or detained were infringing copies, the defendant believed, and had reasonable grounds for believing, that they were not infringing copies."

With this provision in mind, the defendants pleaded in paragraph 6 of their defence that if their magazine and poster photographs were infringing copies they, the defendants, believed and had reasonable grounds for believing that they were not infringing copies.

The term "infringing copy" is defined in section 18(3). For present purposes, we may say that an infringing copy, in relation to a cinematograph film, is a copy of the film being an article the making of which constituted an infringement of the copyright in the film. Thus, the defendants have the protection of section 18(2) if they prove that their photographs were not made in infringement of copyright and, further, that they had reasonable grounds for that belief.

The Starsky and Hutch series of films first appeared on B.B.C. television towards the end of 1975. The plaintiffs caused publicity material, including photographs, to be made available in England at the time of the launch of the series. Some of the publicity material is in the hands of the B.B.C. and as well in the hands of photographic agencies, including Syndication International Limited of London. The terms on which the B.B.C. and Syndication International received this material, directly or indirectly from the plaintiffs, does not appear, at any rate with any particularity. During 1976 the defendants decided to produce the Starsky and Hutch poster. Shortly afterwards, they decided to produce the Starsky and Hutch magazine. Accordingly, the defendants stood in need of some appropriate photographs.

At this time, a Mr. Snelgrove was employed by the defendants as a picture researcher. Mr. Snelgrove gave evidence before me. He dealt as well as he could with the steps he took in obtaining the material that the defendants eventually published. He explained that, since all his time was then taken up with looking for pictures required by his employers for various publications, he could not remember in any detail exactly what he had done or exactly what he was told when he obtained the Starsky and Hutch material. He obtained four photographs of four frames from the plaintiffs' films from Syndication International. These are the photographs on pp. 1, 21, 22–23 and 28–29 of the magazine. The photograph on pp. 28–29 is also the poster photograph. He obtained the other four photographs from the B.B.C. Those are the photographs at pp.6–7, pp. 24–25, p. 26 and p. 27.

Mervyn Davies Q.C.    Spelling Goldberg Productions Inc. v.    [1981] R.P.C.
B.P.C. Publishing Ltd.

Mr. Snelgrove first obtained the poster photograph complained of. He said that he probably visited Syndication International for that purpose and would have told them the use he intended for any photograph that he asked for, but at that time he may not have known the intended use. Normally, he said, he was looking for photographs for magazines. On the other hand, he said in cross-examination that he had not before sought photographs connected with a television series. He said that he could not remember what was said about the poster photograph, but that no one said anything about an editorial restriction. He was clear that, if anything had been said about that, he would have reported the matter to one of his colleagues or to the poster or magazine designer. He supposed that, paying the Syndication International fee, the defendants were free to use any photographs they obtained photographs, that is, those used in a magazine, at some time a little later than the date when he obtained the poster photograph. His clear impression was that the photographs obtained from Syndication International were free from embargo. He pointed out that there was nothing on the pictures, written or painted, to suggest any embargo.

Two Syndication International invoices, both dated 14 January 1977, in sums totalling £302·40 were produced. These specified the rights sold and show these words: "Our permission to reproduce relates only to our copyright and does not imply that any person seen in a photograph has consented to publication for advertising purposes". However, I do not think that those invoices can affect the matter, because, as I understand it, they were rendered too late to be said to communicate any restriction to the defendants.

The defendants' evidence in respect of the Syndication photographs was given by Mr. Ahrens and Mr. Crawford, who both worked for Syndication International. Mr. Ahrens said that he told Mr. Snelgrove that the material supplied to him was for editorial purposes only and that meant, he said, for use in a magazine and not in a poster. Mr. Crawford's view was that the defendants' 35p publication was not an editorial use. In the light of that evidence, it is difficult to see how the defendants can be deprived of the protection of section 18(2) in respect of the Syndication photographs published in the defendants' magazine. The defendants were justified in supposing that Syndication International were authorised to license the use of the photographs. Syndication itself says that they authorised an editorial use and, further, that the magazine use made was an authorised use. For myself, looking at the magazine and the folded poster side by side, I do not see how the defendants could be expected to distinguish between the use made in their magazine and the use made in their poster. On that basis, I am satisfied that the defendants believed, and had reasonable grounds for believing, that they were entitled to make the use they did of the Syndication photographs. Accordingly, the defendants believed, and had reasonable grounds for believing, that the photographs they printed from material supplied by Syndication were not infringing copies. Thus, had the plaintiffs succeeded in their infringement claim, I would have held that the defendants were not entitled to damages in respect of the conversion of the photographs obtained from Syndication.

That leaves the B.B.C. photographs. Unlike the Syndication photographs, these were supplied free of charge. The B.B.C. invoice dated 13 January 1977 that was

[No. 18]    Chancery Division    Mervyn Davies Q.C.

produced relates to duplicating work which Mr. Snelgrove requested. Mr. Snelgrove went to the B.B.C. in September 1976 and there was a second visit in November. On his first visit he saw Miss Elizabeth Rezler, who worked in the B.B.C. Photograph Library. He does not remember who he saw on his second visit. At any rate, he was shown some Starsky and Hutch photographs. He remembers nothing being said about any embargo on the use of the photographs. His assumption was that the photographs were publicity photographs that could be put to any use, unless it was otherwise stated. Nevertheless, in cross-examination he said that he was told that some of the photographs were copyright to the plaintiffs. He selected some photographs and asked whether he could get better prints. He telephoned the plaintiffs in America to request better prints, but his request was not attended to.

Miss Rezler said in evidence that the B.B.C. had received some publicity material, including the photographs, for use in the Starsky and Hutch series. The material was received indirectly from the plaintiffs by way of an American company called Metro Media. That material was received on the understanding that it was to be used only for publicity in connection with the Starsky and Hutch programme. Use beyond that purpose would, said Miss Rezler, make Metro Media very cross. It is from this material that Mr. Snelgrove was supplied. Miss Rezler said that Mr. Snelgrove did not say what use he had in mind for the photographs, but she told him that if the photographs were to be used otherwise than for publicising the television series, then it had to be borne in mind that the photographs were copyright to the plaintiffs.

Both Miss Rezler and Mr. Snelgrove were excellent witnesses. My conclusion is that Miss Rezler did indeed remark on a copyright difficulty, should the photographs be used otherwise than to publicise the Starsky and Hutch television series. Mr. Snelgrove must have forgotten or not taken in this remark. If that be so, then I do not see how the defendants can rely on section 18(2) in respect of the conversion alleged as to the photographs obtained from the B.B.C. I think that this result accords with what one would expect. The defendants paid over £300 for the Syndication photographs. For that sum, they were permitted to use them for editorial purposes and it was for this purpose that, in my view, they did use them. On the other hand, the defendants obtained the B.B.C. photographs free of charge. They must have known that the photographs were in the B.B.C.'s hands for the purpose of publicising the series. If that be so, then they ought, in my view, to have confirmed with the B.B.C. that they were free to exploit the photographs for their own profit. This they did not do.

I must add that the defendants did not deliberately make any unauthorised use of the B.B.C. photographs. The defendants are a reputable company, and Mr. Nugus, one of their chief executives, explained that the defendants would not wish, nor would it be worth their while, to try to avoid paying what they ought to pay. However that may be, as concerns the B.B.C. photographs, the facts do not seem to me to justify the defendants calling on section 18(2) of the Copyright Act 1956, if it should hereafter be held that the defendants have infringed the copyright of the plaintiffs' cinematograph film. Accordingly, the action is dismissed.

On appeal, William Aldous Q.C., Hugh Laddie, and Jeremy Davies, instructed by Lee Lane-Smith of Manchester, appeared for the plaintiffs. The defendants were represented as before.

Buckley L.J.—This is an appeal by the plaintiffs in the action, Aaron Spelling Productions Incorporated and Leonard Goldberg Productions Incorporated, who carry on business in partnership under the trading name of Spelling Goldberg Productions in the United States of America. The learned judge dismissed their action, which is an action for infringement of copyright, and they appeal from that dismissal.

The facts of the case are not in dispute. The plaintiffs were the makers and producers of a series of films intended for television broadcasting and well known under the designation of Starsky and Hutch, relating to the adventures of a pair of American policemen. The United Kingdom copyright in those films is vested in the plaintiffs. The defendants are publishers, carrying on business in this country under the name of Phoebus Publishing Company. In 1976 the defendants published in a magazine a number of photographs deriving from the films. They also published a pin-up poster, suitable for displaying on the wall of a living room, a school room or anywhere else where it was thought that it would be decorative, which also consisted of a photograph derived from one of the films. Those photographs were all made from frames comprised in one or other of the films that make up the series. The defendants, in doing what they did, acted without any authority or permission from the plaintiffs, and the question we have to consider is whether in these circumstances what they did amounted to an infringement of the plaintiffs' copyright in the films.

By their statement of claim the plaintiffs alleged that they were the owners of the copyright in each of the films, and in photographs taken and made by persons in the employment of the plaintiffs or in photographs of characters in the films. By paragraph 6 of their statement of claim they alleged that in publishing certain of the photographs contained in the magazine and the poster which I have mentioned, the defendants had infringed the plaintiffs' copyright. Various particulars were given under that statement of claim; I do not think I need refer to them in any detail, but they particularised, as the sources from which the photographs which were published by the defendants were made, frames derived from the films, and at a very late stage the plaintiffs sought to introduce also a reference to I think three still photographs not forming part of the physical reels of the films. The learned judge thought that that application was made at too late a stage and he disallowed it, but in any event, so far as I can understand, nothing of substance turns upon that because it is common ground that all the pictures that appeared in the magazine, and the picture upon the poster, were pictures that derived from frames comprised in the films. I do not really think there is anything further connected with the facts that I need mention at this stage.

Before the commencement of the Copyright Act 1956, which came into force on 1 June 1957, copyright in films, as well as copyright in other copyright material, was governed by the Copyright Act 1911, under which the only copyright subsisting in a cinematograph film was a copyright in every individual frame on that film as a distinct photograph. When the Act of 1956 was enacted, the legislature departed from that concept of a cinematograph film, and that Act contains a section, section 13, which deals expressly with copyright in cinematograph films. The Act is divided into a number of Parts, Part I of which deals with copyright in what are called "original works"; that is to say, literary, dramatic, musical and artistic works, all of which are the product of the brain and imagination of some author who has invented the work. Part II deals with copyright in sound recordings, cinematograph

films, broadcasts and sundry other matters, and sets up copyrights in respect of those various heads which I think can all be said to be copyrights in respect of works based upon something which has been produced by some author, but the work which is copyright is the product of the application of some special technique, skill and knowledge to produce a version of the original author's script, score or whatever it may be, and recorded in a form which enables it to be reproduced visually, or audibly, or in the form of an edition of some work for the benefit of the public.

It is into Part II that section 13 falls. Section 13(1) and (2) provides as follows:

"(1) Copyright shall subsist, subject to the provisions of this Act, in every cinematograph film of which the maker was a qualified person for the whole or a substantial part of the period during which the film was made.

(2) Without prejudice to the preceding subsection, copyright shall subsist, subject to the provisions of this Act, in every cinematograph film which has been published, if the first publication of the film took place in the United Kingdom or in another country to which this section extends."

As I say, it is common ground that copyright subsists in this country in the Starsky and Hutch films, and is vested in the plaintiffs.

The acts which are restricted by the copyright in respect of a cinematograph film are to be found set out in subsection (5) of section 13, which provides as follows:

"The acts restricted by the copyright in a cinematograph film are—

(a) making a copy of the film;

(b) causing the film, in so far as it consists of visual images, to be seen in public, or, in so far as it consists of sounds, to be heard in public;

(c) broadcasting the film;

(d) causing the film to be transmitted to subscribers to a diffusion service."

Subsection (10) of that section contains definitions which are of some importance in the present case. "Cinematograph film" is defined as meaning "any sequence of visual images recorded on material of any description (whether translucent or not) so as to be capable, by the use of that material, (a) of being shown as a moving picture, or (b) of being recorded on other material (whether translucent or not), by the use of which it can be so shown". "Copy" is defined as meaning, in relation to a cinematograph film, "any print, negative, tape or other article on which the film or part of it is recorded".

The Act contains transitional provisions to deal with the position in regard to copyright in cinematograph films existing before the commencement of the Act of 1956. Those transitional provisions are to be found in the 7th Schedule, paragraphs 14 and 16; paragraph 14 provides that this section 13 shall not apply to cinematograph films made before the commencement of that section, so that nothing I have referred to in section 13 applies to a film which was made before 1 June 1957; paragraph 16 provides:

"The provisions of this Act shall have effect in relation to photographs forming part of a cinematograph film made before the commencement of section thirteen as those provisions have effect in relation to photographs not forming part of a cinematograph film."

In connection with that it is necessary to look at the definition of "photograph", which is contained in section 48(1), which defines a photograph as meaning "any product of photography or of any process akin to photography, other than a part of a cinematograph film . . .". So for the purposes of the 1956 Act, not part of a cinematograph film is a photograph, but under the transitional provisions the Act takes effect in relation to films made before the commencement of the Act as if the parts of the film were photographs not forming part of a cinematograph film, and therefore photographs falling within the definition of a "photograph". The object of the transitional provisions seems clearly to have been to preserve the pre-1957 situation intact as regards copyright in all the photographs comprised in any cinematograph film made before the commencement of the 1956 Act.

The learned judge took the view that in the definition of "copy" contained in section 13(10), what is there referred to as "part of it"—that is to say, part of the film—must be something having the same characteristics as the cinematograph film itself. He said:

". . . a cinematograph film has three characteristics. It has a sequence of images, it is recorded on material, and it is capable of being shown as a moving picture. One then looks at the definition of 'copy' in section 13(10). That definition reads, ' "Copy", in relation to a cinematograph film, means any print, negative, tape or other article on which the film or part of it is recorded'. The word 'copy' in section 13(5)(a) therefore means an article on which the cinematograph film or part of it is recorded."

Then comes what I think is the crucial passage in the judgment:

"The definitions that I have mentioned convey to me the notion that a copy of part of the film is an article which itself has the three characteristics set out above. It follows that one does not make a copy of a substantial part of a cinematograph film by making a copy of a single frame from the film, because to make a copy of a part of the film one has to make an article which itself has the three characteristics."

Passing over the reference there to a "substantial part", which does not appear to me to have any relevance to this particular part of the argument, what the learned judge is saying is that a part of a cinematograph film for the purposes of the definition of "copy" contained in section 13(10) must be itself something which has the characteristics of being a cinematograph film.

The learned judge returned to this same concept further on in his judgment, where he says:

"A film is the subject-matter of copyright by virtue of Part II of the Act. Accordingly it is argued that the part mentioned in the definition of 'copy' in section 13(10) can be a part less than a substantial part and so may be a single frame. It follows that a reading of section 13(5)(a) need not be confined to the

act of making a copy of the film or a substantial part. It extends to the making of any part. I do not see any difficulty in accepting the argument thus far, but in my view it does not get the plaintiffs home. I say that because section 13(5)(a) requires the plaintiffs to show that a part of the film has been made and what the defendants have made here is a photograph, not a part of a cinematograph film, a cinematograph film being an article having the three characteristics that I have referred to earlier."

So the learned judge really hinged his decision upon that interpretation of the definition of "copy" in section 13(10).

The appellants, on the other hand, say that that is a mistaken construction of the definition; that the definition should be read in accordance with its terms and that what the defendants did was to make a print of several parts of the films, each photograph being taken from and being a part of one of the films. They say that the act of making a copy of a film extends to making any print, negative, tape or other article on which a part of a film is recorded. Mr. Aldous says that that is precisely what the defendants have done in the present cases.

Before leaving the provisions of the Act, I should make reference to section 49(1), which is in these terms:

"Except in so far as the context otherwise requires, any reference in this Act to the doing of an act in relation to a work or other subject-matter shall be taken to include a reference to the doing of that act in relation to a substantial part thereof . . ."

I shall refer to that in a minute as the first part of the subsection. I read on:

". . . and any reference to a reproduction, adaptation or copy of a work or a record embodying a sound recording, shall be taken to include a reference to a reproduction, adaptation or copy of a substantial part of the work, or a record embodying a substantial part of the sound recording, as the case may be."

I do not think I need read the proviso.

The first part of the subsection refers to what are called "works" and to other subject-matter. It is common ground between counsel that the types of copyright which are dealt with in Part I of the Act are copyrights in what are called "works", and that the copyright in the subject-matters dealt with in Part II of the Act is not copyright in "works" within the meaning of the Act, but copyright in other subject-matter. The second part of the subsection, starting with the words "and any reference to a reproduction" refers to "works" but makes no reference to other subject-matter (other than sound recordings) and Mr. Mummery concedes that the second part of the subsection does not apply to cinematograph films.

Some of the argument has turned upon reading section 49(1), the first part, with the definition of "copy" contained in section 13(10) and with the terms of section 13(5)(a). Mr. Aldous has submitted that the definition of the word "copy" contains a context which does "otherwise require" for the purposes of section 49(1), because there is a reference to a part of the film, without any express provision that that part must be a substantial part, and he says that such effect must be given to the

Court of Appeal                                   Buckley L.J.

[No. 18]

matter of giving the language its ordinary sense as distinct from any special sense that can be derived from close analysis of the provisions of the Act, I reach the conclusion that a single frame from a film is a part of that film within the meaning of the definition of "copy".

Mr. Mummery agreed that a copy of a single frame is a copy of part of the film in the ordinary sense of language, or at any rate is a copy of part of the film, regarding the film as a physical entity. But he said that it was not a copy of part of the film for the purposes of the definition of "copy" because it did not have the character of being a film or part of a film; it could not be shown as a moving picture. He said that one frame is not a sequence of visual images; it is therefore not a record of any such sequence and is not within the contemplation of section 13(10) at all. I do not feel able to accept that view of the matter. It seems to me that upon the true interpretation of the language a single frame, which is what the defendants did in this case, and by making a print from a single frame, which is what the intendment of section 13 of the Act. For those reasons I do not agree with the decision of the learned judge.

There is one other aspect of the case to which I should make reference. Section 18 of the Act confers upon the owners of copyright the right to damages as for conversion or detinue in respect of infringing copies. Section 18(1) provides:

"Subject to the provisions of this Act, the owner of any copyright shall be entitled to all such rights and remedies, in respect of the conversion or detention by any person of any infringing copy, or of any plate used or intended to be used for making infringing copies, as he would be entitled to if he were the owner of every such copy or plate and had been the owner thereof since the time when it was made."

Subsection (2) provides:

"A plaintiff shall not be entitled by virtue of this section to any damages or to any other pecuniary remedy (except costs) if it is proved or admitted that, at the time of the conversion or detention in question,—(a) the defendant was not aware, and had no reasonable grounds for suspecting, that copyright subsisted in the work or other subject-matter to which the action relates, or (b) where the articles converted or detained were infringing copies, the defendant believed, and had reasonable grounds for believing, that they were not infringing copies . . . ."

Subsection (3) contains a definition of "infringing copy" which I do not think I need read, but it is of course of significance in putting into operation the provisions of the two preceding subsections.

In the present case the learned judge found that the photographs with which we are concerned came, some of them from a concern which I shall call "Syndication" and some from the British Broadcasting Corporation. So far as the material which came from Syndication is concerned, the learned judge found as a fact that the defendants believed, and had reasonable grounds for believing, that they were entitled to make the use they did of the Syndication photographs; that is to say, that they were entitled to the protection afforded by subsection 2(b) of section 18, and there is no appeal against that finding.

---

Buckley L.J.            Spelling Goldberg Productions Inc: v.            [1981] R.P.C.
                       B.P.C. Publishing Ltd.

terms of the definition overriding the general provision contained in the first part of section 49(1), which is expressed to take effect "except in so far as the context otherwise requires"; he says that here is a context which otherwise requires, because if the legislature had meant in section 13(10) to refer to a substantial part of the film, the legislature would have said so.

In the outcome it does not really appear to me to make very much difference whether one eliminates section 49(1) on the ground that here there is a context which "otherwise requires", or whether one reads section 13(5)(a) in conjunction restricted by the copyright in a cinematograph film are the making of a copy of the film or other article on which that film or a substantial part of it; that is to say, making any print, negative, tape substantial part, is recorded; or indeed, if one reads the words "substantial part thereof" into the definition clause itself, so that the definition clause provides that in relation to a cinematograph film "copy" means any print, negative, tape or other article on which the film or part of it is recorded, or any substantial part of the film, or of that part of the film, is recorded.

Mr. Mummery has of course supported the learned judge's reasoning and contends that a part of a film within the meaning of the definition must be something which has the characteristics of a film; that is to say, it must consist of a sequence of visual images recorded in some way which makes it possible to show it as a be shown as a moving picture. If one construes the words "or part of it" in that sense, it seems to me that the part of it must itself constitute a cinematograph film within the definition of "cinematograph film", because that definition relates to any sequence of visual images recorded in such a way as to be capable of being shown as a moving picture, and every part of a complete film which is itself of sufficient duration to amount to a showing as a moving picture must itself answer to the definition of a cinematograph film. For instance, if one were to take a complete film lasting perhaps an hour and a half and were to cut out ten minutes of it, that ten minute excerpt would in my judgment undoubtedly constitute a cinematograph film within the definition contained in section 13(10). If from that ten minutes one were then to cut out one minute, that one minute would still constitute a cinematograph film within the definition; and if from that one minute one were to cut out ten seconds, that ten seconds would still constitute a sequence of visual images recorded in a manner capable of being shown as a moving picture. It would only be when you reduce the thing so far that you could not properly say that it was capable of being shown as a moving picture that what you are considering would cease to be a cinematograph film, and if the part which is referred to in the definition of "copy" is to be something less than a cinematograph film, then it must be something less than what can be shown as a moving picture, and in that way it is not surprising that one comes down to a single frame from the cinematograph film as being a part of the film.

Indeed, as a matter of ordinary use of language I should have thought it was very difficult indeed to say that a single frame taken out of, or selected from, the frames contained in a cinematograph film was not itself part of that film. This view of the matter does not seem to me to be surprising when one remembers that until 1957 every single frame in a film constituted an individual photograph for copyright purposes, and as a matter of construction of the language, as well as a

With regard to the photographs which came from the British Broadcasting Corporation, he found as a fact that the defendants, through their representative who dealt with the Corporation, a Mr. Snelgrove, had been told that there was a copyright difficulty about those photographs if they were going to be used otherwise than to publicise the Starsky and Hutch television series. The publications made by the defendants were not made for the purpose of publicising the television series. The learned judge said, at page 16 of the transcript: "They (the defendants) must have known that the photographs were in the B.B.C.'s hands for the purpose of publicising the series. If that be so, then they ought, in my view, to have confirmed with the B.B.C. that they were free to exploit the photographs for their own profit. This they did not do". The learned judge then said this: "I must add that the defendants did not deliberately make any unauthorised use of the B.B.C. photographs"—and then he said that they were a reputable body and that they did not intend to do anything improper, and he went on: "However that may be, as concerns the B.B.C. photographs, the facts do not seem to me to justify the defendants calling on Section 18(2) of the Copyright Act 1956, if it should hereafter be held that the defendants have infringed the copyright of the plaintiffs' cinematograph film".

As I understand the learned judge's judgment, he was saying that although he thought that the defendants did believe that they were free to do what they did with regard to the photographs, they had not reasonable grounds for so believing, and so could not avail themselves, in respect of those photographs, of the protection of section 18(2). Mr. Mummery has made some criticism of that part of the learned judge's judgment, but on the findings which he made it seems to me to be inescapable that in regard to the B.B.C. photographs the defendants are liable for damages under section 18 and are not entitled to any protection under section 18(2).

For those reasons I would allow this appeal.

**Templeman L.J.**—I agree.

The question we have to decide is whether the copyright in a film is infringed by the unauthorised copying of a single frame. By the light of nature a single frame must either be a photograph or a part of a cinematograph film, or both. Since both photographs and cinematograph films are expressly protected by the Copyright Act 1956, the answer to the question should be a resounding single or double affirmative.

Under the Copyright Act 1911, a cinematograph film and a single frame were both "photographs" and were protected as such. The Copyright Act 1956 introduced a new form of copyright applicable to cinematograph films. Thus Section 13(1), shorn for the moment of unnecessary embellishments, roundly declares that copyright shall subsist in every cinematograph film.

By the 1956 Act also, a frame ceased to be a photograph. Thus section 48(1) defined a photograph as meaning any product of photography other than a part of a cinematograph film.

That change in the nature of a frame from "photograph" to "part of a cinematograph film" is recognised also by paragraphs 14 and 16 of the 7th Schedule to the Act. Paragraph 14 provided that section 13, which I have outlined, should

not apply to cinematograph films made before the commencement of that section; and paragraph 16 provided that the provisions of the Act should have effect in relation to photographs forming part of a cinematograph film made before the commencement of section 13 as those provisions have effect in relation to photographs not forming part of a cinematograph film. Those provisions state that a frame is a photograph if made before the Act comes into force, and to my mind imply also that a photograph made after the Act came into force out of a film made after the Act came into force is not a photograph because it is part of a film.

With that introduction I can turn back to section 13 which, as I have said, vested copyright in every cinematograph film. Subsection (5) defines the limits of the copyright, and provides inter alia that the acts restricted by the copyright in a cinematograph film are making a copy of the film. To find out what a "film" is one turns to subsection (10) of the same section, which defines "cinematograph film" as meaning "any sequence of visual images recorded on material of any description . . . so as to be capable . . . of being shown as a moving picture . . .".

The Act also defines a "copy", subsection (10) of section 13 provides that a copy, in relation to a cinematograph film, means any print, negative, tape or other article on which the film or part of it is recorded. In the present case the defendants made a print of a frame which was part of a cinematograph film; they therefore made a copy of the film within section 13(5).

Mr. Mummery, who argued strenuously to the contrary, relied really on two points. First of all, he said that to be a part of a cinematograph film there must be something which is capable of being shown as a moving picture, and as that does not apply to a frame, a frame is not caught by section 13 at all. For the reasons given by Buckley L.J. that seems to me to be wrong as an analysis of the definitions in the Act, and it also seems to me to be wrong when applying the definition of the word "copy" which applies to a part of a film. A film is made up of a number of parts, each of which constitutes a frame.

Mr. Mummery's second submission depended on section 49(1), which Buckley L.J. has read, and which in relation to the doing of an act, or in relation to a copy of a work other than a cinematograph film, does set out that references to "a part" shall mean references to a substantial part.

In the first place it seems to me that that subsection was drawn so as not to catch up the provisions of section 13(10) which refer, in my view deliberately, to a copy incorporating a part of a film without specifying that it shall be a substantial part; and in the second place, so far as section 49(1) applies at all, it seems to me that it can apply with perfect sense, as Buckley L.J. has indicated, to a part of a frame; if it is only a part of a frame which is to be reproduced, then it may be that one has to see whether what is reproduced is a substantial part of that frame and therefore comes within the infringement context.

So for these reasons, together with the reasons given by Buckley L.J., with which I entirely agree, I would allow the appeal, and also for the reasons that he has given I would dismiss the cross-appeal, which referred to section 18(2).

300

Donaldson L.J.    *Spelling Goldberg Productions Inc. v.*    [1981] R.P.C.
*B.P.C. Publishing Ltd.*

**Donaldson L.J.**—I also agree.

Under the 1911 Act there was no copyright in a cinematograph film as such; the copyright was in the individual photographs which, when arranged in sequence, constituted a film; but it is quite clear from the transitional provisions contained in paragraphs 14 and 16 of the 7th Schedule to the 1956 Act, that a different approach has now been adopted.

Under the 1956 Act, photographs forming part of a cinematograph film are not photographs for the purposes of that Act: see the definition of "photograph" in section 48(1).

It follows that the copyright, if any, in photographs made from single frames is to be found in section 13 of the Act and not elsewhere.

The learned judge held, in my view correctly, that a cinematograph film had three essential characteristics. They were: (1) A sequence of images; (2) recorded on material; (3) capable of being shown as a moving picture. As the conduct restricted by section 13(5)(a) consists of making a copy of a film, the learned judge held that any infringing article must have the same characteristics.

In this I think, with great respect to him, that he erred. Section 13(5)(a) comprises six words, two of which are defined. The relevant restrictive acts can therefore be rewritten as "making any print, negative, tape or other article on which is recorded the whole or part of the sequence of visual images, which in a recorded form constituted a cinematograph film which was the subject of copyright under the Act".

It is the unique feature of a cinematograph film that it is composed of a multitude of parts none of which by itself is capable of being shown as a moving picture. For my part I can see no reason why the copyright restrictions should apply only to such number of those parts as constitute a sequence, and when viewed in sequence are capable of being shown. Indeed, as Buckley L.J. pointed out in argument, any sequence of frames which is capable of being shown as a moving picture is itself a cinematograph film and not part of such a film.

But Mr. Mummery has a further argument. May I say in parenthesis that he has argued this appeal with a skill and attractiveness which is so rare that at times I have wondered whether it was not copyright! He submits that if the appellants' argument is accepted, the restriction under section 13(5)(a) is unique, in that in all other cases copyright extends only to the work or other subject-matter, and to a substantial part of that work or subject-matter: see section 49(1). In his submission a single frame is not a substantial part of the film.

Having from time to time been inflicted with action replays on television, I am not entirely satisfied that that is always the case, but I would assume, for the purposes of this appeal, that that is right.

Nevertheless, I think there are three answers to this point. The first is that a cinematograph film is, as I have said, a unique subject for copyright, and it is therefore not particularly surprising if, as I think is the case, it has received unique treatment.

---

301

[No. 18]    Court of Appeal    Donaldson L.J.

The second is that section 49(1) does not apply if the context otherwise requires, and I am inclined to think that that is the position in relation to section 13(5)(a).

The third is that if section 49(1) does apply, it has the effect that section 13(5)(a) writ large reads "Making a copy of a film or a copy of any substantial part of a film". Writ even larger, this then reads: "Making any print, negative, tape or other article on which is recorded the whole or part of a sequence of visual images which in a recorded form constitute a cinematograph film or a substantial part of a cinematograph film". If, as I think is the case, a single frame can be part of a cinematograph film—that is to say, part of the whole of the cinematograph film—still more can it be part of a substantial part of such a film.

I am therefore satisfied that a single frame is protected by copyright under section 13.

The respondents have filed a notice complaining of the failure of the learned judge to make findings of fact which would bring them within paragraph (b) of section 18(2), and thus entitle them to the limited protection afforded by that subsection. On the evidence accepted by the learned judge, I do not think the respondents have any grounds for complaint at all. They did not of course deliberately breach the plaintiffs' copyright, but earlier on they had known that there were copyright problems and they had simply forgotten. If a person once knows that a copy would, or might be, an infringing copy, mere forgetfulness, however genuine, can never in my judgment of itself put him in a position in which he has reasonable grounds for believing that the copy is not an infringing copy.

I too would therefore allow the appeal; I do so with all the greater enthusiasm, because the proposition that there is no copyright in enlargements from individual frames of a cinematograph film seems to me to be wholly contrary to commonsense and, despite a widespread popular belief to the contrary, the law does not usually cont

*Appeal dismissed. Defendants to pay plaintiffs' costs of the appeal and their costs below, save in so far as increased by the plaintiffs' pleas of passing off and of conversion in relation to the Syndication photographs. Leave to appeal to the House of Lords was not applied for.*

Printed in Scotland by Her Majesty's Stationery Office at HMSO Press, Edinburgh
Dd 825254A/V791 (1/7061)